IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE ABBOTT LABORATORIES NORVIR ANTI-TRUST LITIGATION

No. C 04-1511 CW

ORDER GRANTING IN PART ABBOTT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFFS' CROSS-MOTION FOR SUMMARY ADJUDICATION OF PATENT INVALIDITY

/

Defendant Abbott Laboratories moves for summary judgment on all of the claims against it. Plaintiffs John Doe and Service Employees International Union Health and Welfare Fund oppose Abbott's motion and cross move for summary adjudication that Abbott's patents do not provide a defense to antitrust liability. The matter was heard on May 1, 2008. Having considered oral argument and all of the papers submitted by the parties, the Court grants Abbott's motion for summary judgment in part and grants Plaintiffs' motion for summary adjudication.

BACKGROUND

Protease inhibitors (PIs) are considered the most potent class of drugs to combat the HIV virus. In 1996, Abbott introduced

1  Norvir as a stand-alone PI with a daily recommended dose of 1,200
2  milligrams (twelve 100-mg capsules a day), priced at approximately
3  eighteen dollars per day.  Norvir is the brand name for a patented
4  compound called ritonavir.

5      After Norvir's release, it was discovered that, when used in
6  small quantities with another PI, Norvir would "boost" the anti-
7  viral properties of that PI.  Not only did a small dose of Norvir
8  -- about 100 to 400 milligrams per day -- make other PIs more
9  effective and decrease the side effects associated with high doses,
10 but it also slowed the rate at which HIV developed resistance to
11 the effects of those PIs.  The use of Norvir as a "booster" has
12 enabled HIV patients to live longer.  But the use of Norvir as a
13 booster, and not a stand-alone PI, has also meant that the average
14 daily price of Norvir has plummeted since Norvir was first
15 introduced, because patients need a much smaller daily dose of
16 Norvir when it is used as a booster compared to when it is used as
17 a stand-alone PI.  By 2003, the average price for a daily dose of
18 Norvir was $1.71.

19     In 2000, Abbott introduced Kaletra, a single pill containing
20 the PI lopinavir as well as ritonavir, which is used to boost the
21 effects of lopinavir.  Although effective and widely used, Kaletra
22 causes some patients to experience significant side effects.

23     In 2003, two new PIs, Bristol-Myers Squibb's Reyataz and
24 GlaxoSmithKline's Lexiva, were about to be introduced to the
25 market.  Studies showed that, when boosted with Norvir, the new PIs
26 were as effective as Kaletra, and were more convenient.  In July,
27 2003, Reyataz was successfully introduced to the market.  As a
28 result, Kaletra's market share fell more than Abbott had

anticipated. The average daily dose of Norvir also fell. Before Reyataz's release, the most common boosting dose of Norvir ranged from 200 milligrams to 400 milligrams a day. Clinical trials, however, showed that a Norvir dose of only 100 milligrams a day effectively boosted Reyataz.

On December 3, 2003, Abbott raised the wholesale price of Norvir by 400 percent while keeping the price of Kaletra constant. Abbott contends that it did this so that the price of Norvir would be more in line with the drug's enormous clinical value. Plaintiffs contend that the Norvir price increase was an illegal attempt to achieve an anti-competitive purpose in the "boosted market," which Plaintiffs define as the market for those PIs, such as Reyataz, Lexiva and Kaletra, that are prescribed for use with Norvir as a booster. Plaintiffs sued for, among other things, monopolization and attempted monopolization in violation of the Sherman Act, 15 U.S.C. § 2.

## LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if it is supported by affidavits or other evidentiary material. Celotex, 477 U.S. at 324; Eisenberg,

3

1  815 F.2d at 1289.  The court must draw all reasonable inferences in
2  favor of the party against whom summary judgment is sought.
3  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,
4  587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d
5  1551, 1558 (9th Cir. 1991).

6  Material facts which would preclude entry of summary judgment
7  are those which, under applicable substantive law, may affect the
8  outcome of the case.  The substantive law will identify which facts
9  are material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248
10 (1986).

11 Where the moving party does not bear the burden of proof on an
12 issue at trial, the moving party may discharge its burden of
13 production by either of two methods:

> The moving party may produce evidence negating an
> essential element of the nonmoving party's case, or,
> after suitable discovery, the moving party may show that
> the nonmoving party does not have enough evidence of an
> essential element of its claim or defense to carry its
> ultimate burden of persuasion at trial.

