UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

| | | |
|---|---|---|
| JOHN DOE 1 AND JOHN DOE 2, | ) | |
| ON BEHALF OF THEMSELVES | ) | ***ORIGINAL*** |
| AND ALL OTHER PERSONS | ) | |
| SIMILARLY SITUATED, | ) | PAGES 1 – 76 |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | |
| VS. | ) | NO. C 04–1511 CW |
| | ) | |
| ABBOTT LABORATORIES, | ) | |
| | ) | |
| DEFENDANT. | ) | OAKLAND, CALIFORNIA |
| _____ | ) | TUESDAY, AUGUST 19, 2008 |
| MEIJER, INC., ET AL., | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | |
| VS. | ) | NO. C 07–05985 CW |
| | ) | |
| ABBOTT LABORATORIES, | ) | |
| | ) | |
| DEFENDANT. | ) | |
| _____ | ) | |

**TRANSCRIPT OF PROCEEDINGS**

APPEARANCES:

FOR PLAINTIFFS:          BERMAN DEVALERIO PEASE TABACCO BURT &
                         PUCILLO
                         425 CALIFORNIA STREET, 21ST FLOOR
                         SAN FRANCISCO, CALIFORNIA  94104
                   BY:  JOSEPH J. TABACCO, JR., ATTORNEY AT LAW

                         LABATRON SUCHAROW LLP
                         140 BROADWAY
                         NEW YORK, NEW YORK  10005
                   BY:  HOLLIS L. SALZMAN, ATTORNEY AT LAW

           (APPEARANCES CONT'D. NEXT PAGE)

REPORTED BY:          RAYNEE H. MERCADO, CSR NO. 8258

### APPEARANCES (CONT'D.)

```
                          HANGLEY, ARONCHICK, SEGAL & PUDLIN
                          30 NORTH THIRD STREET, SUITE 700
                          HARRISBURG, PENNSYLVANIA  17101
                     BY:  MONICA L. REBUCK, ATTORNEY AT LAW

PLAINTIFF SEIU HEALTH    LAW OFFICE OF RICHARD R. WIEBE
AND WELFARE FUND:        425 CALIFORNIA STREET, SUITE 2025
                         SAN FRANCISCO, CA  94104
                     BY:  RICHARD R. WIEBE, ATTORNEY AT LAW

FOR PLAINTIFFS:          BERGER & MONTAGUE, P.C.
(NORVIR DIRECT CLASS)    1622 LOCUST STREET,
                         PHILADELPHIA, PENNSYLVANIA  19103
                     BY:  ERIC L. CRAMER, ATTORNEY AT LAW

                         KAPLAN, KILSHEIMER & FOX
                         850 THIRD AVENUE
                         NEW YORK, NEW YORK  10022
                     BY:  JOHN D. RADICE, ATTORNEY AT LAW

                         LIEFF, CABRASER, HEIMANN &
                             BERNSTEIN, LLP
                         275 BATTERY STREET, 30TH FLOOR
                         SAN FRANCISCO, CALIFORNIA  94111
                     BY:  JORDAN ELIAS, ATTORNEY AT LAW

FOR LOUISIANA            GARWIN, BRONZAFT, GERSTEIN & FISHER LLP
WHOLESALE DRUG CO.:      1501 BROADWAY
                         NEW YORK, NEW YORK  10036
                     BY:  BRUCE E. GERSTEIN, ATTORNEY AT LAW

                         AUBERTINE DRAPER ROSE LLP
                         1211 SW SIXTH AVENUE
                         PORTLAND, OREGON  97204
                     BY:  ANDREW E. AUBERTINE, ATTORNEY AT LAW

FOR DEFENDANT:           WINSTON & STRAWN
                         101 CALIFORNIA STREET, SUITE 3900
                         SAN FRANCISCO, CALIFORNIA  94111
                     BY:  JAMES F. HURST, ATTORNEY AT LAW

                         MUNGER, TOLLES & OLSON LLP
                         355 SOUTH GRAND AVNUE 35TH FLOOR
                         LOS ANGELES, CALIFORNIA  90071-1560
                     BY:  JEFFREY I. WEINBERGER, ATTORNEY AT LAW
```

### APPEARANCES (CONT'D.)


```
FOR AMICUS CURIAE        IRELL & MANELLA
GLAXOSMITHKLINE:         1800 AVENUE OF THE STARS, SUITE 900
                         LOS ANGELES, CALIFORNIA  90067-4276
                 BY:   ALEXANDER F. WILES, ATTORNEY AT LAW

                         GLAXOSMITHKLINE
                         FIVE MOORE DRIVE
                         PO BO 13398
                         BIDE C4156.4B
                 BY:   RESEARCH TRIANGLE PARK
                         NORTH CAROLINA  27709-3398
                         TIMOTHY A. THELEN,
                         ASSISTANT GENERAL COUNSEL


                         --O0O--
```

```
 1   TUESDAY, AUGUST 19, 2008                           2:45 P.M.

 2                      P R O C E E D I N G S

 3            THE CLERK:  CALLING THE MATTER OF IN RE: ABBOTT

 4   LABS, CIVIL ACTION NO. C04-1511, AND MEIJER VERSUS ABBOTT

 5   LABORATORIES, CIVIL ACTION NO. C07-5985.

 6            COUNSEL, PLEASE COME FORWARD, STATE YOUR APPEARANCES

 7   FOR THE RECORD.

 8            MR. TABACCO:  YOUR HONOR, DO YOU WANT TO HANDLE THE

 9   SETTLEMENT FIRST OR THE CERTIFICATION FIRST?

10            THE COURT:  OH, I DON'T KNOW.  OH, SETTLEMENT OR

11   CERTIFICATION?

12            MR. TABACCO:  SETTLEMENT --

13            THE COURT:  THOSE ARE TOGETHER, BUT THE QUESTION IS

14   WHAT ABOUT THE CLASS CERT MOTION.

15            MR. TABACCO:  THAT'S WHAT I MEANT.

16            THE COURT:  I THOUGHT YOU MEANT THE CERTIFICATION OF

17   APPEAL.  OH, WHY DON'T WE DO THE CLASS CERT FIRST.

18            MR. WEINBERGER:  GOOD AFTERNOON, YOUR HONOR.

19   JEFFREY WEINBERGER OF MUNGER, TOLLES & OLSON FOR ABBOTT

20   LABORATORIES.

21            MR. CRAMER:  GOOD AFTERNOON, YOUR HONOR.  ERIC

22   CRAMER FROM BERGER & MONTAGUE FOR THE CLASS PLAINTIFFS.

23            MR. RADICE:  GOOD AFTERNOON, YOUR HONOR.  JOHN

24   RADICE FROM KAPLAN FOX ALSO FOR THE CLASS PLAINTIFFS.

25            THE COURT:  I HAVE A COUPLE OF SORT OF SMALL FACT --
```

1          **MR. GERSTEIN:**  YOUR HONOR, BRUCE GERSTEIN OF GARWIN

2   GERSTEIN & FISHER FOR THE CLASS PLAINTIFFS.

3          **THE COURT:**  OH, SORRY.

4          **MR. CRAMER:**  YOUR HONOR, I HAVE -- I HAVE SOME

5   SLIDES THAT I'M GOING TO USE IN CONJUNCTION WITH MY ARGUMENT.

6   IF YOUR HONOR WOULDN'T MIND, I WOULD LIKE TO HAND THEM UP.

7          **THE COURT:**  WELL, ARE THEY ALREADY IN THE RECORD?

8          **MR. CRAMER:**  THEY ARE -- THEY ARE BASICALLY JUST AN

9   OUTLINE OF MY PRESENTATION AND SOME QUOTES AND OTHER THINGS

10  THAT GO ALONG WITH THE PRESENTATION JUST SO IT'S EASIER TO

11  FOLLOW ALONG.

12         **THE COURT:**  OKAY.  I DON'T THINK IT WILL GO THAT

13  WAY, BUT YOU CAN HAND IT TO THE CLERK.  I CAN'T GUARANTEE I'LL

14  LOOK AT IT.

15         **MR. WEINBERGER:**  I ALSO WAS JUST HANDED THIS, YOUR

16  HONOR.

17         **THE COURT:**  YEAH.

18         LET ME JUST ASK YOU QUESTIONS FIRST, AND THEN I

19  WILL -- WELL, I'LL TELL YOU BEFORE I ASK QUESTIONS THAT I'M

20  QUITE INCLINED TO CERTIFY THE CLASS.  I WILL HEAR FROM YOU

21  BRIEFLY, BUT I HAVE READ THE PAPERS, AND I'M INCLINED TO

22  CERTIFY IT.

23         MY QUESTIONS ARE -- THERE WAS SOME QUESTION ABOUT

24  WHETHER MEIJER -- HOW DO YOU PRONOUNCE IT?

25         MEYER (PHONETIC)?  MEIJER (PHONETIC)?  MEYER

```
1    (PHONETIC)?

2              MR. CRAMER:  MEYER (PHONETIC).

3              THE COURT:  -- MEIJER REALLY DID BUY NORVIR AND

4    KALETRA FROM KERR.  THE DEFENDANTS QUESTIONED IT.  THE

5    PLAINTIFFS IN THEIR REPLY INDICATING THAT THEY HAD -- COULD

6    SHOW THAT THEY HAD, AND I JUST WONDERED WHETHER YOU STILL

7    DISPUTED OR QUESTION THAT.

8              MR. WEINBERGER:  I THINK THE RECORD IS THAT THEY

9    PURCHASED ON AN ASSIGNMENT BEGINNING IN -- BEGINNING IN 2006,

10   THERE WAS A PROVISION IN THE -- IN THE PURCHASE AGREEMENT THAT

11   PROHIBITED ASSIGNMENT OF CLAIMS.

12             THAT'S MY UNDERSTANDING OF THE RECORD --

13             THE COURT:  NO, THE QUESTION IS DID THEY BUY NORVIR

14   AND KALETRA FROM KERR.  DID THEY BUY THE DRUGS?

15             MR. WEINBERGER:  YES.

16             THE COURT:  YOU SEEM TO QUESTION THAT.

17             MR. WEINBERGER:  NO, NO.

18             THE COURT:  YOU DON'T.  OH, OKAY.

19             MR. WEINBERGER:  THEY DIDN'T BUY IT DIRECTLY FROM

20   ABBOTT, WAS THE POINT.

21             THE COURT:  RIGHT, BUT THEY BOUGHT IT FROM KERR.

22             MR. WEINBERGER:  CORRECT.  SO THE ONLY WAY THEY

23   COULD SUE AS DIRECT PURCHASERS IS IF THEY HAVE A VALID

24   ASSIGNMENT FROM KERR ASSIGNING THE CLAIMS THAT WOULD OTHERWISE

25   BELONG TO KERR.
```

1              **THE COURT:**  NOW, THERE'S A QUESTION ABOUT THE

2     ASSIGNMENT BETWEEN KERR AND MEIJER, WHICH IS UNDER MICHIGAN LAW

3     AND WHICH RECITES THAT THERE'S GOOD AND VALUABLE CONSIDERATION,

4     AND YOU CITE A CASE FOR THE FACT THAT SUCH A RECITATION IS

5     ADEQUATE, BUT THE CASE SEEMS TO BE APPLYING NEW YORK LAW.  SO

6     I'M WONDERING WHETHER THERE'S ANYTHING LIKE THAT UNDER MICHIGAN

7     LAW.

8              **MR. CRAMER:**  YOUR HONOR, MR. RADICE, WHO REPRESENTS

9     MEIJER, IS GOING TO ADDRESS THOSE QUESTIONS.

10             **THE COURT:**  OKAY.

11             **MR. RADICE:**  YES, YOUR HONOR.  I HAVE NOT SEEN A

12    CASE UNDER MICHIGAN LAW DIRECTLY ON THAT.  I BELIEVE THE

13    NEW YORK CASE COMES FROM THE CONTRACTS -- FROM THE RESTATEMENT

14    POSITION WHICH IS --

15             **THE COURT:**  I'M SORRY.  COMES FROM CONTRACTS WHAT?

16             **MR. RADICE:**  FROM THE RESTATEMENTS OF CONTRACTS,

17    WHICH I BELIEVE --

18             **THE COURT:**  OH.

19             **MR. RADICE:**  -- IS APPLICABLE, GENERALLY.

20             AND WHAT THE -- WHAT THAT CASE STANDS FOR THE

21    PROPOSITION IS THAT IF IT SAYS ON ITS FACE THAT THERE IS

22    ADEQUATE CONSIDERATION, THERE'S NO NEED TO DO A FURTHER

23    INQUIRY.

24             **THE COURT:**  HMM.

25             **MR. RADICE:**  NOW, IF THE COURT WERE CONCERNED ABOUT

```
1    THIS, WE COULD -- THIS IS AN ISSUE THAT COULD BE EASILY

2    RESOLVABLE THROUGH TESTIMONY FROM PEOPLE AT MEIJER OR OTHER

3    WAYS THAT THERE WAS VALUABLE CONSIDERATION IN TERMS OF THE GOOD

4    WILL THAT KERR RECEIVED AND THE ASSIGNMENT THAT MEIJER

5    RECEIVED.

6              I THINK THAT THE TAKE-AWAY POINT FROM IT IS, AS A

7    NUMBER OF OTHER COURTS HAVE HELD IN AFFIRMING THIS

8    ASSIGNMENT -- THIS VERY SAME ASSIGNMENT BETWEEN MEIJER AND KERR

9    IN OTHER -- IN OTHER DIRECT PURCHASER CLASS ACTION

10   PHARMACEUTICAL CASES, THESE ARE NOT ISSUES THAT SHOULD IN ANY

11   WAY DEFEAT MEIJER BEING A CLASS REPRESENTATIVE.  THREE OTHER

12   COURTS HAVE CONSIDERED MEIJER AS A CLASS REPRESENTATIVE.  ALL

13   OF THOSE COURTS -- THOSE COURTS ARE --

14              (SIMULTANEOUS COLLOQUY.)

15        THE COURT:  OKAY.  YEAH, I KNOW.  THAT'S ALL IN THE

16   PAPERS.

17        MR. RADICE:  -- WELLBUTRIN AND TRICOR --

18        THE COURT:  I WAS JUST INTERESTED IN WHETHER THERE

19   WAS ANY MICHIGAN LAW ON THE POINT OF WHETHER A RECITATION OF

20   MUTUAL CONSIDERATION WITHOUT ANYTHING MORE AT LEAST APPEARING

21   AT THIS POINT IS NOT ENOUGH.

22              DO YOU HAVE ANYTHING THAT SAYS IT'S NOT ENOUGH IN

23   MICHIGAN?

24        MR. WEINBERGER:  I THINK WHAT WE HAVE IS WHAT WE

25   CITED, WHICH SAYS THAT CONSIDERATION IS NEEDED.  BUT THAT'S AS
```

```
1   FAR AS I THINK IT WOULD GO.

2            THE COURT:  OKAY.

3            MR. RADICE:  AND THE ONE OTHER THING, YOUR HONOR --

4   I'M SORRY -- THAT I WOULD POINT OUT IS IT'S THE SAME

5   CONSIDERATION RECITATION AS IS IN THE ABBOTT/KERR CONTRACT, THE

6   EXACT SAME ONE.

7            THE COURT:  OKAY.  WELL, YEAH, THAT ONE, I DON'T

8   THINK, IS IN DISPUTE.

9            BUT ANYWAY, ARE THERE ANY -- THERE SEEMS TO BE AN

10  ISSUE ABOUT PLAINTIFFS WHO SELL ON A COST-PLUS BASIS.  AND I'M

11  WONDERING WHETHER ANY OF THE NAMED PLAINTIFFS SELL ON A

12  COST-PLUS BASIS.

13           MR. CRAMER:  I'M NOT SURE WHAT -- WHAT ISSUE, YOUR

14  HONOR.  THE COST-PLUS -- THERE --

15           THE COURT:  THERE'S A CLAIM THAT SOME PEOPLE MIGHT

16  SELL ON A COST-PLUS BASIS AND, THEREFORE, THEY MIGHT HAVE A

17  DIFFERENT SET OF CONSIDERATIONS --

18           MR. CRAMER:  I SEE.

19           THE COURT:  -- THAN WHO SELLS ON SOME OTHER BASIS.

20  SO IF THERE WERE SOME PLAINTIFFS THAT SOLD ON A COST-PLUS BASIS

21  AND SOME THAT SOLD ON SOME OTHER BASIS, THEN I WOULDN'T SEE IT

22  AS A PROBLEM.

23           MR. CRAMER:  WELL, THE FIRST THING I WOULD SAY IS

24  THAT "COST PLUS" IS A TERM OF ART THAT'S USED AS AN EXCEPTION

25  TO ILLINOIS BRICK, AND THAT'S A VERY SPECIFIED TERM HAVING TO
```

1    DO WITH COST PLUS AND FIXED QUANTITY.  AND THERE ARE NO SUCH

2    CONTRACTS IN THIS CASE.

3              BUT THE SECOND THING I WOULD SAY --

4         **THE COURT:**  WELL, IN THE WAY THAT THEY'RE USING IT.

5              (SIMULTANEOUS COLLOQUY.)

6         **THE COURT:**  -- AND THEN THEY ADD A UNIFORM MARKUP TO

7    IT AND SELL IT.

8         **MR. CRAMER:**  THAT'S RIGHT.  A PERCENTAGE MARKUP.

9              AND, IN FACT, NEARLY ALL WHOLESALERS, WHICH ARE A

10   BIG CHUNK OF THE CLASS, SELL ON A COST-PLUS OR PERCENTAGE

11   MARKUP BASIS, AND ALL THAT MEANS --

12        **THE COURT:**  RIGHT.  BUT MY QUESTION IS, DO ANY OF

13   NAMED PLAINTIFFS SELL ON A COST-PLUS BASIS --

14        **MR. CRAMER:**  THE ANSWER TO THAT IS YES --

15        **THE COURT:**  OKAY.

16        **MR. CRAMER:**  -- THAT TWO OF THE NAMED PLAINTIFFS,

17   LOUISIANA WHOLESALE AND ROCHESTER DRUG ARE WHOLESALERS, AND

18   THEY SELL ON A PERCENTAGE MARKUP BASIS, JUST LIKE THE VAST

19   MAJORITY OF ABSENT CLASS MEMBERS.  ONE OF THE NAMED PLAINTIFFS

20   IS MEIJER.  THEY ARE A PHARMACY, AND THEY ALSO SELL IN SOME

21   WAYS ON A PERCENTAGE MARKUP BASIS.  IT'S A LITTLE BIT DIFFERENT

22   THAN A WHOLESALER, BUT THEY BUY AT ONE PRICE AND SELL AT A

23   HIGHER PRICE.

24        **THE COURT:**  THEN MAYBE I SHOULD ASK THE OTHER

25   QUESTION.  ARE THERE ANY NAMED PLAINTIFFS WHO DON'T SELL ON

1    COST-PLUS BASIS?

2              **MR. CRAMER:**  I THINK THAT THAT MAY BE SOME PURCHASES

3    BY SOME OF THE NAMED PLAINTIFFS -- THERE ARE THREE -- THAT ARE

4    NOT ON A PERCENTAGE MARKUP BASIS.  BUT MOST OF THEM -- MOST OF

5    THEM IN SOME WAY -- THAT'S WHAT RESELLERS DO, AND NEARLY ALL OF

6    THE CLASS MEMBERS ARE RESELLERS BECAUSE THEY BUY AND RESELL.

7    AND SO THEY BUY IT AT ONE PRICE AND SELL IT AT ANOTHER PRICE.

8              **THE COURT:**  OKAY.  WELL --

9              **MR. WEINBERGER:**  YOUR HONOR --

10             **THE COURT:**  LET ME TURN TO YOU, THEN, BECAUSE AS I

11   SAY, I'M INCLINED TO GRANT CLASS CERTIFICATION.  I HAVE READ

12   THE PAPERS, SO YOU MAY ADD TO WHAT YOU'VE SAID IN ANY WAY THAT

13   YOU'D LIKE.

14             **MR. WEINBERGER:**  FIRST, I WOULD SAY IN RESPONSE TO

15   YOUR HONOR'S QUESTIONS TO MR. CRAMER, THAT SIMPLY TO SAY THAT A

16   RESELLER SELLS ON A COST-PLUS BASIS I DON'T THINK IS THE POINT.

17             THE POINT IS WHETHER THERE IS A PERCENTAGE THAT'S

18   AGREED UPON IN ADVANCE WITH THE CUSTOMERS WHERE I WILL SELL YOU

19   ALL DRUGS AT X PERCENT.  THAT'S WHAT WE'RE TALKING ABOUT.

20             OF COURSE, A PHARMACY IS NOT GOING TO SELL THE DRUGS

21   AT A LOSS.  IT'S GOING TO SELL IT AT SOME PERCENTAGE OF THE

22   PURCHASE PRICE.  SO I JUST WANTED TO CLARIFY THAT.

23             **THE COURT:**  OKAY.