<u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d
1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an
absence of evidence to support an essential element of a claim or
defense, it is not required to produce evidence showing the absence
of a material fact on such issues, or to support its motion with
evidence negating the non-moving party's claim.  <u>Id.</u>; <u>see also</u>
<u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 885 (1990); <u>Bhan v.</u>
<u>NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991).  If the
moving party shows an absence of evidence to support the non-moving
party's case, the burden then shifts to the non-moving party to

produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. Nissan, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. Id. This is true even though the non-moving party bears the ultimate burden of persuasion at trial. Id. at 1107.

Where the moving party bears the burden of proof on an issue at trial, it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a prima facie showing in support of its position on that issue. UA Local 343 v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1994). That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. Id. Once it has done so, the non-moving party must set forth specific facts controverting the moving party's prima facie case. UA Local 343, 48 F.3d at 1471. The non-moving party's "burden of contradicting [the moving party's] evidence is not negligible." Id. This standard does not change merely because resolution of the relevant issue is "highly fact specific." Id.

DISCUSSION

I.  Sherman Act Claims

A monopolization claim under section 2 of the Sherman Act requires a plaintiff to prove "(1) possession of monopoly power in the relevant market, (2) willful acquisition or maintenance of that power, and (3) causal 'antitrust injury.'"  Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729, 736 (9th Cir. 1987).  An attempted monopolization claim requires "(1) specific intent to control prices or destroy competition in the relevant market, (2) predatory or anti-competitive conduct directed to accomplishing the unlawful purpose, and (3) a dangerous probability of success."  Id.  As the Ninth Circuit has noted, the requirements of both claims are similar, "differing primarily in the requisite intent and the necessary level of monopoly power."  Image Technical Servs., Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1202 (9th Cir. 1997).  Abbott argues that Plaintiffs have failed to make a showing that there is a triable issue of fact with respect to any of the elements of a Sherman Act claim.

A.  Antitrust Injury

Abbott argues that Plaintiffs have failed to show that they have suffered an antitrust injury.  The Court has rejected this argument in at least two previous orders.  In ruling on Abbott's motion to dismiss, the Court found that, because Plaintiffs have been forced into a "Hobson's choice" of either "paying more for competing boosted regimens versus paying less for Defendant's Kaletra while accepting the drug's harmful side effects," Plaintiffs have stated an antitrust injury similar to the one identified by the Supreme Court in Blue Shield of Virginia v.

1 McCready, 457 U.S. 465 (1982).  Docket No. 63 at 8-9.  In the
2 Court's order denying Abbott's previous motion for summary
3 judgment, it found that Plaintiffs' expert's finding that
4 "Defendant's price increase harms HIV patients by creating another
5 barrier to entry that hinders the introduction of new PIs from
6 Defendant's competitors" also created a dispute of fact as to
7 whether Plaintiffs have suffered an antitrust injury.  Docket No.
8 256 at 12.

9     Abbott argues that, since the Court's previous rulings on the
10 matter, Plaintiffs' expert has admitted that there is no
11 evidentiary support for his assertion that potential competitors
12 may have been excluded from the market.  Specifically, Plaintiff's
13 expert stated in his rebuttal report, "I do not think it is
14 possible to prove that innovation would actually fall due to the
15 price increase, and I did not pretend to offer any such proof."
16 Hurst Dec. (Docket No. 440) Ex. I ¶ 103.

17     Abbott is incorrect in suggesting that Plaintiffs must offer
18 direct proof that competitors have actually been excluded from the
19 market.  Doing so would be extremely difficult, if not impossible.
20 A jury could infer from the disparity between the price of
21 ritonavir when it is sold as a component of Kaletra and when it is
22 sold independently as Norvir that Abbott has hindered competition
23 in the boosted market.  This would injure consumers in that market.
24     In addition, there is no basis for revisiting the Court's
25 decision that the Hobson's choice consumers face could itself
26 constitute an antitrust injury.  Abbott is incorrect in suggesting
27 that Plaintiffs must come forward with a patient who wanted to
28 purchase a drug that competes with Kaletra but could not afford to

do so. It is the "penalty" consumers pay, in the form of a disparately high price for Norvir when they choose to use one of the competing drugs, that gives rise to the injury. Cf. McCready, 457 U.S. 465 (where health plan reimbursed its members for psychotherapy treatment administered by psychiatrists but not psychologists, member who chose to forgo reimbursement and receive treatment from psychologist had suffered antitrust injury). And although Abbott maintains that requiring patients to pay a high price for a patented drug can never be an antitrust injury, the price of Norvir cannot be considered in a vacuum. It is the comparatively high price of Norvir in relation to the low price of Kaletra that is the crux of Abbott's alleged anticompetitive conduct.