24             **MR. WEINBERGER:**  I THINK THE OTHER POINTS THAT I'D

25   LIKE TO MAKE ARE, NUMBER 1, THAT IN ADDRESSING THE CONFLICT

1    THAT WE SHOW BETWEEN KALETRA PURCHASERS AND NORVIR PURCHASERS,

2    THAT IS, THOSE WHO PRIMARILY PURCHASE ONLY ONE OF THOSE DRUGS,

3    PLAINTIFFS MADE A COUPLE OF POINTS.  FIRST, THEY SAID, WELL,

4    THE NUMBER IS SMALL SO WE SHOULDN'T WORRY ABOUT IT.

5              WE SUBMIT THAT ACTUALLY THE NUMBER IS NOT SMALL,

6    THAT A SUBSTANTIAL PERCENTAGE OF -- IN TERMS OF NUMBER OF

7    PURCHASERS, NOT IN TERMS OF PERCENTAGE OF PRODUCT.  BUT IN

8    TERMS OF MEMBERS OF THE CLASS, ARE IN THAT CATEGORY.  I THINK

9    IT'S SOMETHING LIKE 21 PERCENT OF THE -- OF THE CLASS PURCHASES

10   PRIMARILY ARE ONLY KALETRA IN THE RELEVANT TIME PERIOD.  AND

11   SOMETHING LIKE 38 PERCENT PURCHASES ONLY NORVIR.

12             SO I THINK THE CONFLICT IS REAL EVEN THOUGH THE

13   PERCENTAGES OF PURCHASES IS SMALL, BECAUSE MOST OF THESE DRUGS

14   ARE SOLD BY THE BIG THREE.  SO ANY PERCENTAGE PAST THE BIG

15   THREE IS GOING TO BE SMALL.  AND PLAINTIFFS GET -- TRYING TO

16   GET AROUND THIS BY SAYING, WELL, THEIR CLAIMS DON'T DEPEND UPON

17   THE KALETRA PRICE, THEY'RE SIMPLY ALLEGING THAT THE NORVIR

18   PRICE WAS TOO HIGH AND HAS NOTHING TO DO WITH THE KALETRA

19   PRICE.

20             AND I SUBMIT -- AND I KNOW YOU'RE VERY FAMILIAR WITH

21   THE LEGAL THEORIES IN THIS CASE -- THAT A CLAIM THAT THE PRICE

22   OF NORVIR IS TOO HIGH WITHOUT REFERENCE TO WHAT THE PRICE OF

23   KALETRA WAS IS JUST NOT A CREDIBLE CLAIM, AND THAT PLAINTIFFS'

24   CLAIMS -- EVEN IF THEY COME UP WITH ONE THAT DOESN'T INVOLVE

25   IT, THEY SURELY HAVE CLAIMS THAT INVOLVE THE PRICE DIFFERENTIAL

1    BETWEEN NORVIR AND KALETRA.

2              AND IF THE PRICE OF KALETRA WAS INCREASED BY THE

3    SAME AMOUNT AT THE SAME TIME AS THE NORVIR PRICE INCREASE WAS

4    ANNOUNCED, THEN THERE WOULD BE NO CLAIM HERE OF ANY KIND.  SO I

5    THINK IT'S CLEAR THAT THE CASE -- THE CASE DOES REVOLVE AROUND

6    THE DIFFERENTIAL AND, AS SUCH, THERE'S A CLEAR CONFLICT BETWEEN

7    THE KALETRA-ONLY PURCHASERS AND THE NORVIR PURCHASERS.

8              MOVING TO THE OTHER PRINCIPAL GROUND, YOUR HONOR,

9    AND THAT IS THE DIFFERENTIAL, THE DISCOUNTING AND THE EXTREME

10   VARIETY AMONG THESE CLASS MEMBERS.  I THINK PLAINTIFFS HAVE

11   BACK-TRACKED SOME.

12             THEY STARTED OUT BY SAYING THAT THE NORVIR PRODUCT

13   IS PRINCIPALLY SOLD AT THE WAC OR WHOLESALE ACQUISITION COST OR

14   A VERY STANDARD DISCOUNT FROM IT AND, THEREFORE, THERE'S NO

15   PROBLEM WITH THEIR FORMULA FOR IMPACT OF DAMAGES.

16             WE SHOW THAT ACTUALLY THE DISCOUNTING IS ENORMOUSLY

17   VARIANT AMONG PURCHASERS, AND OVER TIME FOR THE SAME

18   PURCHASERS, AND SO THAT NEEDS TO BE ACCOUNTED FOR IN THE

19   PURCHASES.  AND THEY'VE NOW COME BACK AND SAID, WELL, THAT'S --

20   MOST OF THE DISCOUNT IS FOR GOVERNMENT PURCHASES, AND,

21   THEREFORE, WE JUST TOLD OUR EXPERT TO IGNORE THAT.

22             WELL, THAT'S AKIN TO SAYING, WELL, THERE WERE A

23   NUMBER OF PURCHASES THAT ARE INCLUDED IN THIS CLAIM.  WE'RE

24   GOING TO TAKE ALL THE ONES THAT WERE MADE AT THE HIGH PRICES

25   AND WE'RE GOING TO COUNT THOSE, AND WE'RE GOING TO TAKE ALL THE

1   ONES THAT WERE MADE AT THE DISCOUNTED PRICES, AND WE'RE GOING

2   TO DISREGARD THOSE.

3               REMEMBERING THAT THESE GOVERNMENT PURCHASERS ARE NOT

4   DIRECT PURCHASERS.  THEY'RE INDIRECT PURCHASERS, AND THEY'RE

5   SAYING, WELL, WE'LL LOOK DOWNSTREAM AND EXCLUDE THE GOVERNMENT

6   PURCHASERS, AND WE'LL COUNT THE HIGH ONES.  AND I JUST THINK

7   THAT'S INDEFENSIBLE.

8               WE DON'T KNOW FROM THIS ANALYSIS WHETHER -- WHICH OF

9   THESE PURCHASERS ACTUALLY HAVE A NET LOSS BECAUSE THEY'RE ONLY

10  COUNTING THE HIGH PRICES, THEY'RE NOT COUNTING THE LOW PRICES.

11  SO I THINK THAT'S -- THAT'S A REAL PROBLEM.

12              I THINK THERE ARE OTHER PROBLEMS AS WELL IN TERMS OF

13  THE BUT-FOR PRICE.

14              AND THERE ARE TWO JUST WANT TO MENTION QUICKLY.

15  APPRECIATE THE COURT'S TIME ON THIS.  ONE IS THAT THE -- THE

16  FORMULA THAT IS PROPOSED BY PLAINTIFFS USES A DOLLAR

17  SEVENTY-ONE AS THE BUT-FOR PRICE, AND SO IT ASSUMES THAT BUT

18  FOR THE ANTITRUST VIOLATION, THE PRICE OVER THESE LAST FIVE

19  YEARS WOULD HAVE BEEN A DOLLAR SEVENTY-ONE.

20              AND THAT'S -- THAT'S SIMPLY IRRATIONAL TO SAY

21  THAT -- AND I THINK MR. --

22              **THE COURT:**  ARE YOU STILL ADDRESSING CLASS

23  CERTIFICATION?

24              **MR. WEINBERGER:**  YES, YOUR HONOR.  'CAUSE THAT IS

25  THE METHOD FOR SHOWING IMPACT, AND THE COMMON FORMULA FOR

```
1    DAMAGES DEPENDS UPON SHOWING -- IS THE DIFFERENCE BETWEEN

2    THE -- THE PRICE AFTER 2003 AND THE PRICE BEFORE.  AND

3    PROFESSOR SINGER ASSUMES THAT DOLLAR SEVENTY-ONE IS THE

4    PROFIT-MAXIMIZING PRICE, THAT IS, THE HIGHEST PRICE THAT ABBOTT

5    AS A LEGAL MONOPOLIST COULD CHARGE, AND THEN HIS ENTIRE

6    COMPUTATION IS DONE FROM THAT ASSUMPTION.  AND THAT'S SIMPLY

7    WRONG.  BECAUSE AT A DOLLAR SEVENTY-ONE -- I'M SORRY.  AT THE

8    HIGHER PRICE, ABBOTT WAS STILL SELLING MORE AND MAKING A LOT

9    MORE.  SO IT'S JUST NOT -- IT CAN'T BE SAID THAT A DOLLAR

10   SEVENTY-ONE IS THE PROFIT-MAXIMIZING PRICE.

11             IN OTHER WORDS, THE IDEA THAT UNDER THE ANTITRUST

12   THEORIES, ABBOTT -- ANY PRICE OVER A DOLLAR SEVENTY-ONE IS

13   ILLEGAL, WHICH IS REALLY WHAT THEY'RE SAYING, IS JUST NOT

14   SUSTAINABLE.  AND, CONSEQUENTLY, THE FORMULA AND THE BASIS THAT

15   PROFESSOR SINGER USES FOR SHOWING IMPACT IS JUST WRONG.

16             THE OTHER MAJOR FLAW IN HIS --

17        THE COURT:  WELL, I'M NOT MEANT TO DECIDE THE MERITS

18   OF THE CASE ON CLASS CERTIFICATION.  SO WHILE YOU MIGHT BE

19   RIGHT THAT THAT'S WRONG, THE QUESTION IS WHY DOES THAT MEAN

20   THAT I SHOULDN'T CERTIFY THE CLASS.  IT MIGHT MEAN I SHOULD

21   THROW THE CASE OUT SOME DAY, BUT WHY DOES IT MEAN I SHOULDN'T

22   CERTIFY THE CLASS?

23        MR. WEINBERGER:  I UNDERSTAND THE DISTINCTION, BUT I

24   THINK THAT THE FORMULA ON SHOWING IMPACT HAS TO PASS MUSTER.

25   IT'S NOT A QUESTION OF THE MERITS.  IT'S A QUESTION --
```

1          **THE COURT:**  WHY?  AT THIS POINT, IT HAS TO PASS

2    MUSTER?

3          **MR. WEINBERGER:**  I THINK THAT THERE IS A BURDEN THAT

4    PLAINTIFFS HAVE TO MEET UNDER RULE 23 TO SHOW THAT THEY HAVE A

5    LOGICAL, RATIONAL FORMULA FOR SHOWING IMPACT AND DAMAGES.  AND

6    THAT IF THEY DON'T, THEN IT'S -- THEN THEY HAVE NOT MET THEIR

7    BURDEN, AND THE CLASS SHOULD NOT BE CERTIFIED.

8          **THE COURT:**  WELL, IF YOU HAVEN'T -- YOU'RE SAYING

9    THEY HAVEN'T AND THUS IT'S TOO INDIVIDUALIZED AND THUS CLASS

10   TREATMENT IS NOT PROPER.  THAT WOULD BE AN ARGUMENT.

11         **MR. WEINBERGER:**  THAT'S WHAT I'M SAYING.

12         **THE COURT:**  OH, YOU HADN'T SAID THAT PART YET.

13         **MR. WEINBERGER:**  I'M SORRY.  AND RELATED TO THAT IS

14   THE DISCOUNTING.  THAT IS, THAT THE ARGUMENT THAT PROFESSOR

15   SINGER IS MAKING IS THAT THE DISCOUNTS WOULD HAVE HAPPENED

16   REGARDLESS OF THE PRICE INCREASE.  AND WE'VE SHOWN EVIDENCE --

17   PROFESSOR HAY, IN HIS DECLARATION, SHOWED EVIDENCE THAT

18   ACTUALLY THE DISCOUNTING THAT OCCURRED AFTER THE PRICE INCREASE

19   WAS FOUR, FIVE, SIX-FOLD MORE THAN THE DISCOUNTING THAT WAS

20   GOING ON BEFORE, BECAUSE THERE WERE -- WIDE VARIETY OF

21   PURCHASERS FOR WHOM ABBOTT WAS TRYING TO BLUNT THE EFFECT OF

22   THE INCREASE.

23         SO YOU CAN'T JUST SAY THAT THESE PURCHASERS WOULD

24   HAVE GOTTEN THE SAME DISCOUNTS AFTER THE PRICE INCREASE AS THEY

25   WOULD HAVE GOTTEN BEFORE, WHICH IS -- WHICH IS THE WHOLE

1    ASSUMPTION.  SO WHAT HE HAS NOT DONE IS COME UP WITH ANY KIND

2    OF METHOD THAT'S GOING TO SAY HOW ARE WE GOING TO FIGURE OUT

3    WHAT THE PRICE WOULD HAVE BEEN OF NORVIR, WHAT THE BUT-FOR

4    DISCOUNTS WOULD HAVE BEEN.

5              THOSE ARE ALL THINGS THAT YOU NEED TO DO IN

6    PRESENTING A FORMULA FOR CLASS CERTIFICATION TO SHOW THAT THE

7    COMMON ISSUES INVOLVING IMPACT AND DAMAGES OUTWEIGH ALL THE

8    INDIVIDUAL ISSUES OF EVERY SINGLE PERSON WHO HAD A DIFFERENT

9    DISCOUNT OVER A DIFFERENT PERIOD OF TIME.

10             AND ONE LAST POINT I WOULD MAKE, YOUR HONOR -- AND I

11   APPRECIATE YOUR INDULGENCE -- IS THAT PROFESSOR SINGER IN HIS

12   REBUTTAL, THE LAST REPORT THAT HE FILED SAYS, WELL, WE'VE

13   ACTUALLY MET OUR BURDEN BECAUSE WE CAN SHOW BASED ON PROFESSOR

14   HAY'S DECLARATION THAT EVERY SINGLE MEMBER OF THE CLASS MADE AT

15   LEAST ONE PURCHASE AT THE WHOLESALE ACQUISITION COST AND,

16   THEREFORE, THERE'S CLASS-WIDE IMPACT.

17             I THINK THERE'S TWO PROBLEMS WITH THAT, YOUR HONOR.

18   THE FIRST PROBLEM IS THAT'S NOT THE STANDARD.  I'M NOT AWARE OF

19   A SINGLE CASE THAT SAYS THE ONLY THING A PLAINTIFF HAS TO DO TO

20   SATISFY ITS BURDEN ON CLASS CERTIFICATION IS TO SHOW THAT THE

21   ONE PURCHASE, REGARDLESS OF ALL THE OTHER PURCHASES, REGARDLESS

22   OF WHAT THEY WERE MADE AT, REGARDLESS OF WHETHER ON NET, ANY

23   PURCHASER WAS BETTER OFF AFTER DECEMBER 2003 THAN BEFORE, AND

24   THAT THAT'S ENOUGH.  AND I DON'T THINK IT IS.

25             SECOND OF ALL, IT ISN'T TRUE.  IN THE SURREBUTTAL

1    REPORT THAT PROFESSOR HAY FILED, HE SHOWED THAT EVEN USING THE

2    DATA HE HAD -- THINK IT WAS SOMETHING LIKE 15 PERCENT OF THE --

3    OF THE CLASS -- OF THE PURCHASES BY THE CLASS WERE -- OF THE

4    PURCHASERS -- I'M SORRY -- 15 PERCENT OF THE CLASS MEMBERS DID

5    NOT MAKE A SINGLE PURCHASE AT OR ABOVE THE WHOLESALE

6    ACQUISITION COST.  SO EVEN UNDER HIS VERY LIMITED NARROW THEORY

7    OF WHAT'S REQUIRED, THEY HAVEN'T MET THAT.

8              THANK YOU, YOUR HONOR.

9              **MR. CRAMER:**  YOUR HONOR, I THINK WHAT I'LL DO IS DO

10   PASS MUSTER -- SINCE MR. WEINBERGER BASICALLY PRESENTED ALL OF

11   HIS ARGUMENTS, I THINK WHAT I'LL DO, IF YOU DON'T -- IF YOU

12   WOULD INDULGE ME, YOUR HONOR, IS DO A MODIFIED VERSION OF WHAT

13   I HAD PLANNED TO PRESENT.  EITHER THAT OR I CAN ADDRESS ANY

14   SPECIFIC ISSUES THAT YOUR HONOR HAS THAT YOU'RE CONCERNED WITH,

15   BECAUSE BASICALLY MR. WEINBERGER RAN THROUGH ALL OF THE

16   ARGUMENTS HE MADE IN HIS BRIEF.  AND I WOULD LIKE TO RESPOND TO

17   THOSE IF YOUR HONOR HAS QUESTIONS ABOUT THEM OR CONCERNS ABOUT

18   THEM.

19             WE'VE RESPONDED TO ALL OF THOSE BEFORE, AND IF THERE

20   ARE CERTAIN QUESTIONS THAT ARE NOW IN YOUR HONOR'S MIND, I WILL

21   ADDRESS THOSE, OR I CAN ADDRESS EVERYTHING THAT MR. WEINBERGER

22   JUST RAISED ON --

23             **THE COURT:**  WELL, I WOULD SAY YOU SHOULD ADDRESS

24   BRIEFLY EVERYTHING HE JUST RAISED BUT NOT WITH A PRESENTATION

25   THAT WAS PLANNED BEFOREHAND.  IF YOU COULD JUST GO THROUGH --

```
 1                    (SIMULTANEOUS COLLOQUY.)

 2           MR. CRAMER:   AND I WON'T GO IN THE EXACT SAME ORDER.

 3    MR. WEINBERGER FIRST -- ONE OF THE POINTS HE MADE IS THAT THE

 4    PLAINTIFFS HAVEN'T PRESENTED A COGNIZABLE ANTITRUST THEORY

 5    HERE, ESSENTIALLY.   MR. WEINBERGER SAYS WE DON'T HAVE A

 6    COGNIZABLE THEORY ON DAMAGES.   AND I THINK YOUR HONOR'S

 7    INSTINCT ON THAT IS EXACTLY RIGHT, HE'S MAKING A MERITS POINT

 8    THERE.

 9           THE QUESTION HERE ON CLASS CERTIFICATION IS NOT

10    WHETHER PLAINTIFFS WILL ULTIMATELY BE ABLE TO PROVE THAT THE

11    400 PERCENT PRICE INCREASE WAS PART OF A LEVERAGING TO ENHANCE

12    MONOPOLY POWER ON THE BOOSTED MARKET AND RAISE KALETRA PRICES

13    IN THE BOOSTED MARKET.

14           WHAT PLAINTIFFS NEED TO DO IS -- IS SHOW THAT THEY

15    HAVE A COLORABLE THEORY OF THAT.   AND WE'VE PRESENTED TWO

16    THEORIES OF ANTITRUST VIOLATION HERE.   THE FIRST IS -- DEPENDS

17    UPON THE IMPAIRMENT OF RIVALS.   SO WE CITE THE CASCADE CASE FOR

18    THE IMPAIRMENT OF RIVALS.   AND THE BASIC THEORY OF THAT IS THAT

19    BY RAISING THE PRICE OF NORVIR 400 PERCENT, ABBOTT IS

20    LEVERAGING ITS MONOPOLY POWER INTO THE BOOSTED MARKET, HARMING

21    RIVALS IN THE BOOSTED MARKET, ENHANCING ABBOTT'S MONOPOLY POWER

22    IN THE BOOSTED MARKET AND ALLOWING ABBOTT TO RAISE THE KALETRA

23    PRICE.

24           AND BASICALLY UNDER THAT THEORY, ALL OR PART OF THE

25    400 PERCENT PRICE INCREASE ON NORVIR IS ILLEGAL IF WE CAN PROVE
```

1    THAT UNDER THAT THEORY, AND ALL OR PART OF THE KALETRA PRICE

2    INCREASE IS ILLEGAL IF WE CAN PROVE THAT THEORY.  AND IF WE

3    PROVE THOSE THEORIES, THEN IN THE BUT-FOR WORLD, THE PRICE OF

4    NORVIR WILL BE LOWER AND THE PRICE OF KALETRA WILL BE LOWER.

5              AND UNDER PLAINTIFF'S THEORY, UNDER PLAINTIFF'S

6    PRESENTATION, THE MONOPOLIZATION -- THE CONDUCT OF ABBOTT HAS

7    LED TO HIGHER PRICES OF BOTH NORVIR AND KALETRA.  IN THE

8    BUT-FOR WORLD, THOSE PRICES WOULD BE LOWER, AND EVERYBODY WOULD

9    BE PAYING LESS.

10             **THE COURT:**  WELL, I GUESS WHAT HE'S SAYING IS THAT

11   MAYBE THEY'D BE LOWER, BUT THEY'D BE DIFFERENT AMOUNTS LOWER

12   FOR EVERYBODY, AND, THUS, THERE'D BE PROBLEMS OF WITH

13   INDIVIDUALIZED PROOF OF DAMAGES, WHICH FRANKLY IS -- DOESN'T

14   REALLY MEAN THAT THERE CAN'T BE A CLASS CERTIFICATION EITHER.

15             IN EMPLOYMENT CASES AND OTHER KINDS OF CASES,

16   THEY'RE PLENTY OF THEM WHERE THERE IS STILL INDIVIDUAL DAMAGES

17   CALCULATIONS THAT HAVE TO BE MADE.  SO I'M NOT REALLY SURE EVEN

18   IF YOU WERE RIGHT ABOUT THAT, IN THE WORDS THAT I PUT INTO YOUR

19   MOUTH, THAT THAT WOULD MEAN THAT WE WOULDN'T CERTIFY THE CLASS.

20             (SIMULTANEOUS COLLOQUY.)