B. Monopoly Power

Abbott argues that Plaintiffs have not come forward with evidence showing that it has monopoly power over the boosted market. Such evidence can be either direct or circumstantial.

1. Direct Evidence

In the Court's previous order denying Abbott's motion for summary judgment, it found that Plaintiffs had presented direct evidence that Abbott's price increase had a significant impact on the boosted market. Specifically, the Court stated:

> One of Defendant's competitors in the boosted market, GlaxoSmithKline, the maker of Lexiva, believed that Lexiva's failure to meet forecasted expectations was due, in part, to the Norvir price hike. Professor Douglas F. Greer, Plaintiffs' expert, notes that, in the absence of the price hike, Defendant anticipated that Kaletra's market share would decline by ten percent in 2004. But, according to Professor Greer, following the price increase in December, 2003, sales of Kaletra essentially remained stable. Furthermore, Defendant's documents show that it knew that raising Norvir's price could result in

8

> formularies restricting access to Norvir and a potential increase in Kaletra's market share. As a result of increasing the price of Norvir, Defendant believed that at least one of its competitors in the boosted market "will need to give away significant rebates to be cost neutral to Kaletra."

Docket No. 256 at 7-8.

Abbott argues, as it has argued before, that this is not direct evidence of market power. It maintains that direct evidence must take the form of evidence of restricted output and consequent supracompetitive prices. However, Abbott does not point to any new facts or law which would support a motion for reconsideration. Moreover, Abbott has not cited any case holding that restricted output and supracompetitive prices are the only form direct evidence may take. In Rebel Oil Co., Inc. v. Atl. Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1995), the Ninth Circuit noted, "One type of proof [of monopoly power] is direct evidence of the injurious exercise of market power. If the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power." While this passage indicates that evidence of restricted output and supracompetitive prices is sufficient to demonstrate the injurious exercise of market power, it does not suggest that such evidence is necessary to make such a showing. Rebel Oil involved predatory pricing of a commodity. The concepts of restricted output and supracompetitive prices (i.e., prices higher than marginal cost) have little application to the boosted market, where each PI has only one manufacturer and prices are

9

expected to be significantly above marginal cost.[1]

The defining characteristic of direct evidence is that it demonstrates actual injury to competition.[2] While the Court expresses no opinion as to the strength of the evidence described above, that evidence could support a jury finding that Abbott harmed competition in the boosted PI market by manipulating the price of Norvir. Accordingly, it constitutes direct evidence of monopoly power.

### 2. Circumstantial Evidence

To demonstrate monopoly power by circumstantial evidence, a plaintiff must "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry." Rebel Oil, 51 F.3d at 1434. To establish a prima facie case of market power, courts generally require a sixty-five percent market share. See, e.g., Kodak, 125 F.3d at 1206.

The parties dispute what Abbott's share of the boosted market is. Abbott claims that Plaintiffs' expert's method of calculating its market share is flawed. Specifically, it claims that the expert, Dr. Greer, both improperly counts prescriptions of Norvir as representing a share of the boosted market and improperly counts each prescription of Kaletra as representing two prescriptions in the boosted market.

---

[1] In contrast, if a producer of a single drug for which there was more than one manufacturer had market power, supracompetitive prices could be expected to follow the monopolist's decision to restrict output.

[2] Circumstantial evidence, in turn, demonstrates only that a defendant has the potential to inflict injury to competition.

10

In the Court's previous decision denying Abbott's motion for summary judgment, it found that there are triable issues of fact with respect to which party's method of calculating market share is appropriate. Abbott has not pointed to any new facts or law which would support a motion for reconsideration of that decision.

C. Anticompetitive Conduct

In its decision denying Abbott's motions to dismiss the recently filed related cases, Nos. 07-5985, 07-6010, 07-6118, 07-5470, 07-5702 and 07-6120, the Court found that the Ninth Circuit's recently developed test for identifying potentially exclusionary pricing in the context of bundled discounts, as set out in Cascade Health Solutions v. PeaceHealth, 515 F.3d 883 (9th Cir. 2008), does not apply in the context of the particular antitrust theory asserted against Abbott. As a result, the Court found that the plaintiffs in the related cases need not demonstrate that the imputed price of the lopinavir portion of Kaletra is below Abbott's average variable cost of producing it. The Court incorporates that decision by reference and adheres to its conclusions for the reasons stated therein.