21             **THE COURT:**  -- HAVE TO HAVE SOME KIND OF PROCEDURE

22   AT THE END WHEREBY EVERYONE WOULD PROVE UP THEIR DAMAGES LIKE

23   WE DO IN EMPLOYMENT CASES --

24             (SIMULTANEOUS COLLOQUY.)

25             **MR. WEINBERGER:**  -- QUESTION OF DEGREE, YOUR HONOR.

1          **MR. CRAMER:**  AND, YOUR HONOR, THE BLACKIE V. BARRACK

2     CASE THAT WE CITED TO YOUR HONOR IS DIRECTLY ON POINT ON THAT.

3     IT SAYS INDIVIDUALIZED QUESTIONS WITH REGARD TO PROOF OF

4     DAMAGES WILL NOT IMPEDE CLASS CERTIFICATION.  BUT THERE ARE NO

5     INDIVIDUALIZED QUESTIONS, AND THIS IS A DAMAGE QUESTION.

6          THE ANSWER ON IMPACT IS -- IS BASICALLY IF WE STEP

7     BACK, WE SEE WHAT WENT ON HERE.  ABBOTT INFLATED THE NORVIR

8     PRICE 400 PERCENT.  PLAINTIFFS ARGUE THAT THAT ALLOWED ABBOTT

9     TO MONOPOLIZE THE BOOSTING MARKET AND INFLATE THE KALETRA PRICE

10    25 PERCENT.

11         ALL WE'RE SAYING, BASICALLY IF YOU STEP BACK, IS

12    THAT WHEN A COMPANY MASSIVELY RAISES ITS PRICES, ITS PURCHASERS

13    PAY MORE.  AND AS TO THE QUESTION AS TO WHETHER SOME PAY

14    DIFFERENT PRICES, FIRST OF ALL, ABBOTT HAS CONCEDED THAT

15    80 PERCENT OF THE CLASS PURCHASES HERE WERE AT THE LIST PRICE.

16         SO WHAT WE'RE TALKING ABOUT IS 20 PERCENT OF THE

17    PURCHASES WHERE THERE MIGHT BE SOME VARIANCE.  BUT WHAT

18    PLAINTIFFS HAVE SHOWN AND WHAT DR. SINGER SHOWS IS THAT NEARLY

19    ALL OF THE PURCHASES HERE WERE EITHER AT THE LIST PRICE, THE

20    WHOLESALE ACQUISITION COST, OR RELATED TO THE LIST PRICE, THAT

21    THE -- TO THE EXTENT THERE'S INDIVIDUALIZED NEGOTIATIONS, THEY

22    GO ON IN THE CONTEXT OF THE LIST PRICE.

23         SO IF LIST PRICE GOES UP 400 PERCENT, IF I WAS

24    GETTING A 50 PERCENT DISCOUNT OF THAT LIST PRICE, I STILL PAY

25    MORE IN THE BUT-FOR WORLD EVEN THOUGH I'M DOING BETTER THAN MY

1  FELLOW CLASS MEMBERS.

2              **THE COURT:**  OKAY.

3              **MR. CRAMER:**  IT'S A RISING TIDE LIFTS ALL BOATS --

4              **THE COURT:**  OKAY.

5              **MR. CRAMER:**  -- THEORY, BUT WE DON'T -- LET ME JUST

6  MAKE ONE OTHER POINT ON THAT, YOUR HONOR.

7              WE DON'T EVEN NEED TO RELY ON THAT BECAUSE WHAT --

8  BECAUSE PROFESSOR HAY, ABBOTT'S ECONOMIST, HAVE DONE US A

9  FAVOR.  PROFESSOR HAY SAYS, WELL, DIFFERENT PEOPLE PAY

10  DIFFERENT AMOUNTS, AND PRICES VARIED OVER TIME AND -- THE

11  THINGS THAT DEFENDANTS TYPICALLY SAY IN TRYING POST CLASS

12  CERTIFICATION.  BUT WHAT PROFESSOR HAY FINDS IS HE LOOKS AT

13  WHAT HAPPENED TO PRICES BEFORE AND AFTER THE 400 PERCENT PRICE

14  INCREASE.  AND, LO AND BEHOLD, WHAT DOES HE FIND?  HE FINDS

15  THAT 198 OUT OF 201 CLASS MEMBERS PAY MORE AFTER THE PRICE

16  INCREASE THAN BEFORE.

17              IN OTHER WORDS, PROFESSOR HAY, ABBOTT'S ECONOMIST,

18  HAS -- HAS CONFIRMED PLAINTIFFS' ANALYSIS.  PLAINTIFFS SAY ALL

19  PAY WAC OR LIST PRICE OR A PRICE BASED ON WAC OR LIST PRICE,

20  AND AS A RESULT, IF THE PRICE GOES UP, EVERYONE PAYS MORE.  AND

21  PROFESSOR HAY THEN ANALYZES THE SALES DATA AND FINDS THAT

22  EVERYONE, IN FACT, PAID MORE ON AT LEAST SOME UNITS.  AND IN

23  LEAD -- INDEED, HE FINDS THEY PAID MORE ON AVERAGE.  EVERYBODY

24  IS WORSE OFF.

25              AND IF YOU LOOK AT THE UNAUTHORIZED SURREBUTTAL --

1   SURREPLY OF THE DEFENDANTS OF ABBOTT, THEY SEEM TO EVEN CONCEDE

2   THAT POINT ON PAGE 8 OF THEIR UNAUTHORIZED PROPOSED SURREPLY.

3   WHAT DO THEY SAY?  THEY SAY THE -- LET ME JUST GET IT OUT FOR

4   YOUR HONOR.  IT'S PART OF MY PRESENTATION.  IT'S --

5                 (PAUSE IN THE PROCEEDINGS.)

6           **MR. CRAMER:**  I THINK IT'S ACTUALLY QUITE INDICATIVE

7   AND USEFUL HERE.  THEY SAY -- IT'S ON MY SLIDE 17, THE FACT

8   THAT ALL OR NEARLY ALL DIRECT PURCHASERS PAID MORE AFTER

9   DECEMBER 2003 THAN BEFORE IS NOT ENOUGH TO ANSWER THE CRITICAL

10  QUESTION OF WHETHER ANY OF THEM SUFFERED INJURY OR DAMAGES.

11          WHAT'S -- THERE ARE TWO THINGS THAT ARE IMPORTANT

12  ABOUT IT.  NUMBER ONE, THEY APPEAR TO BE CONCEDING WHAT THEIR

13  OWN EXPERT FOUND, THAT EVERYBODY PAID MORE AFTER 2003 THAN

14  BEFORE.  AND THEN THEY SAY, WELL, THAT'S NOT ENOUGH TO ANSWER

15  WHETHER ANY OF THEM ARE INJURED.

16          WELL, OF COURSE, THAT'S NOT.  PLAINTIFFS WOULD HAVE

17  TO PROVE THAT THE CHALLENGED CONDUCT THAT CAUSED EVERYONE TO

18  PAY MORE WAS ILLEGAL.  THAT'S PROOF OF THE VIOLATION.  WE HAVE

19  TO SHOW THAT ABBOTT'S CONDUCTS WAS ILLEGAL.  BUT, OF COURSE,

20  ABBOTT HAS CONCEDED THAT THAT'S COMMON.

21          THE TRIAL WILL FOCUS ON THIS CASE IN PROVING THAT

22  THE 400 PERCENT PRICE INCREASE WAS ILLEGAL -- WAS ILLEGAL

23  MONOPOLIZATION AND LEVERAGING.

24          **THE COURT:**  OKAY.  WHY DON'T YOU JUST ADDRESS

25  BRIEFLY HIS OTHER POINTS.

 1              **MR. CRAMER:**  YES, I WILL.

 2              **THE COURT:**  -- COMES TO MIND IS THE PEOPLE WHO

 3    BOUGHT ONLY KALETRA.

 4              **MR. CRAMER:**  RIGHT.  THEY HAD -- HE HAS THE -- THEY

 5    HAVE THREE LITTLE CONFLICT ARGUMENTS.  THEY'RE QUITE CLEVER,

 6    BUT NONE OF THEM HOLD WATER.  THE ONE THAT MR. WEINBERGER

 7    ADDRESSED WAS THE SUPPOSED CONFLICT BETWEEN THOSE CLASS MEMBERS

 8    THAT ONLY BUY NORVIR AND THOSE CLASS MEMBERS THAT ONLY BUY

 9    KALETRA.

10              FIRST THING TO NOTE IS THAT NEARLY ALL OF THE

11    PURCHASES IN THIS CASE ARE MADE BY ENTITIES THAT BUY BOTH.  THE

12    SECOND POINT TO MAKE IS THAT THERE'S NO CONFLICT BECAUSE THE --

13    BASICALLY WHAT THE -- IF YOU UNDERSTAND WHAT THE THEORIES IN

14    THE CASE ARE, YOU'LL SEE THAT THERE'S NO CONFLICT.

15              THE THEORY OF THE CASE IS THAT ABBOTT RAISED ITS

16    NORVIR PRICE 400 PERCENT IN ORDER TO LEVERAGE THAT MONOPOLY

17    POWER AND THEN ALLOW ITSELF TO RAISE PRICE IN THE BOOSTED

18    MARKET.

19              AND WHAT ABBOTT IS SAYING IS THAT THERE'S A CONFLICT

20    BETWEEN THE NORVIR-ONLY PURCHASERS AND THE KALETRA-ONLY

21    PURCHASERS BECAUSE THE NORVIR-ONLY PURCHASERS, THEY SAY WOULD

22    HAVE AN INCENTIVE TO SHOW THAT THE KALETRA PRICE WAS LOWER.  SO

23    THE DIFFERENTIAL BETWEEN THE TWO --

24              **THE COURT:**  NO, I THINK WHAT THEY'RE SAYING IS IF

25    ABBOTT DECIDES TO SOLVE ITS PROBLEMS BY RAISING THE PRICE OF

1    KALETRA BY 400 PERCENT ALSO, THEN THE PEOPLE WHO ONLY BUY

2    KALETRA WILL BE HURT, AND THE PEOPLE WHO ONLY BUY NORVIR WON'T

3    BE.

4            **MR. CRAMER:**  THAT'S A DIFFERENT CONFLICT.

5            **THE COURT:**  WELL, THAT'S THE ONE I UNDERSTAND HIM TO

6    BE ARGUING.

7            **MR. CRAMER:**  OKAY.  I WILL ADDRESS THAT ONE.  THAT

8    IS -- THEY HAVE TWO DIFFERENT CONFLICTS THAT ARISE OUT OF THIS

9    QUESTION.  ONE IS THE ONE I WAS JUST ADDRESSING.  THIS IS A

10   DOWNSTREAM CONFLICT.  IN ESSENCE, WHAT THEY'RE ARGUING IS THAT

11   ABBOTT WOULD RESPOND TO PLAINTIFF PURSUING ONE THEORY OVER

12   ANOTHER BY SAYING, OH, YOU'RE COMPLAINING THAT THERE'S A BIG

13   PRICE DIFFERENTIAL BETWEEN NORVIR AND KALETRA.  I KNOW HOW

14   WE'LL SOLVE IT.  WE'LL RAISE THE PRICE OF KALETRA AND ELIMINATE

15   THE PROBLEM.

16           THEY MAKE TWO ARGUMENTS THERE.  ONE IS THE ARGUMENT

17   THAT MR. WEINBERGER ADDRESSED, THAT THE PRICE OF KALETRA --

18   THAT WE CAN SHOW UNDER THE CONSUMER WELFARE APPROACH THAT THE

19   PRICE OF NORVIR -- THAT THE NORVIR PRICE INFLATION IS ILLEGAL

20   REGARDLESS OF THE PRICE OF KALETRA.

21           BUT LET ME PUT THAT ASIDE AND JUST ADDRESS

22   MR. WEINBERGER'S DIRECT POINT.  THE POINT IS -- THE POINT IS

23   THAT ABBOTT WOULD NOT HAVE HAD AN INCENTIVE TO RAISE THE PRICE

24   OF KALETRA BECAUSE THE WHOLE PURPOSE OF THE SCHEME, PLAINTIFFS

25   ARGUE ON THE MERITS, IS THAT ABBOTT RAISED THE PRICE

1   400 PERCENT OF NORVIR IN ORDER TO -- IN ORDER TO LEVERAGE

2   MONOPOLY POWER INTO THE BOOSTED MARKET.

3           IF ABBOTT COULD HAVE SIMPLY RAISED THE PRICE OF BOTH

4   PROFITABLY, IT WOULD HAVE DONE SO.  IT DIDN'T BECAUSE THE WHOLE

5   PURPOSE OF THE SCHEME WAS TO LEVERAGE MONOPOLY POWER.  THEY

6   WANTED TO CREATE THAT DIFFERENTIAL SO THAT THEY CAN IMPAIR

7   RIVALS IN THE BOOSTED MARKET, PENALIZE PURCHASERS FOR BUYING

8   FROM LEXIVA AND REYATAZ BECAUSE THEN THEY WOULD HAVE TO PAY

9   THIS HIGH PENALTY PRICE FOR NORVIR.

10          SO THE WHOLE PURPOSE OF THE SCHEME, PLAINTIFFS

11  ARGUE -- THE WHOLE PURPOSE OF WHY WE'RE HERE IS TO SHOW THAT

12  ABBOTT PURPOSELY MADE THAT DIFFERENTIAL AND DID IT BECAUSE THAT

13  WAS WHAT WAS PROFITABLE.

14          ABBOTT -- WHAT WE ARGUED -- WHAT OUR ARGUMENT HERE

15  IS FOR BOTH THE NORVIR-ONLY AND THE KALETRA-ONLY PURCHASERS IS

16  THAT IN A BUT-FOR WORLD OR IN A WORLD WHERE ABBOTT WASN'T

17  ALLOWED TO DO THAT, THEY WOULDN'T RAISE THE PRICE OF KALETRA.

18  THEY COULDN'T BECAUSE THE ONLY -- THE ONLY WAY THEY CAN GET THE

19  PRICE OF KALETRA UP IS THROUGH THIS LEVERAGING.

20          WHAT THEY WOULD DO IS THEY WOULD HAVE TO LOWER THE

21  PRICE OF NORVIR, 'CAUSE THAT WAS ILLEGAL, AND THEY WOULD ALSO

22  HAVE TO LOWER THE PRICE OF KALETRA.  THAT'S OUR ARGUMENT.

23          THE SECOND ARGUMENT IS THAT THAT'S A DOWNSTREAM

24  CONFLICT.  THAT'S A CONFLICT THAT YOUR HONOR ALREADY CONSIDERED

25  AND DEALT WITH IN THE ORDER DENYING THE MOTION TO COMPEL

1    DOWNSTREAM DISCOVERY.

2              THAT CONFLICT RELATES TO WHETHER PURCHASERS GAIN OR

3    LOSE AS A RESULT OF AN UN- -- ON A NET BASIS AS A RESULT OF

4    PROCEEDING IN LITIGATION, AS A RESULT OF LITIGATION GOING

5    FORWARD.

6              THAT CONFLICT, THIS COURT HAS ALREADY RULED, IS OUT

7    OF BOUNDS AS A MATTER OF LAW BECAUSE WHAT PLAINTIFFS HERE ARE

8    SEEKING IS OVERCHARGES.  AND WHETHER -- WHETHER SOMEONE GAINED

9    OR LOST OR WOULD GAIN OR LOSE IS NOT RELEVANT TO THAT THEORY.

10             AND THE FINAL POINT I WOULD MAKE AS TO THAT IS THAT

11   IF YOUR HONOR REALLY THINKS THAT THERE'S A CONFLICT, POTENTIAL

12   CONFLICT HERE -- CERTAINLY IT'S NOT ACTUAL.  IT'S SPECULATIVE.

13   WE DON'T KNOW WHAT ABBOTT WOULD DO.  THERE ARE NO CLASS MEMBERS

14   IN THE COURT COMPLAINING ABOUT THIS.

15             IN A LOT OF THE CASES THAT ABBOTT CITES, THE ABSENT

16   CLASS MEMBERS ACTUALLY SHOW UP AND SAY YOU KNOW WHAT, THIS

17   THEORY, IT'S GOING TO HURT US.  AND THEY PUT IN DECLARATIONS OR

18   SHOW UP IN COURT.  WE DON'T HAVE THAT HERE.

19             WHAT WE HAVE IS THE OPPOSITE.  WE HAVE THE THREE

20   LARGEST CLASS MEMBERS SUPPORTING CLASS CERTIFICATION HERE.  BUT

21   IF YOUR HONOR THINKS THERE'S A CONCERN -- A PROBLEM THAT MIGHT

22   COME UP DOWN THE ROAD, THE ANSWER ISN'T TO NOT CERTIFY THE

23   CLASS.  THE ANSWER IS TO PROVIDE NOTICE AND OPT-OUT PROCEDURES,

24   JUST AS DUE PROCESS ALLOWS AND REQUIRES.

25             THE CONFLICT -- WHOLE CONFLICT ISSUE IS ABOUT THE

```
 1   DUE PROCESS RIGHTS OF ABSENT CLASS MEMBERS.  THAT'S WHAT WE

 2   CARE ABOUT.  AND WHAT WE -- WHAT WE SHOULD BE DOING HERE IS

 3   THINKING ABOUT NOT WHAT'S IN THE INTEREST OF ABBOTT BUT WHAT'S

 4   IN THE INTEREST OF THE ABSENT CLASS MEMBERS.  AND IF THERE ARE

 5   ABSENT CLASS MEMBERS WHO DON'T LIKE THE THEORY THAT PLAINTIFFS

 6   ARE PURSUING HERE --

 7               THE COURT:  OKAY.

 8               MR. CRAMER:  -- WHO BUY --

 9               THE COURT:  THAT'S FINE.  YOU CAN GO ON.  I DON'T

10   KNOW IF HE HAD ANY OTHER POINTS THAT YOU WANTED TO ADDRESS.

11               MR. CRAMER:  I THINK THAT I'VE -- I'VE BASICALLY

12   COVERED MOST OF MY -- MOST OF MY MAIN POINTS.  AND IF YOUR

13   HONOR HAS ANY OTHER QUESTIONS, I WILL ADDRESS THEM.

14               LET ME JUST SAY THAT THERE ARE NOW 11 RECENT

15   DECISIONS WITH THE SAME -- BASICALLY THE SAME CLASS

16   REPRESENTATIVES AND BASICALLY THE SAME ANTI-TRUST THEORIES THAT

17   HAVE BEEN CERTIFIED BY DISTRICT COURTS, INCLUDING ONE JUST

18   YESTERDAY THAT WE FILED WITH YOUR HONOR IN THE TRICOR CASE

19   WHERE ABBOTT IS A DEFENDANT.  AND THE NAMED PLAINTIFFS IN THAT

20   CASE, MEIJER, ROCHESTER DRUG, LOUISIANA WHOLESALE.

21               THE ABSENT CLASS MEMBERS, BASICALLY THE SAME CASE --

22   SAME CLASS AS THIS CASE.  AND THE OTHER TEN CASES WE'VE CITED

23   TO YOUR HONOR, INCLUDING THE JVDL CASE AND THE WELLBUTRIN CASE

24   AND THE -- CASE, ALL OF THESE CASES BASICALLY ALLEGE THAT A

25   DEFENDANT MONOPOLIST OR DEFENDANT ANTI-TRUST -- A DEFENDANT
```

1    PHARMACEUTICAL COMPANY USED ITS POWER TO HARM RIVALS AND RAISE

2    ITS PRICES.

3            AND IN ALL THOSE CASES, DEFENDANTS MADE THE SAME

4    ARGUMENTS THAT ABBOTT IS MAKING HERE, THAT THERE ARE THESE

5    SPECULATIVE CONFLICTS, THAT IMPACT CAN'T BE PROVEN ON A

6    CLASS-WIDE BASIS.  AND IN ALL THE CASES THAT WE CITED TO YOUR

7    HONOR, THE CASES WERE CERTIFIED, INCLUDING THE JVDL CASE, WHICH

8    IS DIRECTLY ON POINT, WHICH DIRECTLY REJECTED THE CONFLICT

9    ARGUMENT THAT MR. WEINBERGER IS MAKING AND DIRECTLY REJECTED

10   THE POINT ABOUT DISCOUNTING.

11           IT SAID THAT IF THERE IS CONDUCT THAT RAISES THE

12   LIST PRICE, THE WAC PRICE, AS A RESULT OF ANY COMPETITIVE

13   CONDUCT, THEN THE FACT OF DISCOUNTING DOESN'T MATTER FOR THE

14   SAME REASONS THAT I STATED TO YOUR HONOR.  RISING TIDE LIFTS --

15           **THE COURT:**  OKAY.  DID YOU WANT TO REPLY --

16           **MR. WEINBERGER:**  VERY BRIEFLY, YOUR HONOR.