D. Patent Immunity

Abbott argues that its patents give it the right to a monopoly in the market for boosted PIs, and therefore it cannot be held liable for violating the Sherman Act. Plaintiffs dispute this assertion on a number of grounds, arguing generally that the patents are invalid and do not grant Abbott the exclusionary rights it asserts over the boosted market.

Although Abbott maintains that its patents contain "dozens of applicable claims" that "cover the boosted market," it relies on

11

only two representative claims in its papers.  The first is Claim 9 of U.S. Patent No. 6,037,157 (the '157 patent), which states:

> A method for increasing human blood levels of a drug which is metabolized by cytochrome P450 monooxygenase comprising administering to a human in need of such treatment a therapeutically effective amount of a combination of said drug or a pharmaceutically acceptable salt thereof and ritonavir or a pharmaceutically acceptable salt thereof.

Hurst Dec. Ex. M at col. 14.

The second claim on which Abbott relies is Claim 22 of U.S. Patent No. 6,703,403 (the '403 patent), which is dependant on Claim 21 of the same patent.  Claim 21 states:

> A method for improving the pharmacokinetics of a drug which is metabolized by cytochrome P450 monooxygenase comprising administering to a human in need of such treatment an amount effective to inhibit cytochrome P450 monooxygenase of ritonavir or a pharmaceutically acceptable salt thereof.

Hurst Dec. Ex. K at col. 12.  Claim 22 states, "The method of claim 21 wherein the drug which is metabolized by cytochrome P450 monooxygenase is an HIV protease inhibitor."  Id.

Claim 21 of the '403 patent is similar in scope to Claim 9 of the '157 patent.  The two primary differences are largely semantic: The preamble of Claim 9 refers to a method for "increasing human blood levels" of a drug metabolized by cytochrome P450 monooxygenase, whereas Claim 21 refers to a method for "improving the pharmacokinetics" of such a drug.  But under Abbott's undisputed proposed claim construction, improving the pharmacokinetics of a drug is tantamount to increasing its blood levels.  See Hurst Dec. Ex. T at 5.  And while Claim 9 refers to administering ritonavir in combination with another drug whereas Claim 21 refers simply to administering ritonavir, it is clear that

Claim 21's method of improving the pharmacokinetics of another drug would be effective only if the individual to whom ritonavir was administered was also taking the other drug.

Plaintiffs argue that these claims are invalid because they are anticipated by, among others, U.S. Patent No. 5,674,882 (the '882 patent). This patent claims, "A method of inhibiting an HIV infection comprising administering to a human in need thereof a therapeutically effective amount of [Norvir] or a pharmaceutically acceptable salt thereof in combination with a therapeutically effective amount of another HIV protease inhibiting compound." Wiebe Dec. of 2/10/06 (Docket No. 187) Ex. M at col. 112.

The parties appear to agree that, when written, this claim contemplated administering Norvir as part of a "cocktail" of PIs, not specifically as a boosting agent. However, any time Norvir is administered with another PI that is metabolized by cytochrome P450 monooxygenase, it will necessarily have the effect of boosting that PI; this is what makes Norvir particularly effective when administered as part of a PI regimen. "[T]he discovery of a previously unappreciated property of a prior art composition, or of a scientific explanation for the prior art's functioning, does not render the old composition patentably new to the discoverer." Atlas Powder Co. v. Ireco, Inc., 190 F.3d 1342, 1347 (Fed. Cir. 1999). The claims of the '157 and '403 patent attempt to patent a result -- boosting -- that was an inherent function of the prior art's teaching of combining Norvir with other PIs. Because someone practicing the prior art by taking Norvir with a PI metabolized by cytochrome P450 monooxygenase would necessarily infringe the new claims, those claims are invalid as anticipated. Id. at 1346

13

("[I]f granting patent protection on the disputed claim would allow the patentee to exclude the public from practicing the prior art, then that claim is anticipated, regardless of whether it also covers subject matter not in the prior art.").