17           FIRST OF ALL, MR. CRAMER SAYS THAT ALMOST ALL THE

18   PURCHASES WERE MADE AT LIST.  THE FACT IS THEIR OWN EXPERT

19   ADMITS THAT 20 PERCENT OF PURCHASES -- THAT'S A BIG NUMBER IN

20   OUR CASE CONSIDERING MOST OF THESE PURCHASES WERE MADE BY THE

21   BIG THREE -- 20 PERCENT OF THE PURCHASES WERE MADE AT LESS THAN

22   LIST, AND THAT REPRESENTS ALMOST 50 PERCENT OF THE PURCHASES.

23   SO IT'S NOT A MINOR PROBLEM.  IT'S A SIGNIFICANT PROBLEM.

24           SECONDLY, WHOLESALERS, WE'VE SHOWN THAT 60 PERCENT

25   OF PURCHASERS, PURCHASERS, CLASS MEMBERS, MADE PURCHASES OF

 1   JUST KALETRA OR NORVIR.  SO, AGAIN, IT'S NOT A MINOR PROBLEM.

 2   A CLASS REPRESENTATIVE CAN'T SAY, WELL, I'M NOT GOING TO WORRY

 3   ABOUT ALL THOSE LITTLE GUYS HERE.  WE'RE JUST GOING TO WORRY

 4   ABOUT THE BIG GUYS.

 5        THE WHOLE POINT IS THAT EVERYBODY HAS TO BE

 6   REPRESENTED.  AS FAR AS THE CONFLICT IS CONCERNED, YOUR HONOR,

 7   THIS IS NOT A DOWNSTREAM ISSUE.  LET ME BE VERY CLEAR ABOUT

 8   THIS.  IF ABBOTT RAISED THE PRICE OF KALETRA IN RESPONSE TO A

 9   FINDING OF LIABILITY IN ORDER TO ELIMINATE THE DIFFERENTIAL OF

10   ANY FUTURE CLAIM OF LEVERAGING IF THERE IS ONE, THEN THE DIRECT

11   PURCHASER WHO'S BUYING KALETRA FROM ABBOTT IS GOING TO PAY

12   MORE, HAS NOTHING TO DO WITH THE DOWNSTREAM ISSUE.

13        IF ABBOTT LOWERS THE PRICE OF NORVIR, THEN THE

14   DOWNSTREAM -- THEN THE DIRECT PURCHASER IS GOING TO PAY LESS,

15   REGARDLESS OF WHAT THEY'RE RESELLING IT FOR.  SO I'M NOT MAKING

16   A DOWNSTREAM ARGUMENT.  I UNDERSTAND THE COURT HAS NOT ACCEPTED

17   THAT, AND THAT WILL BE AN ISSUE FOR ANOTHER DAY.  BUT THIS IS

18   NOT A DOWNSTREAM ARGUMENT.

19        SO THE LAST POINT I WANT TO MAKE IS WITH RESPECT TO

20   ALL THESE OTHER CASES THAT MR. CRAMER IS REFERRING TO.  THOSE

21   CASES, FOR THE MOST PART, ARE FUNDAMENTALLY DIFFERENT BECAUSE

22   THEY INVOLVE ALLEGED PER SE VIOLATIONS WHERE A PHARMACEUTICAL

23   COMPANY WAS ALLEGED TO DELAY THE ENTRY OF A GENERIC DRUG.

24        AND IN THAT SITUATION, IT WAS NOT DIFFICULT TO SHOW

25   THAT MOST PURCHASERS WERE GOING TO BUY A GENERIC IF IT WAS

1   AVAILABLE, AND THE GENERIC WOULD HAVE COST A LOT LESS.  AND

2   THERE ARE MODELS -- WELL-ACCEPTED ECONOMIC MODELS AND FORMULAS

3   FOR GENERIC ENTRY, PRICE OF GENERICS WHEN THEY ENTER, OR

4   WHATEVER THAT ECONOMISTS RELY UPON IN THOSE CASES TO SHOW THAT

5   THERE'S A COMMON IMPACT OF DAMAGES.

6           WE DON'T HAVE THAT HERE.

7           **THE COURT:**  OKAY.

8           **MR. CRAMER:**  YOUR HONOR, IF I COULD ADDRESS THAT

9   LAST POINT 'CAUSE I FIND IT AMUSING, GIVEN THAT MR. WEINBERGER

10  WAS IN ONE OF THESE CASES AND HE DIDN'T AGREE THAT THERE WERE

11  COMMON METHODS IN ANY --

12          **MR. WEINBERGER:**  NEITHER DID THE 11TH CIRCUIT, YOUR

13  HONOR.

14          **THE COURT:**  OKAY.  WELL, I WILL TAKE ANOTHER LOOK AT

15  IT, BUT I AM STILL INCLINED TO CERTIFY THE CLASS, AND YOU

16  SHOULD PROBABLY MAKE PLANS WITH THAT IN MIND.

17          **MR. WEINBERGER:**  THANK YOU, YOUR HONOR.

18          **THE COURT:**  TURNING TO THE OTHER CASE --

19          **MR. CRAMER:**  THANK YOU, YOUR HONOR.

20          **THE COURT:**  YOU ALL ARE AMICI IN THAT CASE.

21          I SENT OUT A TENTATIVE ORDER BECAUSE I WANTED ALL OF

22  YOUR COMMENTS ON THE CHANGES THAT I WOULD THINK ABOUT OR

23  SUGGEST MAKING.

24          **MR. CRAMER:**  WOULD YOU LIKE APPEARANCES?  I DIDN'T

25  APPEAR.

1          **THE COURT:**  OH, I'M SORRY.  YEAH, GO AHEAD.

2          **MR. WILES:**  ALEXANDER WILES FOR AMICUS CURIAE

3   SMITHKLINE BEECHAM.

4          **MR. HURST:**  JIM HURST ON BEHALF OF ABBOTT LABS --

5          **MR. TABACCO:**  JOSEPH TABACCO FOR THE CLASS

6   PLAINTIFFS, INDIRECT PLAINTIFFS.

7          **MR. WIEBE:**  RICHARD WIEBE FOR THE DOE PLAINTIFFS.

8          **MS. SALZMAN:**  HOLLIS SALZMAN FOR SEIU.

9          **MR. GERSTEIN:**  YOUR HONOR, I'M BRUCE GERSTEIN.  I'M

10  APPEARING FOR THE DIRECT PURCHASER CLASS AMICIAE.

11         **MR. AUBERTINE:**  YOUR HONOR, ANDREW AUBERTINE FOR THE

12  DIRECT PURCHASER CLASS.

13         **THE COURT:**  SO BEFORE WE GET TO THE PHRASEOLOGY, LET

14  ME SAY THAT I HOPE EVERYONE IS OF THE SAME UNDERSTANDING THAT I

15  AM WITH RESPECT TO WHAT THE NINTH CIRCUIT DOES WITH

16  INTERLOCUTORY APPEALS, WHICH IS TO SAY IT REALLY ISN'T A

17  QUESTION OF PHRASING AND CERTIFYING A QUESTION LIKE IT WOULD BE

18  IF YOU WERE CERTIFYING A QUESTION TO THE CALIFORNIA

19  SUPREME COURT, FOR EXAMPLE.  IT'S AN APPEAL OF THE CASE SO

20  YOU'D BE APPEALING ALL OF THE COURT'S DISPOSITIVE ORDERS.

21         NOW, WE'RE WRITING UP SOME QUESTIONS TO ASK THEM

22  SORT OF TO MAKE IT EASIER FOR THEM AND TO HELP THEM DECIDING

23  WHETHER THEY WANT TO TAKE IT.  BUT THEY WOULDN'T JUST TAKE IT

24  AND ANSWER THOSE QUESTIONS, YES, YES, NO, OR SOMETHING LIKE

25  THAT.  THEY WOULD TAKE THE WHOLE RECORD ON THE SUMMARY JUDGMENT

```
 1    MOTIONS, AND THEY WOULD DECIDE IT AS THEY WOULD AN APPEAL OF A

 2    FINAL JUDGMENT.

 3              MR. HURST:  YEAH.

 4              THE COURT:  DO YOU AGREE WITH THAT?

 5              MR. HURST:  YEAH, I DO.

 6              MR. TABACCO:  ABSOLUTELY.

 7              THE COURT:  YEAH.  OKAY.

 8              MR. HURST:  CAN I SAY SOMETHING?

 9              JUST THE ANALYSIS, THOUGH, IN TERMS OF WHAT IS A

10    CONTROLLING ISSUE OF LAW AND SO FORTH, THAT SORT OF FOCUSES ON

11    A PARTICULAR LEGAL ISSUE, WHICH IS --

12              THE COURT:  TRUE.  YEAH.

13              MR. HURST:  -- FRAME THE ISSUES.

14              THE COURT:  I JUST WANTED TO ANSWER THEM IN THAT

15    WAY.

16              MR. HURST:  I AGREE.

17              THE COURT:  OKAY.

18              THEN I HAD A COUPLE OF QUESTIONS JUST ABOUT THE

19    WORDING OF THE THING -- WELL, THE OTHER PARTS OF THE AGREEMENT.

20              MY READING OF IT IS THAT -- THAT THE DECISION AS TO

21    WHETHER ABBOTT IS PREVAILING OR NOT PREVAILING DEPENDS UPON THE

22    FINAL DECISION OF THE NINTH CIRCUIT, EVEN IF THAT MEANS AN

23    EN BANC DECISION AND THAT ABBOTT AFTER THAT CAN SEEK CERTIORARI

24    BUT THAT WOULD NOT AFFECT THE FACT THAT ABBOTT WOULD NOT BE

25    PREVAILING IF -- EVEN IF ABBOTT LATER WON IN THE U.S.
```

```
 1    SUPREME COURT.

 2              MR. HURST:  THAT'S TRUE.

 3              THE COURT:  OKAY.  AND I SEE WHERE YOU'VE GIVEN

 4    JURISDICTION OVER ANY DISPUTES ABOUT THE AGREEMENT TO A

 5    DIFFERENT PERSON AT JAMS, NOT TO JUDGE INFANTE NOR TO MYSELF,

 6    AND THAT'S FINE WITH ME.  THERE WOULD HAVE BEEN OTHER

 7    POSSIBILITIES, BUT IF THAT'S WHAT YOU BOTH THINK IS BEST,

 8    THAT'S FINE.

 9              AND THAT WOULD BE DISPOSITIVE, I TAKE IT.

10              IF THERE WAS A DISPUTE ABOUT THE LANGUAGE OF A

11    RELEASE OR THIS OR THAT, THAT THAT WOULD BE DECIDED ON A

12    DISPOSITIVE BASIS BY THE AGREED-UPON JAMS MEDIATOR.

13              MR. HURST:  PRIVATE ARBITRATION IS THE WAY WE

14    DECIDED TO GO ON THAT.

15              MR. TABACCO:  YES.  AND, OF COURSE, THAT WAS, LIKE

16    ANYTHING ELSE, A NEGOTIATED RESOLUTION.

17              THE COURT:  OKAY.

18              NOW, I'M A LITTLE CONCERNED ABOUT THE CHARITABLE

19    CONTRIBUTION ISSUE.  AND IT'S RAISED IN THE AGREEMENT THAT

20    ABBOTT WOULD NOT ALLOW THIS CY PRES PAYMENT -- CY PRES --

21    PEOPLE PRONOUNCE IT DIFFERENT WAYS -- TO TAKE THE PLACE OF

22    CHARTABLE CONTRIBUTIONS THAT IT WOULD OTHERWISE HAVE MADE.  AND

23    I'M WONDERING -- I WOULDN'T WANT IT TO AND I'M WONDERING TO

24    MYSELF HOW I WOULD KNOW WHETHER IT DID.

25              AND IT SEEMS TO ME THE ONLY WAY ONE WOULD KNOW WOULD
```

1   BE TO SEE A RECORD OF ABBOTT'S CHARTABLE CONTRIBUTIONS FOR THE

2   LAST FIVE YEARS OR SOMETHING ALONG THOSE LINES.  OTHERWISE, HOW

3   WOULD WE KNOW THAT EVERY YEAR FOR THE LAST FIVE YEARS, THEY'VE

4   MADE A $10 MILLION DONATION TO ANTI-AIDS ORGANIZATIONS, AND

5   MAKING ANOTHER ONE NEXT YEAR WOULDN'T -- OR THIS YEAR WOULDN'T

6   BE MEANINGFUL.

7             SO DO YOU HAVE ANY WAY OF DEMONSTRATING HOW WE CAN

8   BE SURE THAT IS MEANINGFUL?

9             **MR. HURST:**  I HAVEN'T ACTUALLY LOOKED INTO THE

10  ISSUE.  THIS AGREEMENT AND THAT PARTICULAR ISSUE WAS SOMETHING

11  THAT VETTED WITH VERY SENIOR PEOPLE AT ABBOTT LABORATORIES.  SO

12  I'M POSITIVE THEY HAVE A WAY OF ENSURING THAT THAT HAPPENS.  I

13  DON'T KNOW WHAT KIND OF DOCUMENTATION WE COULD PROVIDE TO PROVE

14  THAT UP, ALTHOUGH I'D BE HAPPY TO WORK WITH COUNSEL TO TRY TO

15  COME UP WITH A PROPOSAL FOR YOUR HONOR.

16            **THE COURT:**  IT'S PROBABLY NOT CONFIDENTIAL.  I MEAN,

17  THEY MUST CLAIM IT ON THEIR TAX RETURNS.

18            **MR. HURST:**  I WOULD THINK SO.

19            **THE COURT:**  WHATEVER THEY DO, IT MUST BE IN THEIR

20  CORPORATE FILINGS OR --

21            **MR. HURST:**  MY GUESS, THOUGH, IS THAT IT VARIES YEAR

22  TO YEAR.

23            **THE COURT:**  RIGHT.

24            **MR. HURST:**  WE WOULDN'T BE ABLE TO LOOK AT THE LAST

25  FIVE YEARS AND SAY, THEREFORE, WE WOULD HAVE MADE "X" AMOUNT

```
 1    THIS YEAR.  BUT THERE WILL BE PARTICULAR PAYMENTS TO IDENTIFY

 2    CHARITIES UNDER THIS SETTLEMENT AGREEMENT.  AND WHAT ABBOTT HAS

 3    COMMITTED TO IS THAT WOULD NOT RESULT IN THE REDUCTION OF

 4    OTHERWISE PLANNED CHARTABLE DONATIONS.

 5              THE COURT:  RIGHT.

 6              HAVE YOU THOUGHT ABOUT SOME WAY OF MAKING SURE THAT

 7    THAT'S THE CASE?

 8              MR. TABACCO:  THERE ARE A COUPLE OF THOUGHTS ABOUT

 9    THAT.  OBVIOUSLY, IF IT BECOMES AN ENFORCEMENT ISSUE --

10              THE COURT:  NO, IT'S MORE OF A DISCLOSURE ISSUE TO

11    ME.

12                   (SIMULTANEOUS COLLOQUY.)

13              MR. TABACCO:  BUT TO ENFORCE THE PROVISION THAT

14    SOMEHOW THEY'RE NOT JUST SHIFTING PAYMENTS, WHICH IS OBVIOUSLY

15    THE CONCERN.  I MEAN, OBVIOUSLY, THE FIRST THING WOULD BE THE

16    DISCLOSURE, THE REPORTING HISTORICAL RECORDS.  IN OTHER CASES

17    WHERE THIS ISSUE HAS COME UP, THAT'S EXACTLY WHAT WE'VE DONE.

18    WE'VE GOTTEN A ANNUAL REPORT TO LOOK AT TO SEE WHAT THE TRACK

19    RECORD IS.  MANY CORPORATIONS, AND ABBOTT'S NOT ALONE, GIVE A

20    LOT OF MONEY, AND THERE'S -- IT'S WELL DOCUMENTED.

21              THE COURT:  ARE THEY PUBLIC DOCUMENTS OR --

22              MR. TABACCO:  NO.

23              THE COURT:  -- DO YOU HAVE TO GET THEIR AGREEMENT TO

24    SHOW --

25              MR. TABACCO:  YOU HAVE TO GET THEIR AGREEMENT --
```

1    **THE COURT:**  SO MAYBE YOU OUGHT TO TALK ABOUT THAT

2    AND SEE IF YOU CAN'T AGREE ON SOME DISCLOSURE THAT WOULD MAKE

3    SURE THAT THAT WAS GOING TO HAPPEN.

4    **MR. HURST:**  YEAH, I'M SURE WE COULD WORK SOMETHING

5    OUT.

6    **THE COURT:**  OKAY.

7    THE EXHIBIT A AND EXHIBIT B ARE SWITCHED.  EXHIBIT B

8    I HAD A QUESTION ABOUT BECAUSE IT SAYS THESE ARE THE SAMPLE

9    PROPOSED ORDERS FOR THE FUTURE.

10    EXHIBIT B IS MEANT TO BE THE FINAL JUDGMENT ORDER.

11    BUT IT SAYS 54B, AND 54B IS A PARTIAL JUDGMENT.  AT THIS POINT,

12    IT WOULD BE A --

13    **MR. TABACCO:**  FINAL JUDGMENT.

14    **THE COURT:**  -- RULE 58 ORDER.  IT WOULDN'T BE A RULE

15    54B ORDER.

16    (INTERRUPTION IN THE PROCEEDINGS; CELL PHONE

17    RINGING.)

18    **MR. TABACCO:**  OH, MY GOD.

19    (OFF-THE-RECORD DISCUSSION.)

20    **THE COURT:**  AM I RIGHT?

21    **MR. HURST:**  YOU ARE RIGHT, YOUR HONOR.  THAT WAS A

22    MISTAKE.

23    **THE COURT:**  AND THEN IF YOU LOOK TO THE BODY OF IT,

24    TOO, IT'S IN --

25    **MR. TABACCO:**  APOLOGIZE, YOUR HONOR.

1          **THE COURT:**  PARAGRAPH SIX, THE LAST PHRASE IS "ONCE

2     THE NINTH CIRCUIT RESOLVES THE INTERLOCUTORY APPEAL IN THE

3     ACTION."  THAT SHOULDN'T BE THERE BECAUSE THIS ORDER WOULD NOT

4     BE SIGNED UNLESS IT ALREADY HAD, RIGHT?  I MEAN, THIS IS FINAL

5     JUDGMENT THAT I SIGN WHEN EVERYTHING'S OVER.

6          **MR. HURST:**  WHEN WE'RE ALL FINISHED UP IN THE NINTH

7     CIRCUIT, AND IT COMES BACK DOWN.

8          **THE COURT:**  ISN'T THAT RIGHT?  I MEAN, THAT'S THE

9     WAY I'M UNDERSTANDING IT.

10          **MR. HURST:**  YOU ARE CORRECT.

11          **THE COURT:**  SO THAT PHRASE SHOULD BE OUT OF THERE.

12          NOW, YOU MENTION A LIST OF ORDERS THAT YOU'RE

13     APPEALING AND ONE OF THEM I COULDN'T FIND ANY ORDER ON THAT

14     DATE.  OH, I GUESS I NOTED THAT IN THE --

15          **MR. TABACCO:**  YOU DID, YOUR HONOR.