Abbott argues that the asserted claims are not invalid because they include a limitation not found in the '882 patent: they encompass only the administration of ritonavir with the intent to improve the pharmacokinetics or increase the blood levels of another PI. Abbott relies primarily on Jansen v. Rexall Sundown, Inc., 342 F.3d 1329 (Fed. Cir. 2003) in support of this argument. In that case, the court addressed a claim stating:

> A method of treating or preventing macrocytic-megaloblastic anemia in humans which anemia is caused by either folic acid deficiency or by vitamin B12 deficiency which comprises administering a daily oral dosage of a vitamin preparation to a human in need thereof comprising at least about 0.5 mg. of vitamin B12 and at least about 0.5 mg. of folic acid.

Id. at 1330 (emphasis in Jansen). The plaintiff in Jansen sued the producer of an over-the-counter dietary supplement containing both vitamin B12 and folic acid within the claimed ranges, charging the defendant with inducement of and contributory infringement of the above claim.

In construing the claim, the Federal Circuit addressed the issue of whether "a human must know that he is in need of either treatment or prevention" of macrocytic-megaloblastic anemia in order to infringe the claim. Id. at 1333. The court noted that "the claim preamble sets forth the objective of the method, and the body of the claim directs that the method be performed on someone 'in need.'" Id. The court found that

the claim['s] recitation of a patient or a human "in

14

>   need" gives life and meaning to the preamble['s] statement of purpose. The preamble is therefore not merely a statement of effect that may or may not be desired or appreciated. Rather, it is a statement of the intentional purpose for which the method must be performed."

Id.

The court also looked at the prosecution history of the plaintiff's patent. It noted that the plaintiff added the modifier, "macrocytic-megaloblastic" to the word, "anemia" and added the phrase, "to a human in need thereof" to render the claims not obvious in light of prior art, which taught administration of both folic acid and vitamin B12 alone to treat anemia generally. See id. at 1330-31. This bolstered the court's conclusion that "administering the claimed vitamins in the claimed doses for some purpose other than treating or preventing macrocytic-megaloblastic anemia is not practicing the claimed method, because Jansen limited his claims to treatment or prevention of that particular condition in those who need such treatment or prevention." Id. at 1334. The court thus rejected the plaintiff's argument that "those who do not affirmatively know that they do not need to take steps to prevent or treat macrocytic-megaloblastic anemia are still 'in need thereof.'" Id.

Although there are similarities between the claims in this case and the claims at issue in Jansen, the court's construction of the claims in that case was informed by the specific facts and history surrounding them. The case did not purport to change the general rule for assigning meaning to a claim's preamble:

>   [A] preamble limits the invention if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim. Conversely, a preamble is not limiting where a patentee defines a

15

>structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.

Catalina Mktg. Int'l Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002).

In Jansen, the preamble language was construed as a limitation because it disclosed a specific theretofore unknown use for taking a combination of folic acid and vitamin B12 -- namely, the prevention and treatment of macrocytic-megaloblastic anemia. The preamble gave "life and meaning" to the claim because without it, the patent would simply recite a method that was already being practiced. Here, the preamble does not disclose a new use for the prior art, i.e., taking Norvir with a PI that is metabolized by cytochrome P450 monooxygenase. The use in both cases is to treat HIV. The preamble simply expresses one of the necessary results of practicing the existing method. Abbott cannot patent the practice of prior art by framing a necessary result of that practice as a claim-limiting purpose. "Newly discovered results of known processes directed to the same purpose are not patentable because such results are inherent." Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc., 246 F.3d 1368, 1376 (Fed. Cir. 2001). "[T]he claimed process here is not directed to a new use," no matter how it is styled; "it is the same use" -- here, the inhibition of HIV infection -- "and it consists of the same steps." Id. Accordingly, the claims on which Abbott relies for its patent immunity defense are anticipated by the '882 patent and are

16

invalid.[3]

II.  Unjust Enrichment Claim

In addition to Sherman Act claims for monopolization and attempted monopolization, Plaintiffs assert state law claims for fraudulent, unfair and deceptive business practices in violation of California Business and Professions Code § 17200 et seq. and for unjust enrichment.

Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), bars indirect purchasers from recovering damages for violations of federal antitrust law.  Abbott argues that a plaintiff may not avoid this holding by seeking restitution under the common law of unjust enrichment where the underlying claim is premised on a violation of federal antitrust law.[4]  While there is no controlling case directly on point, Abbott cites two cases from federal district courts supporting its view.  See In re New Motor Vehicles Canadian Export Antitrust Litig., 350 F. Supp. 2d 160, 211 (D. Me. 2004) ("Certainly no restitutionary remedy can escape the limitations the United States Supreme Court imposed on federal antitrust recovery in Illinois Brick, and the plaintiffs do not argue that it can.  Therefore, as indirect purchasers, the plaintiffs may not use state common law restitution to recover money from the defendants for violation of the federal antitrust laws."); In re Terazosin Hydrochloride Antitrust Litig., 160 F.