16          **THE COURT:**  -- TENTATIVE.  WAS IT THE ONE --

17               (SIMULTANEOUS COLLOQUY.)

18          **MR. TABACCO:**  EXHIBIT B TO MR. HURST'S DECLARATION

19     HAS A COPY OF THE MARCH 2ND, 2005, ORDER.  AND THE REASON THAT

20     YOU COULDN'T FIND IT IS BECAUSE THE SEIU CASE WAS BROUGHT AFTER

21     THE ORIGINAL DOE CASE, AND THE ORDER IMMEDIATELY CONSOLIDATED.

22     AND THAT'S AN ORDER IN THE SEIU CASE, WHICH WAS THEN

23     SUBSEQUENTLY CONSOLIDATED.  AND SO IF YOU LOOKED IN THE 1511

24     FILE THAT FAR BACK, YOU WOULDN'T HAVE FOUND IT.  I THINK IS THE

25     EXPLANATION.

1        **THE COURT:**  SO DON'T WE USUALLY TRANSFER ALL THE

2   STUFF OVER, SHEILAH?

3        **THE CLERK:**  I'M SORRY?

4        **THE COURT:**  WELL, OKAY.

5        **MR. TABACCO:**  SO ANYWAY --

6        **THE COURT:**  SO YOU'RE TELLING ME THERE REALLY IS AN

7   ORDER ON THAT DAY.

8        **MR. TABACCO:**  THERE REALLY IS AN ORDER, AND IT IS --

9   MR. HURST DID FILE IT AS EXHIBIT B.

10              (SIMULTANEOUS COLLOQUY.)

11       **MR. TABACCO:**  -- CONCERNED WHEN WE SAW YOUR NOTE.

12       **THE COURT:**  SO WE PICKED OUT AN ORDER THAT WE

13  THOUGHT YOU MIGHT HAVE MEANT, BUT THAT YOU DON'T MEAN THAT ONE,

14  SEPTEMBER 12TH, '05 --

15              (SIMULTANEOUS COLLOQUY.)

16       **MR. HURST:**  IT'S THE MOTION TO DISMISS IN THE SEIU

17  CASE.

18       **THE COURT:**  OKAY.

19       NOW PART OF THE REASON I DID THIS TENTATIVE ORDER IS

20  BECAUSE WE NEED AN ORDER FROM THE COURT, FROM ME, TELLING THE

21  NINTH CIRCUIT THAT I GIVE YOU PERMISSION TO APPEAL.  WE NEED

22  MORE THAN JUST YOUR SEEKING PERMISSION.  WE NEED ME DOING THIS.

23  AND YOU HADN'T WRITTEN ONE FOR ME.

24       **MR. HURST:**  I THOUGHT WE DID.

25       **THE COURT:**  WELL, I GUESS IT DIDN'T HAVE ALL THE

```
 1   STUFF IN IT THAT IT WAS SUPPOSED TO OR MAYBE I MISSED IT --

 2              MR. HURST:  IT WAS A SHORT ORDER, BUT I THINK IT HAD

 3   ALL THE POINTS.

 4              THE COURT:  OKAY.  WELL -- AND THEN LASTLY, ONE

 5   THING THAT OCCURRED TO ME WAS WE -- YOU'RE SORT OF DENOMINATING

 6   THE ISSUES AS THREE SEPARATE ISSUES.  AND THINGS ARE ALL

 7   DEPENDING ON HOW MANY OF THOSE THE NINTH CIRCUIT AGREES TO

 8   REVIEW.

 9              FRANKLY, MY FEELING IS THE NINTH CIRCUIT WOULD

10   EITHER REVIEW THE CASE OR NOT REVIEW THE CASE.  THEY'RE NOT

11   GOING TO SAY I'LL REVIEW SOME THINGS BUT NOT OTHERS.  THERE

12   WOULDN'T BE ANY POINT IN THAT.  SO I CAN'T IMAGINE THAT WOULD

13   HAPPEN.

14              BUT LET'S SAY THEY DO TAKE THE CASE AS A WHOLE, AND

15   THEN LET'S SAY THEY DECIDE ONE ISSUE THAT'S TOTALLY DISPOSITIVE

16   OF ALL THE OTHERS AND THUS THE OTHERS ARE MOOT AND NOT NEEDED

17   AND ABBOTT WINS BECAUSE ABBOTT HAS WON ON ONE SINGLE

18   CASE-DISPOSITIVE POINT, I'M THINKING THAT THAT WOULD NOT BE A

19   SITUATION IN WHICH ABBOTT SHOULD BE ALLOWED TO WITHDRAW FROM

20   THE AGREEMENT.

21              MR. HURST:  OH, I SEE WHAT YOU'RE SAYING.  NO, IF --

22   THE WAY IT WORKS IS THAT -- SAY, THE NINTH CIRCUIT SAID THE

23   ONLY ISSUE THAT WE THINK IS CONTROLLING IN THIS CASE IS A

24   SINGLE ISSUE AND THEY CHOOSE ANTITRUST INJURY AND THAT'S THE

25   ONLY THING WE'RE GOING TO REVIEW.  AND YOU SUGGESTED THAT WOULD
```

1    BE UNLIKELY, AND I GUESS I WOULD AGREE.  BUT IF THAT WERE TO

2    HAPPEN, WE WOULD HAVE THE RIGHT TO CONSIDER WHETHER WE WANTED

3    TO WITHDRAW FROM THE AGREEMENT BECAUSE WE'RE HOPING TO GET --

4            **THE COURT:**  RIGHT, BUT THAT'S NOT WHAT I'M REFERRING

5    TO.  I'M REFERRING TO THE SITUATION WHERE THE COURT TAKES THE

6    CASE --

7            **MR. HURST:**  RESOLVES ON THE MERITS.

8            **THE COURT:**  GENERALLY WHAT THEY DO IS THEY DON'T SAY

9    I'M TAKING THIS, THAT, OR THE OTHER ISSUE.  THEY JUST SAY OKAY.

10   WE'LL LET YOU APPEAL.  AND LET'S SAY YOU THEN APPEAL AND YOU

11   RAISED YOUR THREE ISSUES AND THEY DECIDE ONLY ONE OF THEM BUT

12   THEY DECIDE IT IN A WAY THAT IT IS CASE DISPOSITIVE IN ABBOTT'S

13   FAVOR.

14           **MR. HURST:**  WE WOULDN'T WITHDRAW BECAUSE WE WOULD --

15   WE WOULD, UNDER THAT CIRCUMSTANCE, BE THE PREVAILING PARTY, AND

16   OUR PAYMENT WOULD BE LIMITED TO 10 MILLION-DOLLAR CY PRES.

17           **THE COURT:**  BUT YOU COULD ARGUE THAT YOU -- THAT

18   THEY ONLY DECIDED ONE ISSUE, THAT THEY DIDN'T DECIDE THE OTHER

19   TWO ISSUES BECAUSE THEY WERE MOOTED AND, THUS, YOU WOULD HAVE

20   THE ABILITY TO BACK OUT AT THAT POINT.

21           **MR. HURST:**  I DON'T THINK THAT'S CORRECT.

22           **MR. TABACCO:**  YEAH.

23           **MR. HURST:**  WE WROTE IT TO DIFFERENTIATE BETWEEN A

24   DECISION ON THE MERITS AND ACCEPTING THE ISSUES AT THE FRONT

25   END.

```
 1              MR. TABACCO:  THE ISSUE -- IT'S REALLY A GATEKEEPER

 2    ISSUE.

 3              THE COURT:  WELL, NO, BUT IT'S ALSO IN THE -- MAYBE

 4    I MISREAD IT, BUT I THOUGHT IT ALSO SAID THAT IF WHEN THEY

 5    DECIDED IT, YOU ONLY WON ON ONE ISSUE --

 6              MR. HURST:  THAT WAS NOT OUR INTENT.  I CAN

 7    GUARANTEE THAT.  IT WAS A NEGOTIATED POINT.  THAT WAS NOT OUR

 8    INTENT.

 9              THE COURT:  I DIDN'T THINK SO.

10              MR. HURST:  YEAH.  EITHER PARTY.

11              THE COURT:  SO MAYBE YOU SHOULD JUST REREAD IT AGAIN

12    TO MAKE SURE THAT THAT'S -- THAT YOU THINK THAT'S ENTIRELY

13    CLEAR.  NOW I DON'T EVEN KNOW WHERE IT IS ANYMORE.

14              MR. TABACCO:  PARAGRAPH C ON PAGE 7 TALKS ABOUT THE

15    NINTH CIRCUIT PERMITTING THE APPEAL.

16              THE COURT:  RIGHT, BUT THAT'S NOT THE PART I'M

17    WORRIED ABOUT.

18              MR. TABACCO:  YOU'RE --

19                   (SIMULTANEOUS COLLOQUY.)

20              THE COURT:  AFTER --

21              MR. TABACCO:  -- TAKE THE APPEAL AND THEN --

22              THE COURT:  AND THEN THEY DECIDE IT AND THEY ONLY

23    RULE ON ONE ISSUE BECAUSE IT'S DISPOSITIVE FOR THE DEFENDANT

24    AND THE OTHER TWO ARE MOOT.

25              THEN THE DEFENDANT COULD SAY, OH, I ONLY WON ON ONE
```

```
 1    ISSUE.  I WANT TO WITHDRAW.  OR I GUESS THEY CAN'T WITHDRAW.

 2              MR. HURST:  THE PAYMENT WOULD BE MADE.  WE WOULD BE

 3    THE PREVAILING PARTY AT THAT POINT.  I THINK THAT OUR

 4    CONTEMPLATION WOULD BE THAT -- THAT THERE WOULD BE NO MECHANISM

 5    FOR US TO WITHDRAW AFTER WE HAD BEEN DEEMED THE PREVAILING

 6    PARTY.

 7              THE COURT:  OKAY.

 8              MR. HURST:  I'M SAYING IT ON THE RECORD, AND WE CAN

 9    CLARIFY THE AGREEMENT IF WE NEED TO.  BUT I THINK THAT'S OUR

10    INTENT, MUTUAL INTENT.

11              MR. TABACCO:  PUT ANOTHER WAY, THE INTENT OF THAT

12    THRESHOLD ISSUE OF WILL THE COURT TAKE THE ISSUES ON APPEAL OR

13    NOT, ONCE THAT DETERMINATION -- THAT RULING HAS BEEN MADE,

14    HOWEVER THE NINTH CIRCUIT RULES THEREAFTER IS IRRELEVANT TO THE

15    PAYMENT OF $10 MILLION.

16              THE COURT:  RIGHT.  NO, IT'S MORE A QUESTION OF --

17              WELL, YEAH.

18              MR. HURST:  I HAVE A PROVISION FOR YOU.

19              THE COURT:  YEAH, YOU'RE RIGHT.  IT'S IRRELEVANT TO

20    THE 10 MILLION.  I GUESS IT'S THE QUESTION OF WHETHER THE

21    17 MILLION OR THE 4 MILLION IS TRIGGERED.

22              MR. TABACCO:  CORRECT.  AND THAT'S WHY WE HAVE,

23    AMONG OTHER THINGS, A DISPUTE RESOLUTION MECHANISM IN PLACE --

24              THE COURT:  OKAY.

25              MR. TABACCO:  -- SO WE CAN THEN GO ON AND ARGUE WHAT
```

```
 1    THE NINTH CIRCUIT REALLY DID.

 2              THE COURT:  OKAY.  OKAY.

 3              SO THEN WHAT I -- THE THING THAT CONCERNED ME ABOUT

 4    THE WAY YOU HAD WRITTEN UP WHAT YOU HAD WRITTEN UP WAS IT

 5    SEEMED TO ME THE QUESTIONS WERE JUST TOO VAGUE.  THEY WEREN'T

 6    GROUNDED IN THE FACTS OF THE CASE, AND THEY SEEMED LIKE THE

 7    NINTH CIRCUIT WOULD READ IT AND SAY, YOU KNOW, THIS IS AN

 8    ADVISORY RULING ON A VERY BROAD QUESTION OF LAW.  HOW IS THIS

 9    GOING TO HELP MATTERS ANY.

10              SO I TRIED TO SAY WHAT YOU WERE SAYING BUT SAY IT IN

11    THE CONTEXT OF THE ACTUAL RULINGS IN THIS CASE.

12              THEN IN THREE OF THE INSTANCES, YOU HAD IT IN A

13    CERTAIN WAY AND WHEN I WENT BACK AND LOOKED AT THE ORDERS, IT

14    SEEMED LIKE THERE WERE SORT OF SOME ALTERNATE REASONS FOR SOME

15    OF THE RULINGS AND THAT YOU WERE ADDRESSING ONE OF THEM BUT NOT

16    THE OTHER OF THEM, SO -- I DON'T REALLY CARE, BUT I THOUGHT YOU

17    MIGHT WANT TO PUT IN FOR THEM TO RULE ON THE ALTERNATE HOLDING

18    ON ANY OF THOSE POINTS.

19              AND, AS I SAY, I DON'T CARE.  IF YOU THINK IT'S

20    BETTER THE WAY IT IS, THAT'S ALL RIGHT WITH ME.

21              MR. HURST:  MAKE TWO POINTS.  ONE IS THE WAY YOU'VE

22    REPHRASED THE ISSUES WITHOUT THE ALTERNATIVES, ABBOTT IS FINE

23    WITH THAT.  I THINK PLAINTIFFS ARE FINE WITH THAT, TOO.

24              WITH RESPECT TO THE ALTERNATIVES IN THE BRACKETS, WE

25    DO PREFER NOT TO IDENTIFY THOSE COLLATERAL -- WHAT WE SEE AS
```

1   SOMEWHAT COLLATERAL ISSUES.

2              **MR. TABACCO:**  BUT I JUST WANT -- YOUR HONOR, THE

3   TENTATIVE ORDER TRIGGERED A VERY INTERESTING DISCUSSION,

4   BECAUSE IT HAS ALWAYS BEEN OUR VIEW THAT BECAUSE WE'RE

5   APPEALING FROM THE ORDERS, THAT THE QUESTIONS THEMSELVES ARE

6   REALLY JUST A LITTLE BIT OF A SHORTHAND GUIDE FOR THE NINTH

7   CIRCUIT, THAT WE HAVE THE RIGHT TO ADVANCE ALL THE ARGUMENTS

8   THAT UNDERPIN THOSE ORDERS AND THAT, YOUR HONOR, I THOUGHT, WAS

9   HELPING US.

10             MR. HURST AND I DISAGREE.  I ACTUALLY THOUGHT THAT

11  YOUR ADDITIONAL LANGUAGE WAS HELPFUL.  HOWEVER, HAVING SAID

12  THAT, WE HAD NEGOTIATED THE LANGUAGE.  I DON'T THINK THAT

13  THE -- THAT YOU MADE A MATERIAL CHANGE, BUT I -- YOU KNOW, IT'S

14  PROBABLY NOT APPROPRIATE TO GET INTO A DEBATE ABOUT THAT

15  BECAUSE, INDEED, THIS IS A COMPROMISE.  THAT LANGUAGE WAS A LOT

16  OF LATE-NIGHT PHONE CALLS TO COME UP WITH THE WORDING.  AND

17  THERE ARE A LOT OF THINGS THAT WERE REJECTED ON BOTH SIDES, SO

18  IT IS A SENSITIVE ISSUE.

19             HAVING SAID THAT, IT IS CERTAINLY THE PLAINTIFFS'

20  VIEW THAT WE HAVE THE FULL RIGHT TO ARGUE ALL OF THE ISSUES

21  THAT ARE IMPLICATED BY THE ORDERS THAT ARE GOING UP ON APPEAL.

22             **THE COURT:**  WELL, WHAT WILL HAPPEN IN THE REAL WORLD

23  IS ABBOTT WILL BE THE APPELLANT, AND ABBOTT WILL FILE A BRIEF

24  WHICH WILL SAY ISSUES PRESENTED.  AND IT WILL SAY THE THINGS

25  THAT IT THINKS ARE WRONG AND WANTS REVERSED.  AND YOU WILL

1   RESPOND BY SAYING, NO, THOSE THINGS AREN'T WRONG AND THE

2   DISTRICT COURT WAS RIGHT AND IT WAS RIGHT FOR -- YOU CAN SAY

3   I'M RIGHT FOR WHATEVER REASON YOU WANT TO.  AND IF THE NINTH

4   CIRCUIT COMES UP WITH ANY REASON THAT THE DISTRICT COURT IS

5   RIGHT, THEN THEY'LL AFFIRM.

6          **MR. TABACCO:**  RIGHT.

7          **THE COURT:**  THAT'S JUST HOW IT WORKS.

8          **MR. HURST:**  OKAY.

9          **THE COURT:**  SO WE'LL LEAVE OFF THE ALTERNATIVE

10  FORMULATIONS, THEN.

11         **MR. HURST:**  IT MAKES IT EASIER.  THANK YOU.

12         **MR. TABACCO:**  THAT'S ACCEPTABLE.  I JUST WANT TO BE

13  CLEAR SO THAT MR. HURST ISN'T SURPRISED LATER BUT, OBVIOUSLY,

14  BY AGREEING TO THAT, WE'RE NOT WAIVING OUR RIGHT, AS WAS

15  IMPLICIT, THAT WE'RE GOING TO ARGUE ALL OF THOSE THINGS.

16         **THE COURT:**  YEAH, I THINK I JUST TOLD HIM THAT

17  THAT'S HOW IT WOULD BE, AND HE SAID HE UNDERSTOOD.

18         **MR. HURST:**  I UNDERSTAND.  THEY CAN MAKE WHATEVER

19  ARGUMENTS THEY WANT TO ON APPEAL AND WE CAN, TOO.  AND THAT'S

20  HOW IT WILL --

21         **THE COURT:**  -- AND YOU CAN'T STOP THE NINTH CIRCUIT

22  FROM AFFIRMING ON --

23              (SIMULTANEOUS COLLOQUY.)

24         **THE COURT:**  -- ON SOME GROUND THAT THEY MAKE UP.

25         **MR. HURST:**  ABSOLUTELY.

1      **THE COURT:**  -- YOU KNOW THAT THAT'S WHAT -- THAT

2    THEY'LL DO WHAT'S RIGHT, AND THEY WILL DO --

3              (SIMULTANEOUS COLLOQUY.)

4      **THE COURT:**  -- YOU CAN'T -- YOU WON'T BE ABLE TO

5    CONTROL THAT ANYWAY.

6         **MR. HURST:**  WE UNDERSTAND.

7      **THE COURT:**  AND THEN THE OTHER REASON I WROTE WHAT I

8    WROTE IS I THOUGHT IT NEEDED A LITTLE MORE EXPLANATION OF THE

9    MERITS OF DOING AN INTERLOCUTORY APPEAL AT THIS TIME, AND SO I

10   WAS TRYING TO EXPRESS THAT AND ALSO ADD A RECOMMENDATION THAT I

11   DO THINK IT'S A GOOD IDEA UNDER ALL THE CIRCUMSTANCES GIVEN THE

12   POSTURE OF THE CASE AT THIS POINT.

13        **MR. TABACCO:**  WE THOUGHT -- I MEAN, I THINK --

14        **MR. HURST:**  WE APPRECIATE WHAT YOU DID.

15     **THE COURT:**  AND YOU DON'T HAVE TO LIKE IT.

16        **MR. HURST:**  NO, WE DON'T, BUT WE APPRECIATE IT.  I

17   MEAN, WE LIKE IT -- I SHOULD SAY WE DO LIKE IT.  WE DON'T

18   OBJECT TO IT.

19     **THE COURT:**  OKAY.

20        **MR. TABACCO:**  WE LIKE --

21             (SIMULTANEOUS COLLOQUY.)

22     **THE COURT:**  -- PROPOSAL.

23             (SIMULTANEOUS COLLOQUY.)

24           (OFF-THE-RECORD DISCUSSION.)

25     **THE COURT:**  THE LAST WHOLE COLLOQUY IS OFF THE

1    RECORD.

2                    AND WE HAVE A NEW PERSON WHO WANTS TO SAY SOMETHING,

3    SO YOU'LL NEED TO STEP FORWARD AND REMIND THE REPORTER OF WHO

4    AND YOU ARE AND WHO YOU REPRESENT AND THEN SAY WHAT IT IS YOU

5    WANT TO SAY.

6               **MR. WILES:**  SURE.  ALEXANDER WILES.  I WAS JUST

7    GOING TO ASK IF THIS MIGHT BE AN APPROPRIATE TIME FOR AMICI TO

8    WEIGH IN WHEN WE WERE TALKING ABOUT THE ORDER, THE TENTATIVE

9    ORDER, BECAUSE THAT IS THE ISSUE THAT WE'RE INTERESTED IN.

10              **THE COURT:**  NO.  I WILL CALL UPON YOU SHORTLY WHEN I

11   FINISH WITH THE PARTIES.

12              **MR. WILES:**  THANK YOU.