---

[3] Having concluded that the claims are invalid, the Court need not address the merits of Plaintiffs' other arguments concerning Abbott's patent defense.

[4] While Abbott sometimes refers to Plaintiffs' state law claims generally, Abbott's Illinois Brick argument does not specifically address Plaintiffs' claim under California's Business and Professions Code § 17200 et seq.

17

Supp. 2d 1365, 1380 (S.D. Fla. 2001) (finding that allowing indirect purchasers to obtain restitution or a constructive trust under state common law would enable them to do "an end run around the policies" articulated in Illinois Brick).

The cases Plaintiffs cite in refuting Abbott's argument do not address the relevant legal issue. Rather, they address whether the plaintiffs in those cases had stated unjust enrichment claims independent of their antitrust claims. See In re Cardizem CD Antitrust Litig., 105 F. Supp. 2d 618, 668-71 (E.D. Mich. 2000); In re K-Dur Antitrust Litig., 338 F. Supp. 2d 517, 543-46 (D.N.J. 2004). And although Plaintiffs maintain that Abbott is attempting to rehash an argument that was rejected by the Court in granting class certification, the Court's order did not address the specific legal issue Abbott raises. Rather, the Court dealt only with whether Plaintiffs' unjust enrichment claims were amenable to adjudication in a class action. See Docket No. 345 at 16-20.

The Court agrees with the approach taken in In re New Motor Vehicles and In re Terazosin Hydrochloride and finds that, because Plaintiffs' unjust enrichment claim appears to be premised wholly on Abbott's alleged violation of federal antitrust law,[5] Illinois Brick bars them from obtaining restitution based on those claims.

III. Interlocutory Appeal and Continuance

Abbott asks the Court to certify the following question for interlocutory appeal:

> Whether this case warrants an exception from the Ninth Circuit's decision in Cascade Health Solutions v. PeaceHealth, 515 F.3d 883 (9th Cir. 2008), which held

---

[5] Plaintiffs appear to concede this point and have not articulated an alternate theory of liability.

18

> that the Supreme "Court's opinions strongly suggest that, in the normal case, above-cost pricing will not be considered exclusionary conduct for antitrust purposes," id. at 912, and "the appropriate measure of costs [in this context] is average variable cost . . ." id. at 920.

Docket No. 491 at 4.

Although the Court will entertain the possibility of Abbott pursuing an interlocutory appeal in the related cases, which were filed recently and are still in the preliminary stages of discovery,[6] the present case is scheduled for a relatively short trial in approximately three months. At this late stage in the proceedings, even if an interlocutory appeal were ultimately granted, it would save a relatively small amount of the parties' resources. In addition, this case has been pending for more than four years, and waiting for the result of an interlocutory appeal would unjustifiably delay trial.

Abbott also seeks a continuance to allow it to conduct supplemental fact and expert discovery in light of the Court's decision that Cascade's below-cost pricing rule does not apply here. But as explained in an earlier order, see Docket No. 492, the need for additional discovery is premised on Abbott's mistaken view that the Court has established a new test for identifying exclusionary pricing. The Court's decision that Cascade does not apply maintained the status quo. There is no reason to permit additional discovery on matters that have been relevant all along.

CONCLUSION

For the foregoing reasons, the Court DENIES Abbott's motion

---

[6] If Abbott wishes to move for an interlocutory appeal in the related cases, it should file a motion in those cases so that those plaintiffs will have an opportunity to respond.

19

for summary judgment on Plaintiffs' antitrust claims (Docket No. 445).[7]  Those claims will proceed to trial.  The Court GRANTS Abbott's motion for summary judgment on Plaintiffs' unjust enrichment claim.  The Court GRANTS Plaintiffs' motion for summary adjudication on Abbott's defense of patent immunity (Docket No. 460).

   IT IS SO ORDERED.

Dated: 5/16/08



CLAUDIA WILKEN
United States District Judge

---

[7]The Court DENIES Abbott's request to file supplemental material in support of its motion for summary judgment (Docket No. 495).  The material is not necessary to the Court's decision.

20