13              **THE COURT:**  NOW, WERE YOU --

14              **MR. HURST:**  I JUST MISSPOKE.  I WANTED TO SAY WHAT

15   YOU WROTE IS FINE WITH US, AND WE APPRECIATE IT.

16              **THE COURT:**  OKAY.

17              **MR. TABACCO:**  SAME HERE, YOUR HONOR.

18              **THE COURT:**  OKAY.  AND YOU DON'T HAVE ANY OTHER

19   SUGGESTIONS OR COMMENTS.

20              **MR. HURST:**  OTHER THAN THE ALTERNATIVES IN BRACKETS,

21   WE HAVE NO OTHER SUGGESTIONS.

22              **THE COURT:**  OKAY.  ANYTHING ELSE FROM THE

23   PLAINTIFFS?

24              **MR. TABACCO:**  YOUR HONOR, ONE OF THE AMICI POINTED

25   OUT A POSSIBLE TYPO, BUT SINCE THEY'RE GOING TO HAVE AN

1    OPPORTUNITY, I'LL ALLOW THEM TO POINT IT OUT TO THE COURT.

2              **THE COURT:**  OKAY.  ALL RIGHT.

3              ALL RIGHT.  SO WHAT DO AMICI WANT TO SAY AT THIS

4    POINT?

5              **MR. TABACCO:**  AND WE'RE GOING TO PUT THE MARCH 2ND

6    DATE BACK?

7              **THE COURT:**  YEAH.  WELL, ASSUMING I CAN FIND THAT.

8              **MR. TABACCO:**  OKAY.  AGAIN, IT IS --

9              **THE COURT:**  YOU HAVE AN ENDORSED FILE COPY?

10             (SIMULTANEOUS COLLOQUY.)

11             **MR. TABACCO:**  -- EXHIBIT B IN THE PAPERS THAT YOU

12   HAVE.

13             **THE COURT:**  AND IT'S AN ENDORSED FILED COPY?

14             **MR. TABACCO:**  ENDORSED FILED COPY.

15             **THE COURT:**  YOU'RE SURE IT'S IN THERE?  WELL, WE'LL

16   GET BACK TO YOU IF WE CAN'T FIND IT.

17             OKAY.

18             **MR. HURST:**  IT IS AN ENDORSED FILED COPY.  YEAH.

19             **MR. WILES:**  SO I'D LIKE TO ADDRESS A FEW THINGS, AND

20   THEN MR. GERSTEIN REPRESENTING DIRECT PURCHASER PLAINTIFFS

21   WOULD LIKE TO ADDRESS A FEW THINGS.

22             ALL WE'RE INTERESTED IN, OF COURSE, IS THIS ISSUE OF

23   THE 1292B CERTIFICATION.  WE'RE NOT HERE TO COMMENT ON THE --

24   THE PRELIMINARY APPROVAL.

25             AND WHAT THE PARTIES HERE ARE DOING IS TRULY

1  UNPRECEDENTED.  THEY'RE -- THEY'VE CITED NO CASES TO THE COURT

2  IN WHICH THE -- A SETTLEMENT HAS BEEN USED BY THE PARTIES TO --

3  TO JUSTIFY CERTIFICATION OF ISSUES -- AND HERE, ISSUES THAT

4  HAVE PREVIOUSLY -- CERTIFICATION PREVIOUSLY BEEN REJECTED.  SO

5  THEY COME IN, AND THEY --

6          **THE COURT:**  WELL, ONE OF THE ISSUES HAD PREVIOUSLY

7  BEEN REJECTED UNDER OTHER CIRCUMSTANCES FOR ADDITIONAL --

8          **MR. WILES:**  -- SO WHAT THEY'RE DOING IS THEY'RE

9  COMING IN AND SAYING, BECAUSE WE HAVE REACHED AN AGREEMENT, YOU

10  SHOULD CHANGE THE WAY YOU LOOK AT THE 1292B CERTIFICATION.

11  THAT'S REALLY WHAT THEY'RE SAYING.  AND THEY'RE VERY EXPLICIT

12  ABOUT THAT.

13          ON TWO OF THE THREE ISSUES, THEY COME IN AND THEY

14  SAY -- THEIR BASIC ARGUMENT IS THERE'S A CONTROLLING QUESTION

15  OF LAW BECAUSE WE'VE AGREED TO IT.  WE'VE AGREED THAT THE CASE

16  WILL BE DISPOSED OF IF THE -- AFTER THE NINTH CIRCUIT RULES, IT

17  WILL BE DISPOSED.  SO THAT'S JUST OVERT.  IT'S BASICALLY SAYING

18  WE'VE AGREED AND, THEREFORE, THAT CHANGES THE FACTS ON THE

19  GROUND, AND THAT'S GOOD ENOUGH.

20          AND SIMILARLY ON THE THIRD PRONG, THE -- ADVANCED

21  THE ULTIMATE TERMINATION OF THE LITIGATION, THEY MAKE THIS

22  EXACTLY --

23          **THE COURT:**  WELL, I'M NOT CLEAR ON EXACTLY WHY

24  YOU'RE OPPOSING THIS.  IF THE CASE HAD GONE TO TRIAL IN AUGUST

25  AND IT HAD BEEN RESOLVED AT TRIAL, IT WOULD HAVE BEEN APPEALED,

1   UNDOUBTEDLY, BY ONE SIDE OR THE OTHER.  THE APPEAL WOULD HAVE

2   TAKEN ABOUT A YEAR OR TWO, AND YOU WOULD HAVE HAD THE RESULT ON

3   APPEAL BEFORE YOU WENT TO TRIAL, SO --

4          **MR. WILES:**  WELL, BEFORE WE WENT TO APPEAL.

5          **THE COURT:**  AT LEAST BEFORE YOU WENT TO APPEAL AND

6   PROBABLY BEFORE YOU WENT TO TRIAL.  SO I'M NOT TOO CLEAR ON WHY

7   YOU'RE OBJECTING.  IT SEEMS LIKE SORT OF A GOOD IDEA FOR YOU

8   ALL AS WELL.

9          **MR. WILES:**  I SORT OF ANTICIPATED YOU WOULD ASK

10  THAT, AND I THINK MR. GERSTEIN WILL SPEAK FOR HIS CLIENTS.

11  FROM MY PERSPECTIVE, THE PROBLEM IS, IS THAT THE -- THE PARTIES

12  ARE TRYING TO UNTETHER THE -- UNTETHER THE NINTH CIRCUIT

13  DECISIONS FROM YOUR DECISION.

14         **THE COURT:**  BUT THEY CAN'T.  AS WE DISCUSSED AT

15  LENGTH A MOMENT AGO, THEY CAN'T.

16         **MR. WILES:**  AND --

17         **THE COURT:**  THEY UNDERSTAND THAT THEY CAN'T DO THAT,

18  AND THEY AREN'T DOING THAT, AND THE NINTH CIRCUIT WOULDN'T LET

19  THEM DO THAT BECAUSE THE NINTH CIRCUIT IS GOING TO REVIEW IT AS

20  A CASE ON ITS RECORD, JUST AS IF I HAD GRANTED SUMMARY JUDGMENT

21  AND THE WHOLE THING WENT UP.

22         **MR. WILES:**  WELL, LET ME GIVE YOU A CONCRETE

23  EXAMPLE.  THE WAY -- MY POINT OF VIEW IS THAT THEY HAVE FRAMED

24  QUESTIONS THAT DO NOT ADEQUATELY REFLECT THE FACTS EITHER AS

25  THEY WOULD HAVE BEEN DEVELOPED AT TRIAL OR AS LOGICALLY ARE IN

1    THE RECORD.

2              **THE COURT:**  RIGHT.  BUT, AGAIN, THOSE QUESTIONS WILL

3    NOT BIND THE NINTH CIRCUIT.  WHAT THEY WILL TO HAVE WRITE IN

4    THEIR APPELLATE BRIEF -- AND I'M NOT EVEN SURE THEIR ISSUES

5    PRESENTED WOULD BE PRECISELY THOSE QUESTIONS BUT EVEN IF THEY

6    WERE, WHAT THEY WOULD HAVE TO SAY IN THEIR BRIEF WOULD BE TO

7    POINT TO THE RECORD AND SHOW WHY, IN LIGHT OF THE RECORD, THE

8    COURT WAS WRONG.

9              AND THE PLAINTIFFS WOULD THEN GO TO THE RECORD AND

10   SHOW WHY IN THE RECORD THE COURT WAS RIGHT AND THE NINTH

11   CIRCUIT, REGARDLESS OF WHETHER ANYBODY SAID ANYTHING ABOUT THE

12   RECORD, WOULD READ THE RECORD AND DECIDE WHETHER THE COURT'S

13   ORDERS WERE RIGHT OR WRONG.

14             **MR. WILES:**  SURE.  AND IF THERE WERE A TRIAL, THERE

15   WOULD BE A MUCH FULLER RECORD.

16             **THE COURT:**  NOT NECESSARILY, NOT ON THESE POINTS.

17             **MR. WILES:**  I THINK ACTUALLY ON MOST POINTS.  ONE OF

18   THE POINTS THAT WE'VE TALKED ABOUT A LOT IS THIS -- IN THE

19   MONOPOLIZATION QUESTION, IS THERE MONOPOLY POWER.  ABBOTT HAS

20   WRITTEN INTO THE QUESTION AND ASSUMED THE -- THAT THERE HAD

21   BEEN PRICE INCREASES BY GSK AND OTHER COMPETITORS.  WHEN, IN

22   FACT, WHAT THE RECORD'S GOING TO SHOW IS THAT WHILE LEXIVA'S

23   PRICE WENT UP FOR A TIME AFTER -- THERE WERE PRICE RAISES AFTER

24   IT WAS ANNOUNCED, KALETRA'S PRICE WENT UP EVEN MORE, AND LEXIVA

25   MANAGED TO REDUCE THE -- THE AMOUNT OF NORVIR NEEDED FOR

1    BOOSTING.  SO THE RELATIVE PRICE OF THE BOOSTED LEXIVA THERAPY

2    HAS GONE DOWN IN COMPARISON TO THE RELATIVE PRICE OF BOOSTED

3    KALETRA THERAPY SINCE THE CONDUCT THAT'S AT, YOU KNOW, ISSUE

4    HERE STARTED.

5              AND SO IT'S NOT SURPRISING UNDER THAT CIRCUMSTANCE

6    THAT ONE WOULD FIND THAT THERE WAS SOME GAIN IN MARKET SHARE.

7              AND YET ABBOTT HAS WRITTEN THIS MONOPOLY POWER

8    QUESTION TO SAY -- IT'S ENCOMPASSED, I THINK, TO SOME EXTENT IN

9    YOUR REWRITE, BUT I HAVEN'T HAD TOO MUCH OF A CHANCE TO STUDY

10   YOUR REWRITE.

11             ABBOTT HAS WRITTEN THE QUESTION TO SAY, WELL, IN THE

12   CIRCUMSTANCE WHERE THERE'S A PRICE INCREASE BY COMPETITORS AND

13   COMPETITORS GAIN MARKET SHARE, COULD THERE BE MONOPOLY POWER.

14   AND IT'S AN ARTIFICIAL QUESTION, AND IT'S NOT WHAT THE RECORD

15   WOULD REFLECT IF THIS CASE WENT TO TRIAL.  AND -- AND,

16   THEREFORE, YOU KNOW, WE SEE A DANGER IN THE NINTH CIRCUIT OF

17   A -- OF WHAT ESSENTIALLY BECOMES A HYPOTHETICAL OPINION THAT

18   WE'RE FORCED TO DISTINGUISH WHEN WE COME BEFORE YOUR HONOR.

19             **THE COURT:**  WELL, IF YOUR FACTS WERE DIFFERENT BY

20   THAT TIME, THEN YOU WOULD HAVE DIFFERENT FACTS AND THEIR RULING

21   WOULDN'T BE BINDING ON YOUR FACTS BECAUSE YOU WOULD HAVE

22   DIFFERENT FACTS.

23             **MR. WILES:**  WELL, WE MAY BE IN THAT POSITION, BUT

24   THE QUESTION YOU'RE ASKING WHY WE'RE OPPOSING THIS IS THAT THAT

25   IS A PREJUDICE TO US.

1          **THE COURT:**  HMM.

2          **MR. WILES:**  THAT FROM THIS SETTLEMENT, WHICH WE VIEW

3    TO BE A -- AN ATTEMPT TO MANUFACTURE APPELLATE JURISDICTION

4    WHERE IT DOESN'T OTHERWISE EXIST --

5          CASCADE, YOUR HONOR, SPECIFICALLY RULED THAT THE --

6    SHE WAS -- YOU WERE NOT GOING TO CERTIFY IT FOR APPEAL.  AND

7    NOW THEY'VE TURNED AROUND AND BY THIS SETTLEMENT, ENABLED

8    THEMSELVES TO MANUFACTURE A BASIS FOR APPEAL.  AND, YOU KNOW,

9    WE'VE CITED THE COURT TO THE CASES -- NOBODY'S EVER TRIED THIS

10   WITH 1292B.  PEOPLE HAVE TRIED THIS WITH 1291, AND IT'S BEEN

11   STRUCK DOWN PRETTY REGULARLY, INCLUDING BY THE NINTH CIRCUIT.

12   AND IT JUST SEEMS --

13         **THE COURT:**  THAT'S BECAUSE WHEN PEOPLE ARE TRYING TO

14   DISGUISE WHAT REALLY IS A 1292 --

15              (SIMULTANEOUS COLLOQUY.)

16         **THE COURT:**  -- PERFECTLY STRAIGHTFORWARD ABOUT WHAT

17   THE WHOLE SITUATION IS.

18         **MR. WILES:**  AND -- BUT THIS REALLY ISN'T A 1292B

19   APPEAL EITHER.  I MEAN, I COULD GO THROUGH THE ISSUES, BUT THE

20   SIMPLEST ONE FOR ME TO UNDERSTAND IS THE MONOPOLY POWER

21   QUESTION.

22         SO THEY'VE SAID TO YOU COLLUSIVELY THAT THIS IS A

23   CONTROLLING ISSUE OF LAW.  FIRST TIME YOUR HONOR HAS SEEN IT,

24   AND IT'S UNDERSTANDABLE THAT YOUR HONOR WOULD REACT AND SAY

25   IT'S A CONTROLLING ISSUE OF LAW.  IT'S NOT.

```
 1              THE DOE PLAINTIFFS AND ALL THE OTHER PLAINTIFFS ARE

 2   ASSERTING A MONOPOLIZATION CLAIM AND AN ATTEMPTED

 3   MONOPOLIZATION.

 4                    (SIMULTANEOUS COLLOQUY.)

 5             THE COURT:  WELL, THAT'S IN THERE, TOO, ISN'T IT?

 6             MR. WILES:  NO.

 7             MR. HURST:  IT'S INTENDED TO BE, YEAH.  IT'S WHETHER

 8   WE CAN HAVE -- IT'S --

 9             THE COURT:  WHICH QUESTION ARE YOU TALKING ABOUT?

10                    (SIMULTANEOUS COLLOQUY.)

11             MR. WILES:  IT'S QUESTION TWO.

12             OKAY.  SO QUESTION TWO, I'M NOW LOOKING AT YOUR

13   HONOR'S.  SO BOTH PARTIES ARE ASSERTING -- ALL THE PLAINTIFFS

14   ARE ASSERTING MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION

15   CLAIMS.

16             THE COURT:  WELL, THAT'S CERTAINLY ADDRESSED.  MAYBE

17   IT ISN'T HERE, BUT IT'S CERTAINLY ADDRESSED IN THE ORDERS.

18             MR. WILES:  YES, IN THE ORDERS YOU HAVE DENIED

19   SUMMARY JUDGMENT, AND SO -- BUT THE 1292B CERTIFICATION ASKS

20   YOU, AS MR. HURST POINTED OUT WHEN YOUR HONOR STARTED, TO LOOK

21   AT SPECIFIC ISSUES AND SAY THEY'RE CONTROLLING ISSUES OF LAW.

22             AND YOU SAY THAT, YES, THEY ARE; OR NO, THEY AREN'T.

23   AND IF THEY AREN'T, THEN YOU SHOULDN'T CERTIFY.  AND SO THIS

24   ISSUE I'M JUST SAYING IS NOT -- TWO, IT'S VERY SIMPLE.  IT'S

25   NOT A CONTROLLING ISSUE OF LAW BECAUSE THE -- THE PLAINTIFFS DO
```

1    NOT NEED TO SHOW MONOPOLY POWER UNDER ANYBODY'S ANALYSIS IN

2    THEIR ATTEMPT CLAIM.  THEY HAVE TO SHOW DANGEROUS PROBABILITY

3    OF SUCCESS.  I DON'T SEE THAT ANYWHERE IN QUESTION TWO.  HOW

4    CAN QUESTION TWO BE A CONTROLLING ISSUE OF LAW?

5            I MEAN, I THINK -- I'M JUST ILLUSTRATING THE KIND OF

6    DANGER THAT WE HAVE HERE WHEN THE PARTIES COLLUDE TO

7    MANUFACTURE JURISDICTION.

8           **THE COURT:**  NOW, THE OTHER ONES WERE PHRASED IN

9    TERMS OF DESIGN TO CREATE OR MAINTAIN MONOPOLY, SO PERHAPS THIS

10    ONE COULD BE PHRASED IN THE SAME WAY SO THAT IT WOULD INCLUDE

11    THE ATTEMPT CONCEPT.

12           **MR. WILES:**  YEAH, I DON'T KNOW HOW YOU DO THAT AND

13    STILL RAISE THE QUESTION THAT ABBOTT WANTS DECIDED, WHICH THE

14    QUESTION THEY REALLY WANT DECIDED IS THAT -- WAS YOUR FINDING

15    THAT THEY -- CIRCUMSTANTIAL EVIDENCE OF MONOPOLY POWER

16    APPROPRIATE GIVEN WHAT HAS HAPPENED TO THEIR MARKET SHARE IN

17    THEIR VIEW.  THAT'S THE QUESTION THEY REALLY WANT TO CITE.

18           BUT THAT DOESN'T ENCOMPASS THE ATTEMPT CLAIM, AND I

19    DON'T SEE HOW YOU CAN REWRITE THESE WORDS TO ENCOMPASS THE

20    ATTEMPT CLAIM.  BUT -- AND DO THAT.

21           SIMILARLY -- AND I SORT OF HESITATE TO TALK ABOUT

22    THIS TOO MUCH -- BUT ON THE STANDARD OF IS THERE A SUBSTANTIAL

23    GROUND FOR DIFFERENCE OF OPINION, YOU KNOW, THE COURT HAS

24    REACHED ONE RESULT WITH RESPECT TO THE CASCADE ISSUE A MONTH

25    AND A HALF AGO AND NOW IS REACHING A DIFFERENT RESULT, AND

1    NOTHING HAS CHANGED FACTUALLY OR LEGALLY WITH RESPECT TO

2    SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION.

3              SO IN EFFECT, THEY'VE ASKED YOU TO RECONSIDER.  YOUR

4    HONOR'S TENTATIVE IS YES, I'LL RECONSIDER AND FIND THAT THERE

5    IS A SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION.

6              YOU KNOW, IN -- IN THESE CIRCUMSTANCES, WE HAVE TO

7    THINK ABOUT THE APPEARANCES.  THIS IS AN UNPRECEDENTED ATTEMPT

8    TO MANUFACTURE JURISDICTION.  AND, YOU KNOW, ONE OF THE CASES

9    WE CITED, THERE'S A RATHER PERTURBED COURT OF APPEAL TALKING

10   ABOUT THE -- THE JUDGE -- OR THE DISTRICT JUDGE AND I DON'T

11   WANT THAT TO HAPPEN HERE, PARTICULARLY SINCE WE HAVE OUR CASE

12   IN FRONT OF YOU, AND WE WANT OUR CASE TO BE PERCEIVED BY YOU

13   PROPERLY AND BY THE NINTH CIRCUIT TO HAVE YOUR DECISIONS IN

14   THAT CASE PERCEIVED PROPERLY.

15             SO THAT'S A -- YOU KNOW, THAT'S ANOTHER ISSUE THAT,

16   YOU KNOW, IT'S HARD TO TOUCH ON, BUT IT'S THERE.

17             AND, YOU KNOW, SO LET ME ARGUE FOR A SECOND WHY I

18   THINK THAT YOU SHOULDN'T RECONSIDER THE STANDARD, AND I CAN DO

19   THAT -- ABBOTT'S BASIC ARGUMENT IS ANY TIME YOU HAVE AN ISSUE

20   OF FIRST IMPRESSION, IT'S A DIFFICULT ISSUE.  YOU CAN HAVE A

21   SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION.

22             WE'VE CITED IN OUR ORIGINAL DENIAL THE CASES THAT

23   SAY THAT THAT'S NOT ENOUGH.  YOUR HONOR AGREED WITH US.  ONE OF

24   THE CASES WE CITED WAS YOUR HONOR'S CASE IN VALDOVINOS, IF I'M

25   REMEMBERING THE NAME RIGHT.  AND THERE ARE OTHER CASES THAT WE

1    CITED.  THERE'S A SECOND CIRCUIT CASE, A SEVENTH CIRCUIT CASE,

2    THAT ALL STAND FOR THAT PROPOSITION.

3          AND IT REALLY -- IF YOU CHANGE YOUR MIND ON THAT AND

4    GO TO THE POINT WHERE YOU SAY, YOU KNOW, A DIFFICULT, NOVEL

5    QUESTION IS CERTIFIABLE, YOU THEN GET THE KIND OF REQUEST TO

6    DISTINGUISH A CASE THAT YOU SEE IN -- IN THE MOTION ITSELF.

7          SO I JUST WANTED TO -- TO KIND OF HIGHLIGHT WHAT --

8    THE LENGTHS TO WHICH I GUESS -- LET'S SEE.  THIS IS THE MOTION,

9    SO IT'S MOVING PARTIES HAVE TO GO TO TRY TO CONVINCE YOU THAT

10   THERE'S A SUBSTANTIAL QUESTION FOR DIFFERENCE OF OPINION ON THE

11   ANTITRUST INJURY CASE, 'CAUSE THIS IS THE ONE THAT WAS MOST

12   STARK TO ME ON THIS PARTICULAR POINT.

13         THAT'S THE ISSUE WHERE YOUR HONOR REPLIED ON --

14   RELIED ON BLUE SHIELD VS. MCCREADY IN FINDING THAT THESE

15   PLAINTIFFS HAD SUFFERED -- THE DOE PLAINTIFFS HAD SUFFERED

16   ANTITRUST INJURY.  THERE IS NO CONTRADICTORY AUTHORITY.

17   MCCREADY IS ON POINT.  IT CERTAINLY DOESN'T DEAL WITH EXACTLY

18   THE SAME THEORY OF LIABILITY AS THIS CASE.  THERE'S NO QUESTION

19   ABOUT THAT.  BUT IT'S ON POINT.  YOUR HONOR FOUND IT ON POINT,

20   AND NOW ABBOTT, AND THE MOVING PARTIES COLLUSIVELY ARE SAYING

21   DO -- THIS PRESENTS A GROUND FOR SUBSTANTIAL QUESTION --

22   SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION.

23         SO HERE'S THE OPINION.  HERE'S THEIR BASIS FOR

24   SAYING THAT.  THEY SAY, THE COURT OF APPEALS HAS YET TO APPLY

25   MCCREADY WHERE, AS HERE, THE PLAINTIFF ALLEGES INJURY IN A

1   MONOPOLY LEVERAGING CASE BASED ON RAISING THE PRICE OF A

2   PATENTED PRODUCT IN THE ALLEGED LEVERAGING MARKET AND FAILING

3   TO RAISE THE PRICE OF A PATENTED PRODUCT IN THE LEVERAGED

4   MARKET.

5            SO I MEAN, IF YOU -- I CAN'T COUNT THE CLAUSES, BUT

6   IT SEEMS LIKE THERE'S FIVE OR SIX CLAUSES THERE AFTER THEY

7   FINISH WITH MCCREADY.  IF THAT'S A BASIS FOR FINDING A

8   SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION, THEN VIRTUALLY

9   EVERY DIFFICULT QUESTION THAT THE COURT IS FACED (SIC) WOULD BE

10  A BASIS FOR FINDING SUBSTANTIAL GROUND FOR DIFFERENCE OF

11  OPINION.

12           YOUR HONOR HAS NEVER SAID THAT.  THE CASES THAT HAVE

13  BEEN CITED TO YOUR HONOR IN ALL OF THE BRIEFS DON'T SAY THAT.

14  YOU'VE REQUIRED AND THESE OTHER CASES HAVE REQUIRED THAT THERE

15  BE SOME CONFLICT WITH THE COURT'S DECISION.

16           AND -- AND THEY'VE JUST BASICALLY SAID WE CAN'T FIND

17  ONE, BUT WE CAN CERTAINLY STATE THIS ISSUE IN A WAY THAT HASN'T

18  BEEN DECIDED BY ANOTHER COURT.

19           THAT'S ALMOST ALWAYS GOING TO BE TRUE, AND THAT'S

20  WHAT TROUBLES ME HERE, IS THAT THEY'RE REALLY TRYING TO

21  MANUFACTURE A DIFFERENT RESULT BY THE WAY THEY -- BY THEIR, YOU

22  KNOW, COLLUSIVE ACTIVITY.  AND I JUST THINK THAT'S TROUBLING.

23           THANK YOU.

24           **MR. GERSTEIN:**  YOUR HONOR, AGAIN, BRUCE GERSTEIN FOR

25  THE DIRECT PURCHASER CLASS PLAINTIFFS.

```
 1              FIRST OF ALL, I HAVE A COUPLE OF COMMENTS REGARDING
 2   THE ORDER JUST TO BRING TO THE COURT'S ATTENTION.  THE EASIEST
 3   ONE IS ON PAGE 4 IN THE THIRD QUESTION, THE THIRD LINE,
 4   SECOND-TO-LAST WORD, IT SAYS "KALETRA."  I THINK THE COURT
 5   MEANT LOPINAVIR, THAT THERE WAS AN IMPUTED PRICE OF LOPINAVIR.
 6   KALETRA WOULD BE THE ACTUAL PRICE OF THE BUNDLE.  BUT ABBOTT
 7   HAS ASSERTED TO YOU THE BUNDLE.
 8              THE COURT:  OKAY.  WELL, I DON'T WANT TO DECIDE THAT
 9   RIGHT THIS SECOND, BUT I'LL TAKE ANOTHER LOOK AT IT.
10              MR. GERSTEIN:  OKAY.
11              THE COURT:  I DON'T KNOW IF I SAID THAT FROM THEIR
12   LANGUAGE OR IF THAT WAS SOMETHING THAT I CHANGED.
13              MR. HURST:  I THINK THAT WAS YOUR LANGUAGE, YOUR
14   HONOR.
15              THE COURT:  GO AHEAD.
16              MR. GERSTEIN:  ON PAGE 5, YOU REFER TO THE RELATED
17   CASES AND YOU SUGGEST THAT THE RELATED CASES, THAT THIS COULD
18   MATERIALLY ADVANCE THE ULTIMATE TERMINATION OF THE RELATED
19   CASES.
20              WE AT LEAST WANT TO POINT TO YOUR HONOR THAT WE
21   THINK THAT THAT IS AN OVERSTATEMENT REGARDING EVEN THIS ORDER
22   FOR THE VERY SIMPLE REASON IS IN THE DIRECT PURCHASER CLASS
23   CASE, WE'VE ADVANCED THE CASCADE THEORY AS ONE ALTERNATIVE THAT
24   NOBODY'S CHALLENGING AND THIS COULD NOT GO FORWARD.  WE ALSO
25   HAVE OTHER THEORIES.  AND I KNOW THAT THE GLAXOSMITHKLINE HAS
```

1    OTHER COURSES UNDER STATE LAW THAT WOULD PROCEED.

2              SO CLEARLY THOSE -- THOSE CLAIMS WILL CONTINUE

3    FORWARD.  THIS ALMOST MAKES IT APPEAR LIKE IT WOULD BE

4    DISPOSITIVE IN OUR CASE, AND WE JUST WANTED TO AT LEAST RAISE

5    THAT 'CAUSE WE --

6              **THE COURT:**  NO, I DIDN'T INTEND TO IMPLY THAT.

7    WHERE ARE YOU SEEING THAT?

8              **MR. GERSTEIN:**  IF YOU LOOK AT PAGE 5 NEAR THE

9    BOTTOM, IT SAYS, MOREOVER, THE RESOLUTION ON APPEAL OF ANY OF

10   THE ABOVE ISSUES IN ABBOTT'S FAVOR WOULD BE -- WOULD ALSO BE

11   LIKELY TO MATERIALLY ADVANCE THE ULTIMATE TERMINATION OF THE

12   RELATED ANTITRUST CASES.

13             **THE COURT:**  WELL, I DIDN'T MEAN TO IMPLY IT WOULD BE

14   DISPOSITIVE OF THEM.  I'M -- BUT IT PROBABLY WOULD ADVANCE THEM

15   IN THAT THEY WOULD MOVE FASTER IF THERE WERE FEWER ARGUMENTS.

16             **MR. GERSTEIN:**  WELL, THAT COULD BE ON ANY SITUATION

17   THE COURT DECIDES, BUT IT'S GIVING THE IMPRESSION THAT IT'S

18   ALMOST LIKE WE'RE IN LOCK STEP WITH --

19             **THE COURT:**  THAT WASN'T MY INTENTION.  DO YOU HAVE

20   ANY PROPOSAL OF HOW I SHOULD CHANGE IT?

21             **MR. GERSTEIN:**  I DON'T THINK THE LANGUAGE IS

22   NECESSARY THERE AT ALL.  ALL THIS IS RELATING SPECIFICALLY --

23   AS I SAID, WE WOULD TAKE --

24             **THE COURT:**  WELL, I THINK IT WOULD BE HELPFUL IN

25   SOME --

```
 1                     (SIMULTANEOUS COLLOQUY.)

 2          MR. GERSTEIN:  THERE ARE SOME --

 3          THE COURT:  -- THAT --

 4                     (SIMULTANEOUS COLLOQUY.)

 5          THE COURT:  -- THAT DEGREE WOULD BE HELPFUL.  NOW,

 6   IF YOU DON'T LIKE THE LANGUAGE --

 7                     (SIMULTANEOUS COLLOQUY.)

 8          MR. GERSTEIN:  -- HELPFUL IN THE RELATED CASES,

 9   THAT'S SOMETHING THAT THIS COULD SUGGEST.  BUT THAT LEADS ME TO

10   A POINT THAT I WANTED TO POINT OUT, WHICH I THINK IS A FLAW IN

11   THE WAY THE QUESTIONS ARE PRESENTED, ORIGINALLY THE WAY THEY

12   WERE PRESENTED BY THE MOVING PARTIES AND HOW IT CAN ACTUALLY DO

13   HARM IN OUR CASES.

14          YOU HAVE IN THE FIRST QUESTION, SPECIFICALLY THE

15   QUESTION OF THE MONOPOLY OR THE LEVERAGING MARKET, WHICH --

16   WHERE ABBOTT HAS A PATENT IN THE LEVERAGING MARKET.  AND AS A

17   RESULT OF ITS RAISING PRICES IN THE PATENT MARKET, THE QUESTION

18   ASKS, DOES THAT CREATE ANTITRUST INJURY FOR ANY PLAINTIFF.

19   IT'S A BROAD, SWEEPING QUESTION.

20          THE PROBLEM IS IT COMES IN CONFLICT WITH THE THIRD

21   QUESTION, WHICH IS PARTICULARLY IMPORTANT TO THE DIRECT

22   PURCHASER PLAINTIFFS WHO HAVE ASSERTED THE CASCADE CLAIM.  WHY?

23   BECAUSE IF WE CAN PROVE AND THERE'S NO PROHIBITION OF OUR GOING

24   FORWARD IN THE CASCADE CLAIM THAT CASCADE WAS VIOLATED, WHAT

25   THEY WOULD BE SAYING IS WE PUT THOSE TWO QUESTIONS TOGETHER
```

1    THAT ALTHOUGH WE'VE PROVED THE ILLEGAL CONDUCT AND THE ONLY

2    CONDUCT WAS RAISING NORVIR'S PRICE, THE PRICE OF -- IN THE

3    LEVERAGE MARKET, YET WE WOULDN'T HAVE ANTITRUST STANDING.

4            NOW, THE QUESTION CAN GO -- WELL, THE REALITY IS BY

5    FRAMING THAT WAY, THE DOE PLAINTIFFS DON'T HAVE AN INTEREST TO

6    PRESENT THOSE CONFLICTS TO THE COURT IN THE SAME WAY WE DO.

7    YET IT'S GOING UP ON THAT PROBLEM.  THAT'S THE PROBLEM WHEN YOU

8    HAVE OF TAKING THESE QUESTIONS AND BASICALLY THEN -- THEY'RE

9    UNTETHERED FROM WHAT WOULD BE THE FACTS AT TRIAL.  AND THAT IS

10   OUR CONCERN BY BRINGING THEM ALL TOGETHER.

11           WE ARE IN A SITUATION WHERE, IN THEORY, IF THE COURT

12   TOOK IT UP, THE COURT COULD SAY BLANKETLY THAT A MONOPOLIST CAN

13   RAISE THE PRICE IN A PATENTED MARKET AND EITHER NOT ADDRESS THE

14   CASCADE, WHICH THEY WOULD THEN COME BACK AND SAY THAT CUTS OFF

15   OUR STANDING AS TO AT LEAST THE NORVIR ELEMENT IN THE -- IN THE

16   CASCADE ATTRIBUTION TEST, OR THE COURT COULD NOT CONNECT THE

17   TWO.

18           IT PLACES US IN A VERY, VERY DIFFICULT POSITION

19   REGARDING OUR CASE, AND IT'S AN ISSUE THAT THE DOE PLAINTIFFS

20   DON'T HAVE.

21           SO, YOU KNOW, THOSE ARE THE TYPE OF THINGS I JUST

22   WANTED TO BASICALLY, YOU KNOW, ADDRESS THEM.

23           THE OTHER POINT THAT'S MADE HERE, THE PARTIES HAVE

24   TO CERTIFY THAT THESE QUESTIONS ARE PROPER AS A MATTER OF LAW.

25   THE DOE PLAINTIFFS HAVE ALREADY TAKEN THE POSITION --

1      **THE COURT:**  THE PARTIES HAVE TO CERTIFY?  NO, THE

2    COURT HAS TO CERTIFY.

3      **MR. GERSTEIN:**  BUT THEY WENT TO THE COURT AND THEY

4    CERTIFIED TO THE COURT THAT THESE ARE APPROPRIATE QUESTIONS AS

5    A MATTER OF LAW IN THE STIPULATION TO YOU.  THEY MADE THAT

6    PRESENTATION.  IT'S IN THE PAPERS.  THEY -- THEY'VE GONE OUT

7    AND SAID THE PARTIES HAVE COME TO AN AGREEMENT THAT THESE ARE

8    APPROPRIATE QUESTIONS FOR CERTIFICATION.

9      **THE COURT:**  WELL, THAT'S NOT EXACTLY HOW IT'S

10   WORDED, BUT GO AHEAD WITH YOUR POINT.

11     **MR. GERSTEIN:**  IN SUBSTANCE.  WELL, THE REALITY IS

12   THE DOE PLAINTIFFS DON'T BELIEVE IT.  THEY'VE ARGUED

13   SUCCESSFULLY TO YOU ON THE MOTION FOR SUMMARY JUDGMENT THAT

14   THESE CAN'T BE ANSWERED AS A MATTER OF LAW.  THEY SUCCEEDED.

15        IF, IN FACT, FOR WHATEVER REASON THE NINTH CIRCUIT

16   REJECTS THE APPEAL, IT COMES BACK TO YOU FOR TRIAL.  THEY

17   HAVEN'T CHANGED THEIR POSITION.  THEY'VE JUST SUSPENDED IT FOR

18   THE PURPOSES OF THE SETTLEMENT.  THAT'S A PROBLEM.

19     **THE COURT:**  IT'S NOT COMING BACK FOR TRIAL.  THAT'S

20   THE WHOLE POINT.

21     **MR. GERSTEIN:**  WELL, IF THE NINTH CIRCUIT DOESN'T

22   TAKE IT -- TAKE -- TAKE THE APPEAL AT ALL, THERE'S NO

23   SETTLEMENT.  THEY HAVE TWO OR THREE QUESTIONS.  IF, IN FACT,

24   THEY DON'T TAKE IT, IT'S COMING BACK HERE.  THERE'S NO

25   SETTLEMENT.  I WOULD ASSUME THERE'LL BE A TRIAL.

1    **THE COURT:**  RIGHT.

2    **MR. GERSTEIN:**  WELL, THE DOE PLAINTIFFS INITIALLY

3    TOOK THE POSITION THESE CAN'T BE DECIDED AS A MATTER OF LAW.

4    THEY'RE GOING TO RESUME THAT POSITION IF IT COMES BACK HERE FOR

5    TRIAL, SO WHAT THEY HAVEN'T DONE IS THEY HAVEN'T CHANGED THEIR

6    POSITION, WHICH IS THE SPECIFICS UNDERLYING THE QUESTION.

7    THEY'VE BASICALLY SUSPENDED THEIR POSITION.

8    **THE COURT:**  NO, I DON'T THINK SO.  THEY THINK THAT

9    THERE'S A DISPUTE OF FACTS THAT CAN'T BE DECIDED AS A MATTER OF

10   LAW.  BUT WHETHER THERE IS OR NOT IS A QUESTION OF LAW.  IT'S A

11   QUESTION OF LAW WHETHER THERE ARE DISPUTED FACTS OR NOT.

12   **MR. GERSTEIN:**  UNDER THE NORMAL CIRCUMSTANCES, YOUR

13   HONOR, I WOULD ASSUME THAT ABBOTT SOUGHT SPECIFICALLY ON ITS

14   OWN UNILATERALLY TO TAKE THESE QUESTIONS UP.  THE DOE

15   PLAINTIFFS, IF THEY DIDN'T HAVE THIS AGREEMENT, WOULD HAVE

16   ARGUED THEY'RE INAPPROPRIATE FOR 1292B AND BECAUSE THERE ARE

17   ISSUES OF FACTS AND YOU CAN'T DECIDE IT IN CONTEXT WITHOUT THE

18   FACTUAL PREDICATE.  THAT WOULD BE THE TYPICAL ISSUE THAT WOULD

19   COME AT THE 1292B HEARING IN FRONT OF YOU.

20   **THE COURT:**  WELL, IT'S SUBSTANTIALLY --

21   (SIMULTANEOUS COLLOQUY.)

22   **THE COURT:**  -- WAS WRONG.

23   WHAT THE APPEAL IS SAYING IS THAT IT WAS WRONG TO

24   DENY SUMMARY JUDGMENT, THAT INSTEAD SUMMARY JUDGMENT SHOULD

25   HAVE BEEN GRANTED.  IT SHOULD HAVE BEEN AN ISSUE OF LAW.  IT

1  SHOULD HAVE BEEN DECIDED AS A MATTER OF LAW.

2           **MR. GERSTEIN:**  BUT WHEN THE ISSUE COMES WHETHER OR

3  NOT THE COURT OF APPEALS SHOULD TAKE IT, THE DOE PLAINTIFFS

4  CANNOT BE IN A POSITION TO SAY, WELL, YOU KNOW, YOU SHOULDN'T

5  TAKE IT 'CAUSE IT'S AN ISSUE OF FACT.  IT'S NOT.

6           **THE COURT:**  NO, THEY SHOULD SAY THE COURT WAS RIGHT.

7  IT WASN'T A QUESTION OF SUMMARY JUDGMENT.  THE COURT WAS RIGHT.

8  THERE WERE DISPUTES OF FACT.

9           **MR. GERSTEIN:**  THEY CAN'T SAY DON'T TAKE IT.  THEY

10  HAVE A FINANCIAL INTEREST AS PART OF THE SETTLEMENT TO

11  BASICALLY AT LEAST GET IT UP TO THE COURT OF APPEALS.  THAT'S

12  THE PROBLEM, THE NEXT STEP AS TO WHETHER OR NOT THE COURT'S

13  GOING TO TAKE IT.  AND THEY'RE NOT IN A POSITION TO ACTUALLY

14  CONTEST AT THE NEXT STEP.

15           THAT'S TYPICALLY WHAT HAPPENS IF A COURT

16  CERTIFIES --

17                (SIMULTANEOUS COLLOQUY.)

18           **THE COURT:**  EXCUSE ME.

19           **MR. GERSTEIN:**  I'M SORRY.

20           **THE COURT:**  THEY'LL BE DEFENDING THE COURT'S ORDERS

21  AND SAYING THAT THE COURT WAS CORRECT IN FINDING DISPUTES OF

22  FACT, THAT THE COURT WAS CORRECT IN DENYING SUMMARY JUDGMENT.

23  THAT'S THE POSITION THEY WILL TAKE.  I HOPE.

24           **MR. GERSTEIN:**  I AGREE.  JUDGE --

25           **THE COURT:**  THAT'S THE PLAN.

1        **MR. GERSTEIN:**  -- I AGREE WITH YOU ON THE MERITS.

2   IF THE COURT ACTUALLY ACCEPTS THE APPEAL.  THE QUESTION COMES

3   AS THE INTERMEDIATE STEP AS TO WHETHER OR NOT THE COURT WILL

4   ACCEPT IT.  THEY'RE NOT GOING TO CHALLENGE THAT.  THEY CAN'T.

5   AND THAT'S A PROBLEM THAT YOU HAVE, IS THAT INTERMEDIATE STEP,

6   'CAUSE THAT'S A CONDITION OF THE SETTLEMENT.

7        IT WOULD BE ONE THING IF THEY CONDITIONED THE

8   SETTLEMENT SAYING SPECIFICALLY IF WE SETTLE, IT'S X.  IF THE

9   COURT TAKES IT, IT'S Y, AND YOU CAN FIGHT ON THAT.  BUT THEY'RE

10  GOING OUT AND SAYING, NO, THE ONLY WAY THE SETTLEMENT IS IN

11  PLACE IS IF THE COURT TAKES IT AND TAKES ACTUALLY AT LEAST TWO

12  OF THE QUESTIONS.

13       **THE COURT:**  WELL, AS I SAY, I DON'T ENVISION THE

14  COURT -- I DON'T SEE HOW THE COURT COULD SAY IT'S ONLY GOING TO

15  TAKE ONE QUESTION AND THEN SEND THE OTHERS BACK.  I MEAN,

16  THEY'RE JUST -- I JUST DON'T SEE THAT HAPPENING.  THEY'LL

17  EITHER TAKE THE APPEAL OR THEY WON'T TAKE THE APPEAL.

18       **MR. GERSTEIN:**  IT'S A CLEAR ISSUE AS TO WHETHER OR

19  NOT THERE'S NORMALLY AN ADVERSARIAL PROCEEDING AS TO THE SECOND

20  STEP AS TO WHETHER OR NOT THE COURT SHOULD TAKE IT.  AND THE

21  DOE PLAINTIFFS HAVE BASICALLY COMPROMISED THEIR ABILITY TO

22  CHALLENGE THAT AT THAT POINT, BECAUSE THAT WOULD BE THE TYPICAL

23  STRATEGY THAT A LAWYER WOULD TAKE, IS IF SOMEBODY'S LOOKING FOR

24  1292, THE BEST -- THE BEST STRATEGY IS THE COURT DOESN'T TAKE

25  IT AT ALL.  SECOND STRATEGY IS TO DEFEND THE MERITS.  I'VE NO

1   DOUBT THEY'LL DEFEND THE MERITS.

2          THE QUESTION IS THE FIRST STEP WHICH IS -- IT'S IN

3   RARE SITUATIONS THE COURT TAKES IT, AND THEY'RE NOT IN A

4   POSITION ANYMORE.  THAT'S WHAT I THINK MR. WILES WAS TALKING

5   ABOUT WHERE YOU COLLABORATED AND ALTERED THE SYSTEM.

6          I JUST HAVE ONE MORE QUICK COMMENT, YOUR HONOR.

7          **THE COURT:**  OKAY.

8          **MR. GERSTEIN:**  AND THEN -- IN THE RESPONSE TO -- OUR

9   AMICUS BRIEF, WE RECEIVED YESTERDAY A REPLY FROM -- FROM

10  ABBOTT.  AND THEY MENTION IN THEIR -- THAT OUR POSITION WOULD

11  BE PROTECTED UNDER RULE 29 OF THE FEDERAL RULES OF APPELLATE

12  PROCEDURE WHICH DEAL WITH AMICI TO THE NINTH CIRCUIT.

13         THE SHORTEST WAY FOR US TO DO THAT, IF YOUR HONOR IS

14  GOING TO GO AHEAD AND ACTUALLY CERTIFY THAT, TO GIVE US SOME

15  OPPORTUNITY TO WEIGH IN IS TO ACTUALLY FOR THE PARTIES TO

16  CONSENT TO THAT.

17         WE'VE ASKED BOTH PARTIES.  THE DOE PLAINTIFFS HAVE

18  AGREED TO CONSENT SPECIFICALLY TO -- TO OUR FILING AN AMICI.

19  ABBOTT HAS RESERVED.  THEY DON'T KNOW WHETHER OR NOT -- WHAT

20  POSITION THEY'RE GOING TO TAKE.

21         WE WOULD ASK YOUR HONOR AT A MINIMUM IF YOU -- IF

22  THEY ARE DOING THIS AND THERE IS NO ADVERSARIAL PARTY AT THIS

23  POINT AND OUR INTERESTS, AS YOUR HONOR HAS RECOGNIZED, ARE

24  CLEARLY BEING COMPLICATED, THAT THE ORDER BE CONDITIONED ON

25  BOTH PARTIES CONSENTING, WHICH IS THE EASIEST WAY FOR US TO BE

```
 1   ABLE TO WEIGH IN AS AN AMICI.

 2              THE COURT:  CONSENTING TO WHAT?

 3              MR. GERSTEIN:  OUR BEING AN AMICI IN THE APPELLATE

 4   PROCESS --

 5                   (SIMULTANEOUS COLLOQUY.)

 6              MR. GERSTEIN:  WHAT?

 7              THE COURT:  WHAT PART OF THE APPELLATE PROCESS?

 8              MR. GERSTEIN:  WE EXPECT, AT A MINIMUM, GOING IN AND

 9   CHALLENGING 1292 CERTIFICATION AS TO THE APPROPRIATENESS OF IT.

10              MR. TABACCO:  I HAVE TO CORRECT MR. GERSTEIN.  I

11   APOLOGIZE.  WHEN HE ASKED ME IN THE HALLWAY IF I CONSENTED TO

12   AMICI IN THE APPELLATE PROCESS, I DIDN'T UNDERSTAND THAT YOU

13   INTENDED TO OPPOSE THE 1292B.

14              I HAVE AN OBLIGATION UNDER THE SETTLEMENT.  I CANNOT

15   CONSENT TO THAT.  I WOULD BE DELIGHTED TO HAVE YOU WEIGH IN ON

16   THE MERITS ON THE APPEAL IF THE NINTH CIRCUIT GRANTS US THE --

17              THAT'S THE CONSENT THAT I WAS --

18              THE COURT:  YEAH, I THINK I'LL LEAVE THAT TO THE

19   NINTH CIRCUIT.  THEY CAN DECIDE WHAT AMICI THEY WANT AND WHAT

20   THEY DON'T WANT.  AND I'M SURE THEY WOULDN'T BE CONSTRAINED BY

21   WHAT THE PARTIES NECESSARILY THOUGHT.  IF THEY FELT IT WOULD BE

22   APPROPRIATE, THEY WOULD -- THEY WOULD TAKE THEM.

23              MR. GERSTEIN:  ALL RIGHT.  THANK YOU, YOUR HONOR.

24              MR. HURST:  JUST A FEW THINGS.  THE SUGGESTION THAT

25   THIS TYPE OF SETTLEMENT IS SOMEHOW IMPROPER, THIS WAS, IN FACT,
```

1   THE PRECISE TYPE OF SETTLEMENT AT ISSUE IN NIXON, SUPREME COURT

2   CASE, SAME EXACT THING HAPPENED.

3              **THE COURT:**  WAS IT A 1292 OR WAS --

4              (SIMULTANEOUS COLLOQUY.)

5              **MR. HURST:**  -- INTERLOCUTORY APPEAL.  I ACTUALLY

6   READ THE DECISION TO SEE IF IT WAS UNDER 1292 OR SOME OTHER

7   ALTERNATIVE, AND I COULDN'T FIND A CITE.  BUT IT WAS AN

8   INTERLOCUTORY APPEAL.  AND SO THE SUPREME COURT ADDRESSED THE

9   ISSUE QUITE SPECIFICALLY AND SAID THIS IS PROPER.

10             AND THEY, IN FACT, RESOLVED THE MERITS DESPITE THE

11  AGREEMENT BETWEEN THE PARTIES -- HIGH/LOW -- A HIGH/LOW

12  SETTLEMENT.

13             AND WE ALSO CITED AN ELEVENTH CIRCUIT CASE THAT

14  SUGGESTED THIS AS A MECHANISM TO SETTLE CASES, A CREATIVE WAY

15  TO SETTLE CASES.  AND, AS YOU KNOW, YOUR HONOR, WE WORKED A LOT

16  WITH JUDGE INFANTE.  AND HE GETS THE CREDIT FOR PUSHING US IN

17  THIS DIRECTION.

18             AND I THINK IT, AS YOUR HONOR POINTED OUT, WE HAVE

19  SEEN CASES WHERE PARTIES TRY TO DISGUISE A 1292 APPEAL AS A

20  1291 APPEAL.  AND NOBODY'S DOING THAT.  I MEAN, WE'RE QUITE

21  STRAIGHTFORWARDLY SAYING WHAT THIS IS ABOUT.

22             WE HAD LEGAL ISSUES THAT WE HAD DISAGREEMENTS ON

23  THAT WERE STOPPING US FROM HAVING PRODUCTIVE SETTLEMENT

24  DISCUSSIONS, AND WE THINK WE'VE COME UP WITH A VERY GOOD WAY OF

25  SETTLING THIS CASE TO THE BENEFIT OF ALL THE PARTIES,

1    POTENTIALLY THE COURT, AND ACTUALLY POTENTIALLY TO THE DIRECT

2    PURCHASERS AS WELL, AS YOUR HONOR POINTED OUT.

3              IF THE DECISION COMES DOWN IN A WAY THAT REALLY GUTS

4    THEIR CASE OR AFFIRMS THEIR THEORY, WE COULD ALL BENEFIT ONE

5    WAY OR ANOTHER.  HOWEVER THE APPEAL COMES OUT, I THINK WE COULD

6    ALL BENEFIT.

7              NUMBER TWO, AND THERE WAS DISCUSSION ABOUT THE

8    PRECISE WORDING IN THE ISSUES THAT ARE BEING CITED AS THE

9    CONTROLLING ISSUES, AS MR. TABACCO POINTED OUT, THESE WERE THE

10   SUBJECT OF A LOT OF LATE-NIGHT PHONE CALLS TO TRY TO HONE THESE

11   ISSUES TO SOMETHING THAT OUR CLIENTS COULD ACCEPT AND THAT WE

12   COULD ALL ACCEPT THAT WE AGREED MET THE CRITERIA FOR 1292.

13             REGARDLESS OF OUR MOTIVATION FOR WHY WE'RE DOING

14   THIS ON EITHER SIDE, WE'VE AGREED AS LAWYERS THAT THESE DO MEET

15   THE 1292 THREE CRITERIA FOR A PROPER INTERLOCUTORY APPEAL.

16             AND ON THIS SIDE OF THE BAR, WE'RE ALL ADVOCATES.

17   AND REGARDLESS OF WHAT WENT ON BEFORE, WE HAVE NOW -- WHETHER

18   WE DISAGREE OR AGREE WITH ONE ANOTHER, LOOK, THERE'S ARGUMENTS

19   TO BE MADE ON BOTH SIDES.  AND WHILE I GUARANTEE THE PLAINTIFFS

20   DISAGREE WITH THE ARGUMENTS THAT ABBOTT IS MAKING, THEIR

21   POSITION AS LAWYERS IS THAT THERE'S A SUBSTANTIAL QUESTION ON

22   THE -- THE ISSUES THAT WE CITED.

23             NOW, IN TERMS OF REVISING THE ISSUES, WHICH IS WHY I

24   THINK YOU WERE HEARING FROM THE DIRECT PURCHASER ATTORNEYS.

25   THERE'S PROBLEMS WITH THE ISSUES AS CITED.  AND THEY SAID,

1    WELL, YOU KNOW, THERE'S A DIFFERENCE BETWEEN OUR CASE AND THE

2    WAY THIS ISSUE HAS BEEN PRESENTED.

3              I SUBMIT THAT THAT'S NOT REALLY RELEVANT.  WE'RE

4    APPEALING THIS PARTICULAR CASE.  IF IT TURNS OUT THAT THE NINTH

5    CIRCUIT ADDRESSES AN ISSUE THAT DOES NOT RESOLVE THEIR CASES,

6    THAT WILL NOT BE A GOOD THING FOR ABBOTT.  WE WOULD PREFER THE

7    NINTH CIRCUIT TO ADDRESS THE ISSUES IN A WAY THAT RESOLVES

8    THEIR CASES AS WELL.  BUT THAT'S AN ISSUE FOR THE NINTH CIRCUIT

9    AND THE WAY THEY RESOLVE THIS APPEAL.  IT'S NOT AN ISSUE FOR

10   FINE-TUNING THE ISSUES, AT THIS POINT, I THINK, IS THE ANSWER

11   TO --

12             **THE COURT:**  WELL, THAT'S SOMETHING THAT COULD HAPPEN

13   IN ANY CASE.

14             **MR. HURST:**  EXACTLY.

15             **THE COURT:**  IN ANY CASE, THERE COULD BE A SIMILAR

16   CASE THAT HAPPENS TO GET TO THE COURT OF APPEALS SOONER THAN

17   YOUR CASE DOES, AND, YES, IF LAW IS MADE, THAT COULD AFFECT

18   YOU.  BUT IF YOUR FACTS ARE DIFFERENT, THEN THE LAW WON'T

19   APPLY.  IF THE LAW IS MADE, THEN THAT'S JUST THE WAY THE LAW

20   WORKS.  IT WOULD BE MADE BY SOMEBODY.

21             SO THAT ISN'T PECULIAR TO THIS POSTURE.

22             **MR. HURST:**  I AGREE, YOUR HONOR.

23             IF THERE'S ANYTHING IN PARTICULAR THAT WAS RAISED

24   THAT YOU WOULD LIKE ME TO ADDRESS, I'D BE HAPPY TO ADDRESS IT.

25   BUT THOSE ARE THE POINTS THAT I WANTED TO MAKE.

1          **THE COURT:**  OKAY.  NO, I -- I CONTINUE TO FEEL THAT

2    IT'S A BENEFICIAL AND APPROPRIATE RESOLUTION OF THE MATTER.

3          **MR. TABACCO:**  YOUR HONOR, I HAVE THE FAMOUS ORDER OF

4    MARCH 2ND, 2005.

5          **THE COURT:**  OH, OKAY.  IF YOU COULD HAND IT TO THE

6    CLERK.

7          **MR. TABACCO:**  AND I JUST WANT TO MAKE A COUPLE VERY

8    QUICK OBSERVATIONS, YOUR HONOR.

9          I MEAN, PART OF THE REASON THAT WE'RE HEARING THE

10   OPPOSITION THAT WE ARE IS REALLY SOMEWHAT OF A PECULIAR

11   CIRCUMSTANCE OF THIS CASE.  MANY OF THESE PARTIES DID NOT FILE

12   THEIR COMPLAINT UNTIL ALMOST FOUR YEARS AFTER OUR CASES BEGAN,

13   SO PROCEDURALLY THEY'RE GOING TO BE IN A DIFFERENT POSITION.

14         RECOGNIZING THAT IN THE SETTLEMENT AND OF COURSE

15   PRELIMINARY APPROVAL, PART OF THE SHOWING THAT WE HAVE TO MAKE

16   AND I THINK THERE CAN BE NO DOUBT, IS THAT THERE WAS GENUINE

17   ARM'S LENGTH VIGOROUS ADVOCACY ON BOTH SIDES.

18         AND YOUR HONOR HAS SEEN THE FIGHTS FOR THE LAST FOUR

19   YEARS IN THIS COURTROOM, AND YOU COULD IMAGINE WHAT JUDGE

20   INFANTE HAD TO DO TO KIND OF WRESTLE THIS THING TO THE GROUND.

21         HAVING SAID THAT, OBVIOUSLY, WE THINK THAT THE

22   SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE AND IS CERTAINLY

23   SUBJECT TO PRELIMINARY APPROVAL.  AND WE APPRECIATE THE

24   GUIDANCE THAT THE COURT HAS GIVEN US TODAY.

25         AND, OF COURSE, I CAN ONLY THINK THAT WITH RESPECT

1    TO HOW WE PROCEED, WE'VE SET FORTH IN OUR ORDER OF PRELIMINARY

2    APPROVAL, THE PROPOSED ORDER, AND I SEE -- IF THAT'S NOT

3    SEPARATELY BEFORE YOU, I CAN --

4              **THE COURT:**  WELL, THAT'S EXHIBIT A.

5              **MR. TABACCO:**  THAT'S EXHIBIT -- PRELIMINARY APPROVAL

6    ORDER WAS REALLY WHAT WE'RE -- THAT'S THE SECOND PART, IN

7    ADDITION TO YOUR CERTIFICATION ORDER, OF COURSE, WHICH IS --

8              **THE COURT:**  TRUE.

9              **MR. TABACCO:**  -- CONDITION --

10            **THE COURT:**  AND WE HAVEN'T ADDRESSED THAT YET, BUT I

11    FIND IT APPROPRIATE, AND I DON'T HAVE A PROBLEM WITH

12    PRELIMINARILY APPROVING --

13            **MR. TABACCO:**  FINE.  I JUST WANTED TO MAKE SURE WE

14    TOOK CARE OF THAT HOUSEKEEPING ISSUE.

15            **THE COURT:**  I MAY NEED AN EXTRA COPY OF IT EMAILED

16    TO ME TO SIGN.

17            SHEILAH --

18            **THE CLERK:**  IF THEY HAVEN'T ALREADY.

19            **THE COURT:**  IT WAS FILED AS AN EXHIBIT, BUT THAT

20    WON'T WORK --

21            **THE CLERK:**  NO.

22            **THE COURT:**  I NEED YOU TO EMAIL BOTH ORDERS TO THE

23    CLERK SO THAT I CAN USE IT, 'CAUSE I CAN'T UNFILE AN EXHIBIT

24    THAT'S ALREADY FILED.  I HAVE TO HAVE ANOTHER SET.

25               AND THEN YOU CAN FIX THOSE THINGS, AND YOU CAN MAKE

```
 1   ONE -- YOU NEED TO CHANGE YOUR SETTLEMENT AGREEMENT TO SWITCH

 2   EXHIBIT A AND EXHIBIT B AND MAKE THOSE CHANGES TO EXHIBIT B --

 3             MR. TABACCO:  WE'LL REFILE THEM.

 4             THE COURT:  -- AND SUBMIT THEM.

 5             MR. HURST:  WE'LL REFILE THEM.

 6             THE COURT:  SO IS THERE ANYTHING ELSE, THEN?

 7             MR. HURST:  NOT FROM OUR SIDE, YOUR HONOR.

 8             THE COURT:  OKAY.

 9             MR. TABACCO:  THANK YOU, YOUR HONOR.

10             THE COURT:  NOW, IN THE MEIJER CASE, DO WE HAVE ALL

11   OF OUR DATES AND EVERYTHING IN THAT?

12             MR. WILES:  YES, YOUR HONOR.

13                 (SIMULTANEOUS COLLOQUY.)

14             MR. WILES:  -- RELATED CASES, WE HAVE THEM.

15             THE COURT:  ASSUMING WE'RE CERTIFYING THE CLASS, ALL

16   THE OTHER DATES ARE SET.  WE DON'T NEED TO DO ANYTHING ELSE

17   TODAY.

18             MR. WILES:  I'M NOT IN THE MEIJER CASE.  I'M IN THE

19   GSK CASE, BUT YES, WE HAVE -- IN ALL THE RELATED CASES, THERE'S

20   A SINGLE SCHEDULE.

21             THE COURT:  OKAY.

22        (PROCEEDINGS WERE CONCLUDED AT 4:11 P.M.)

23                       --OOO--

24

25
```

<u>**CERTIFICATE OF REPORTER**</u>

I, RAYNEE H. MERCADO, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C04-1511CW, DOE V. ABBOTT, ET AL., AND C07-05985 CW, MEIJER, INC., ET AL. V. ABBOTT LABORATORIES, WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.

_____

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR

THURSDAY, AUGUST 21, 2008