Joseph J. Tabacco, Jr. (75484)
Christopher T. Heffelfinger (118058)
**BERMAN DeVALERIO**
425 California Street, Suite 2100
San Francisco, CA  94104-2205
Telephone:  (415) 433-3200
Facsimile:  (415) 433-6372


**Co-Lead Counsel and
Counsel for Plaintiffs John Doe 1
and John Doe 2**


Hollis L. Salzman (HS-5994)
Michael W. Stocker (179083)
Kellie Lerner (KL-0927)
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY  10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477


**Co-Lead Counsel and
Counsel for Plaintiff Service Employees
International Union Health and Welfare Fund**

[Additional counsel appear on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| IN RE ABBOTT LABORATORIES NORVIR ANTITRUST LITIGATION | ) Case  No. C 04-1511 CW ) ) **JOINT NOTICE OF MOTION, MOTION AND MEMORANDUM OF  POINTS AND AUTHORITIES IN  SUPPORT OF MOTION FOR FINAL  APPROVAL OF CLASS ACTION SETTLEMENT** ) Date: August 6, 2009 ) Time: 2:00 p.m. ) Courtroom: 2 ) Before: Hon. Claudia Wilken |

## TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................................1

I.   INTRODUCTION .................................................................................................................1

II.  OVERVIEW OF THE LITIGATION AND SETTLEMENT ...........................................3

     A.   Nature of the Litigation........................................................................................ 3

     B.   Procedural History ............................................................................................... 4

     C.   The Litigation Was Hard Fought and Adversarial.................................................. 5

     D.   The Settlement Negotiations Were at Arm's Length and Before a
          Respected Mediator ............................................................................................. 6

     E.   Summary of the Settlement Terms ........................................................................ 6

          1.   Definition of "Prevailing Party" ................................................................. 8

          2.   The Settlement Amount .............................................................................. 8

          3.   Release ...................................................................................................... 9

III. THE SETTLEMENT MERITS THE COURT'S FINAL APPROVAL............................10

     A.   Standard for Approval......................................................................................... 10

     B.   An Analysis of the Requisite Factors Show the Settlement is Fair, Adequate and
          Reasonable ......................................................................................................... 11

          1.   The Strength of Plaintiffs' Case................................................................. 11

          2.   The Risk, Expense, Complexity and Duration of Continued Litigation......... 13

          3.   The Risks of Maintaining Class Certification Through Trial ........................ 14

          4.   The Relief Offered in Settlement ............................................................... 14

          5.   The Extent of Discovery Completed and the Stage of Proceedings When the
               Parties Reached the Settlement.................................................................. 16

          6.   The Experience and Views of Counsel Favor Final Approval ...................... 18

          7.   The Settlement Enjoys Overwhelming Class Support.................................. 20

IV.  THE NOTICE PROGRAM SATISFIES DUE PROCESS ...............................................20

V.   CONCLUSION....................................................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*Bellows v. NCO Fin. Sys., Inc.*, No. 3:07-cv-01413-W-AJB, 2008 WL 5458986
(S.D. Cal. Dec. 10, 2008)..............................................................................................12, 18

*Boyd v. Bechtel Corp.*, 485 F. Supp. 610 (N.D. Cal. 1979).........................................................20

*Brailsford v. Jackson Hewitt Inc.*, No. C 06-00700 CW, 2007 WL 1302978
(N.D. Cal. May 3, 2007) ...............................................................................................18

Cascade Health Solutions v. Peacehealth, 515 F.3d 883 (9th Cir. 2008) ...............................7, 12

*Churchill Village LLC v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004).....................................20, 21

*City P'ship Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041 (1st Cir. 1996)..........................17

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977).......................................................................19

*Flinn v. FMC Corp.*, 528 F.2d 1169 (4th Cir. 1975) .................................................................19

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) .........................................................10

*Hanrahan v. Britt*, 174 F.R.D. 356 (E.D. Pa. 1997) .................................................................19

*Henry v. Sears Roebuck & Co.*, No. 98-CV-4110, 1999 WL 33496080
(N.D. Ill. July 23, 1999)................................................................................................22

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997).......................16

*In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145 (2d Cir. 1987),
*cert. denied sub nom. Pinkey v. Dow Chem. Co.*, 484 U.S. 1004 (1988) ...............................21

*In re Airline Ticket Com'n Antitrust Litig.*, 953 F. Supp. 280 (D. Minn. 1997)........................12

*In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568 (E.D. Pa. 2003)....................................13

*In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002 (N.D. Ill. 2000) .............................15

*In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329 (N.D. Ga. 2000)....................13

*In re Nasdaq Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998).......................14

*In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008)................................10, 20

*In re Pac. Enters. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995) ..........................................18

*In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2007 WL 4171201
    (N.D. Cal. Nov. 26, 2007) ......................................................................17

*In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078 (N.D. Cal. 2007)..................................22

*In re Three Mile Island Litig.*, 557 F. Supp. 96 (M.D. Pa. 1982) ................................15

*In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003).............13

*In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002)...............................13, 22

*In re Warner Commc'ns Sec. Litig.,* 618 F. Supp. 735 (S.D.N.Y. 1985),
    *aff'd*, 798 F.2d 35 (2d Cir. 1986) ......................................................17

*Keele v. Wexler*, 149 F.3d 589 (7th Cir. 1998) ...............................................15

*Knight v. Red Door Salons, Inc.*, No. 08-01520 SC, 2009 WL 248367
    (N.D. Cal. Feb. 2, 2009)......................................................................11

*Mace v. Van Ru Credit Corp.*, 109 F.3d 338 (7th Cir. 1997) ....................................15

*Mangone v. First USA Bank*, 206 F.R.D. 222 (S.D. Ill. 2001) ....................................21

*Mendoza v. Tucson School Dist. No. 1*, 623 F.2d 1338 (9th Cir. 1980), *cert. denied*
    *sub nom. Sanchez v. Tuscon Unified Sch. Dist. No. 1*, 450 U.S. 912 (1981)........................21

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004)......... passim

*Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615
    (9th Cir. 1982)..........................................................................10, 11, 20

*Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597 (D. Colo. 1974) ...........................13

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 129 S. Ct. 1109 (2009).............12

*Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999) ......................................21

*San Francisco NAACP v. San Francisco Unified Sch. Dist.*, No. C-78-1445 WHO,
    2001 WL 1922333 (N.D. Cal. Oct. 24, 2001)......................................................22

*Schor v. Abbott Laboratories.*, 457 F.3d 608 (7th Cir. 2006)....................................12

*Simer v. Rios*, 661 F.2d 655 (7th Cir. 1981) ...............................................15

*Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990) ...............15

*Soberal-Perez v. Heckler*, 717 F.2d 36 (2d Cir. 1983) ........................................................21

*Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370 (9th Cir. 1993)................................................21

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96 (2d Cir. 2005) ......................................21

*Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1982) ................................................................21

*Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713 (E.D.N.Y. 1989) ...................................13

**Statutes**

15 U.S.C. § 2.....................................................................................................................1, 5

28 U.S.C. 1292(b) ..................................................................................................................7

Fed. R. Civ. P. 12(b) ..............................................................................................................5

Fed.R.Civ.P. 23(c)(1)............................................................................................................14

Fed.R.Civ.P. 23(e) ................................................................................................................21

California Bus. & Prof. Code § 17200................................................................................1, 7, 16

**Other Authorities**

4 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.41 (4th ed. 2002) ..............11

4 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11:50 (4th ed. 2002) ..............13

4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions*, §11:53 (4th ed. 2002)..........21

5 James Wm. Moore, *Moore's Federal Practice* ¶¶ 2b.63[8][a], 23.b3 8][b](3d ed. 2003) .......22

Jan Vandemoortele and Enrique Delmonica, *The Education Vaccine Against HIV*,
      Current Issues in Comparative Education, Vol. 3(1) (December 2000)...................................16

*Manual for Complex Litigation* § 30.41 (2nd ed. 1985) ...........................................................19

1

**MOTION AND NOTICE OF MOTION**

2

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3

      **PLEASE TAKE NOTICE** that on August 6, 2009, plaintiffs John Doe 1 ("Doe 1") and

4

the Service Employees International Union Health and Welfare Fund ("SEIU" and with Doe 1,

5

the "Plaintiffs"), on behalf of themselves and all others similarly situated in the United States,

6

and defendant Abbott Laboratories ("Abbott" or "Defendant" and together with the Plaintiffs,

7

the "Parties") by undersigned counsel, will and hereby do respectfully move the Court for an

8

order granting final approval of the class action settlement in the above-captioned action (the

9

"Action").

10

**MEMORANDUM OF POINTS AND AUTHORITIES**

11

**I.    INTRODUCTION**

12

      The Action arises from Plaintiffs' allegations that Abbott violated: (1) the Sherman Act

13

§ 2 (15 U.S.C. § 2); and (2) California's Unfair Competition Law (California Bus. & Prof. Code

14

§ 17200, *et seq.*) ("California's UCL") by raising the wholesale price of its drug Norvir®

15

("Norvir") by 400%.[1]  Plaintiffs alleged that Abbott imposed the price increase in an effort to

16

harm competition in the market for Kaletra® ("Kaletra"), and that its acts injured individual

17

consumers (the "consumers") and Third-Party Payors[2] ("TPPs") (collectively, the "Class"[3]).

18

---

19

    [1] Pursuant to the Court's May 16, 2008 Order Granting in Part Abbott's Motion for

20

Summary Judgment and Granting Plaintiffs' Cross-Motion for Summary Adjudication of Patent Invalidity (the "May 16, 2008 Order"), the Class was limited to seeking injunctive relief under

21

the Sherman Act § 2 and monetary damages for California Class members under California's UCL.

22

    [2] TPP means any entity that is: (a) a party to a contract, issuer of a policy, or sponsor of a

23

plan, and (b) at risk, under such contract, policy, or plan, to pay all or part of the cost of prescription drugs dispensed to covered natural persons.

24

[3] The Class was certified by Order, dated June 11, 2007, and defined as follows:

25

    All persons or entities throughout the United States and its territories who purchased or

26

paid for, or who reimbursed another person or entity who purchased or paid for, Norvir as a booster to other protease inhibitors intended for consumption by themselves, their

27

families, or their members, employees, plan participants and beneficiaries or insureds, and who paid all or part of the cost of Norvir during the period December 3, 2003

28

1   Abbott denied the allegations being made and contended that the lawsuit and damages were not

2   supported under the law.

3       After more than four years of hard-fought litigation, and less than a week before trial,

4   the Parties reached a settlement.  By an Order dated August 27, 2008, this Court preliminarily

5   approved the Stipulation and Settlement Agreement, dated August 13, 2008 (the "Settlement

6   Agreement").  Pursuant to Federal Rule of Civil Procedure 23(e), the Parties now jointly move

7   for final approval of the settlement embodied in the Settlement Agreement ( the "Settlement").

8       Numerous factors weigh heavily in support of final approval.  Subject to the resolution

9   of an interlocutory appeal to the Ninth Circuit Court of Appeals and this Court's final approval,

10  the Settlement will result in a cash payment of between $10 million and $27.5 million.  Under

11  the terms of the agreement, even if the Ninth Circuit were to rule against the Plaintiffs on each

12  of the three issues that are the subject of the interlocutory appeal, twelve HIV-related non profit

13  organizations would receive substantial *cy pres* awards.  If the Ninth Circuit were to conclude

14  that Plaintiffs prevail on appeal, funds would be distributed to both California consumers of

15  Norvir and to the same *cy pres* beneficiaries.

16      Class counsel, who are highly skilled and experienced in antitrust and complex

17  litigation, believe that the Settlement is fair, reasonable and adequate in light of the strengths

18  and weaknesses of the claims and defenses, and the risks, expense and complexities of

19  continued litigation.  Thus far, the Settlement also enjoys the overwhelming support of the

20  Class.

21

22

23  through such time in the future as the effects of Defendant's illegal conduct, as alleged,
    have ceased. Excluded from the Class is Defendant and its subsidiaries and affiliates, all

24  government entities (except for government-funded employee benefits funds), and all
    persons or entities that purchase Norvir: (i) for purposes of resale, or (ii) directly from

25  Defendant.

26  Doe 1 and SEIU were appointed as class representatives.  The Court also created a subclass for
    consumers and another subclass for TPPs.  Doe 1 is the class representative for the consumers;

27  SEIU is the class representative for the TPPs.

28

The Settlement is the product of vigorously contested litigation and an exhaustive examination of the factual and legal bases of the disputed claims.  Indeed, counsel finalized the agreement on the eve of trial and after actively litigating the Action for over four years.  Prior to reaching a resolution, the Parties had exchanged numerous discovery demands, produced and reviewed over half a million pages of documents, took over a dozen depositions, briefed several dispositive motions, hired and deposed experts, investigated applicable law, and engaged the Parties' representatives in numerous meetings and conferences.  Further, the Settlement was executed following months of arms-length negotiations and several mediation sessions with the Honorable Magistrate Judge Edward A. Infante (Ret.), a former Chief Magistrate Judge in the Northern District of California and now a nationally-recognized mediator.  As such, it is clear the Settlement was the product of an informed decision and was reached in good-faith.

Accordingly, the parties respectfully request that the Court grant final approval of the Settlement.[4]

## II.    OVERVIEW OF THE LITIGATION AND SETTLEMENT

### A.    Nature of the Litigation

This is an antitrust lawsuit, in which Plaintiffs allege that Abbott attempted to stifle competition in the market for a class of antiviral drugs used to treat HIV.  Abbott denies the allegations and contends that the lawsuit is not supported under the law.

Norvir, a protease inhibitor ("PI") drug introduced by Abbott in 1996, is the brand name of a compound patented by Abbott called ritonavir.  *See* Order Denying Defendant's Renewed Motion for Summary Judgment, dated July 6, 2006 (the "July 6, 2006 Order"), at 2.  At its introduction, Norvir was used as a PI at a daily recommended dose of 1,200 milligrams (twelve

---

[4] The Court has presided over this Action and is, thus, familiar with the background, complexity and intensity with which the Parties have prosecuted and defended the Action. Accordingly, the Parties only briefly summarize the claims and history of the Action and Settlement here.  A more detailed account of the Action is set forth in the accompanying Declaration of Christopher T. Heffelfinger in support of the Joint Motion for Final Approval of Class Action Settement  ("Heffelfinger Decl.").

1   100-mg capsules a day). *Id.*  However, among other things, due to side effects associated with

2   the use of Norvir at this high dosage, the drug was not successful as a PI.

3   Following Norvir's release, scientists discovered that when the drug was administered in

4   very small quantities together with other PIs, Norvir could "boost" the antiviral effects of the

5   other PIs.  *Id.* at 2.  Not only did a small dose of Norvir, about 100 to 400 milligrams per day,

6   make other PIs more effective and decrease side effects, but it also slowed down the rate at

7   which the HIV virus could mutate and develop resistance to the effects of PIs.  *Id.*  The use of

8   Norvir as a "booster" for PIs dramatically improved the lives of people with HIV.  *Id.*

9   In 2000, Abbott introduced Kaletra, a drug containing a protease inhibitor called

10  lopinavir along with a boosting dose of ritonavir (the active ingredient of Norvir) in a single

11  pill.  *Id.* at 2.  By 2003, Kaletra gained the largest market share of any PI that was being boosted

12  with Norvir.  *Id.*  However, two new PIs that could be boosted with Norvir, Bristol-Myers

13  Squibb's Reyataz® and GlaxoSmithKline's Lexiva®, were introduced in 2003.  *Id.*  Kaletra

14  began experiencing loss of market share.  *Id.*

15  On December 3, 2003, Abbott raised the wholesale acquisition cost of Norvir from

16  $1.71 to $8.57 per capsule.  *Id.* at 3.  Plaintiffs allege, however, that Abbott did not increase the

17  price of the ritonavir component contained in its drug Kaletra.  Plaintiffs assert that by means of

18  the Norvir price increase, Abbott intended to unlawfully use its monopoly in the Norvir market

19  to monopolize or attempt to monopolize the market for PIs when boosted by Norvir, and, thus,

20  halt the decline of Kaletra's market share.  Abbott denies these allegations.

21  **B.   Procedural History**

22  This Action was filed as a class action pursuant to Federal Rule of Civil Procedure

23  23(a), (b) (2), and (b) (3).[5]  On June 11, 2007, the Court certified the Class to bring nationwide

---

25  [5] On April 19, 2004, Doe 1 and others filed a putative class action against Defendant under
26  the caption *John Doe 1 et al.  v. Abbott Laboratories*, No. 04-cv-1511.  SEIU initiated a
    putative class action on October 4, 2004 under the caption *SEIU v. Abbott Laboratories*, No.
27  04-cv-4203.  On May 2, 2005, this Court consolidated these two actions under the caption *In re
    Abbott Laboratories Norvir Antitrust Litigation*, No. C 04-1511.

28

claims for injunctive relief under the Sherman Act § 2 (15 U.S.C. § 2), and monetary compensation under California's UCL and the common law of unjust enrichment in 48 states. In the May 16, 2008 Order, the Court rejected Abbott's patent immunity defense and dismissed Plaintiffs' restitution claims based on the unjust enrichment laws. The Court allowed the remaining claims – *i.e.*, injunctive relief under the Sherman Act § 2 and equitable relief for California Class members under California's UCL - to proceed to trial, which was set for August 18, 2008.

### C. The Litigation Was Hard Fought and Adversarial

This Action was vigorously contested since its inception. Abbott consistently denied any wrongdoing and asserted that the increased price of Norvir reflected its changed use from a high-dose protease inhibitor to a low-dose booster, most patients saw no change in their out-of-pocket costs, and that the price of Norvir was reasonable. Abbott also denied that the price increase had any negative impact on competition or that it violated any law..

As such, this Action has involved extensive motion practice. For instance, the Parties fully briefed and argued, and the Court ruled on, Abbott's two Fed. R. Civ. P. 12(b)(6) motions to dismiss, Abbott's three summary judgment motions, Plaintiffs' Rule 56(f) motion, Plaintiffs' Cross-Motion for Summary Judgment, and Plaintiffs' Class Certification motion, as well as Defendant's motion to reconsider and for leave to file an interlocutory appeal. Heffelfinger Decl. at ¶ 13.

Discovery was also extensive and has spanned the course of about three years. Heffelfinger Decl. at ¶ 10. The Parties propounded numerous discovery demands, reviewed thousands of documents, took over a dozen depositions, and hired and deposed several experts. *Id.* at ¶¶ 10-12. Plaintiffs' efforts alone underscore the breadth of discovery. Collectively, Plaintiffs served eight requests for production of hundreds of categories of documents, five sets of interrogatories, and two sets of requests for admissions. *Id.* at ¶ 10. Plaintiffs reviewed in excess of 500,000 pages of documents produced by Abbott and non-parties, such as

1  GlaxoSmithKline and Fleishman Hilliard, as well as many volumes of depositions, exhibits and

2  testimony produced in the State Attorneys' General investigations of Norvir's price increase.

3  *Id.* at 10.  Depositions were taken of over a dozen Abbott witnesses comprised of former Abbott

4  employees, third parties, and medical and economics experts concerning the major issues in this

5  case including market share, whether Abbott had engaged in anticompetitive conduct, the scope

6  and breadth of Abbott's patents, and how the market was affected by Abbott's conduct.    Id. at

7  ¶¶ 11-12.   Plaintiffs also retained the services of two testifying experts, an economist and a

8  medical doctor with extensive experience in AIDS care, research and training.   Heffelfinger

9  Decl. at ¶ 12.   Abbott, likewise, engaged in its own extensive affirmative discovery, took

10  depositions, and responded to and defended Plaintiffs' numerous discovery requests and

11  depositions.

12  **D.    The Settlement Negotiations Were at Arm's Length and Before a Respected Mediator**

13

14      The Settlement was reached after months of vigorous, arm's-length negotiations by

15  experienced counsel and with the aid of Judge Infante.   Heffelfinger Decl. at ¶¶ 17-20.

16  Throughout the mediation, the primary goal was to craft a settlement that would fairly,

17  reasonably, and adequately address the concerns underlying the litigation while acknowledging

18  the potential risks and benefits of taking the matter to trial.  Heffelfinger Decl. at ¶ 40. Given

19  the involvement and approval of Judge Infante, the support of the class representatives, and the

20  extensive bargaining process employed throughout the settlement process, there can be little

21  doubt that the Settlement was reached in good-faith.

22      **E.    Summary of the Settlement Terms**

23      The terms of the settlement is set forth in the publicly filed Settlement Agreement with

24  the Court.  (Docket No. 601, Exhibit D).   In general, Abbott has agreed to make a non-

25  refundable payment of $10 million to HIV/AIDS charities based on the Ninth Circuit's

26  approval of an interlocutory appeal concerning three issues specified in the Settlement

27

28

(described below).  An additional settlement payment of up to $17.5 million is contingent on the outcome of that appeal.  If Abbott prevails on appeal (as defined below) Abbott's consideration for the Settlement will be $10 million; if Abbott does not prevail, Abbott's consideration for the Settlement will be increased by up to $17.5 million.  In either case, if the Court approves the Settlement, Abbott will be entitled to final judgment, with prejudice, on all individual and class-wide claims.

Pursuant to the Settlement the Parties jointly sought certification under 28 U.S.C. 1292(b) of the following three issues (with a preliminary paragraph for context) addressed in the Court's orders resolving Abbott's dispositive motions in this case:

> In this case, Plaintiffs have alleged that Abbott's pricing decisions in December 2003 violated the Sherman Act under a monopoly-leveraging theory, and California Unfair Competition Law under Business & Professions Code §§ 17200, *et seq.*, and further, that such conduct unjustly enriched Abbott.  Plaintiffs claim that Abbott raised the price of a patented drug (Norvir) by 400% (representing a $6.84 increase per 100mg daily dose) in one alleged market (the Booster Market) in an effort to create or maintain a monopoly for another Abbott drug known as Kaletra in a separate alleged market (the Boosted Market). Norvir's active ingredient is called "ritonavir."  Kaletra is a co-formulated product that includes both ritonavir and a protease inhibitor known as "liponavir."  The three proposed interlocutory issues are:

> Issue One: Whether, as a matter of law, a plaintiff can establish antitrust injury based on the payment of an increased price for a patented product in the leveraging market, where the plaintiff contends the price increase was designed to maintain or create a monopoly in the leveraged market?

> Issue Two: Whether, as a matter of law, a plaintiff can potentially establish monopoly power – in a case where the defendant allegedly used exclusionary pricing to slow a market share decline – where some existing competitors have increased both their market share and prices since the challenged pricing decision?

> Issue Three: Whether the Ninth Circuit's decision in *Cascade Health Solutions v. Peacehealth*, 515 F.3d 883 (9th Cir. 2008), mandates judgment against a monopoly leveraging claim based on unilateral pricing conduct where there is no allegation of below-cost pricing?

On December 18, 2008, the Ninth Circuit granted the Parties' joint petition to bring an interlocutory appeal concerning these three issues.  That appeal is now fully briefed and was argued on May 13, 2009.

### 1.     Definition of "Prevailing Party"

Pursuant to the Settlement, for Abbott to prevail on appeal, the Ninth Circuit must accept the substance of Abbott's position on at least one of the three issues accepted by the Ninth Circuit on appeal.  The following is further clarification of what will qualify Abbott as a prevailing party:

(1)     For Issue One, Abbott will be deemed the Prevailing Party if the Ninth Circuit holds, in substance, that Plaintiffs cannot establish antitrust injury under the law based on the price increase for Norvir;

(2)     For Issue Two, Abbott will be deemed the Prevailing Party if the Ninth Circuit holds that under the appropriate legal standard, Plaintiffs cannot establish monopoly power under the circumstances of this case;

(3)     For Issue Three, Abbott will be deemed the Prevailing Party if the Ninth Circuit holds that a showing of below-cost pricing is necessary for the type of Sherman Act claims alleged in this case; and

(4)     Abbott will also be deemed a Partially-Prevailing Party if, without reaching a decision falling within (1), (2) or (3), the Ninth Circuit reverses or vacates any challenged ruling or order by the Court and remands any matter or issue to the Court for reconsideration or further review based upon a legal or factual standard enunciated by the Ninth Circuit that differs from any standard applied by the Court.[6]

The decision from the Ninth Circuit, including any rehearing decision, will determine whether Abbott is the Prevailing Party.  To the extent Abbott does not prevail or partially prevails based on the criteria set forth above, Plaintiffs will be deemed the Prevailing Party.

### 2.     The Settlement Amount

Pursuant to the Settlement, since the Ninth Circuit permitted the interlocutory appeal of all three issues central to the Settlement, on January 4, 2009, Abbott wire transfered $10 million

---

[6] In this circumstance, Abbott will pay one-fourth of the Final Payment (defined below) amount to be distributed in the same manner as detailed below.

(the "Initial Payment") into an interest-bearing account.  The Initial Payment (net of Court-authorized deductions for attorneys' fees, costs and incentive awards) shall be distributed at the conclusion of the appellate process under the Settlement, on a *cy pres* basis, to several 501(c)(3) non-profit institution(s) benefiting individuals with HIV/AIDS, as enumerated in the Settlement.[7]   A portion of this amount shall be allocated to non-profit organizations for HIV/AIDS educational purposes.

If Plaintiffs are the Prevailing Party on appeal, Abbott will pay an additional $17.5 million (the "Final Payment"), for a total of $27.5 million.  The allocation of the Initial ($10 million) and Final Payment ($17.5 million), net of Court-authorized deductions for attorneys' fees, costs and incentive awards, is as follows: (1) 70% will be distributed on a *cy pres* basis to the proposed recipients; and (2) 30% will be allocated to Class members who are consumers or TPPs that purchased Norvir in California and filed valid and timely claims.

### 3.    Release

The Settlement releases any claims, demands, actions, causes of action or liability of any nature, whether known or unknown, derivative or direct, suspected or unsuspected, accrued or unaccrued, asserted or unasserted, whether in law or in equity, including, without limitation, claims which have been asserted or could have been asserted in this action, or any litigation against Abbott arising out of the matters alleged in the Action that any Releasor (as defined in ¶ 1(r) of the Settlement Agreement) now has, ever had, could have had or may have had as of the date the Settlement Agreement was executed (whether or not such Releasor objects to the Settlement or whether or not he/she or it makes a claim upon or participates in the Settlement proceeds, whether directly, representatively, derivatively or in any other capacity), and that

---

[7] The proposed *cy pres* recipients are: AIDS Action Foundation, DC, AIDS Foundation of Chicago, AIDS Resource Center of Wisconsin, Atlanta AIDS Partnership Fund, Bienestar Human Services Inc., Black AIDS Institute, Brownsville Multi-Service Family Health Center, Latino Commission on AIDS, New Orleans AIDS Task Force, South Florida AIDS Network, UCSF AIDS Health Project, UCSF Center for AIDS Prevention Studies, and Whitman Walker Clinic (the "proposed recipients").

1    Abbott shall be forever released and discharged from any and all liability in respect of the

2    Released Claims (as defined in ¶1(r) of the Settlement Agreement).

3        Notwithstanding the above, no claims alleging damages and/or seeking non-monetary

4    relief cause by the failure of Norvir to be safe and/or effective or alleging other conduct not

5    related to, or arising from, claims of the type alleged or argued in the action, including, without

6    limitation, claims asserted in the Direct Actions (as defined in ¶1(g) of the Settlement

7    Agreement), personal injury claims, product defect claims, securities claims, breach of contract

8    claims, breach of warranty claims, negligence claims, tort claims, are Released Claims.

9    **III.    THE SETTLEMENT MERITS THE COURT'S FINAL APPROVAL**

10       **A.    Standard for Approval**

11       Rule 23(e) of the Federal Rules of Civil Procedure requires that a class action only be

12   settled with the approval of the Court.  *See Officers for Justice v. Civil Serv. Comm'n of San*

13   *Francisco*, 688 F.2d 615, 623 (9th Cir. 1982).  Before approving a settlement, the Court must

14   determine whether the settlement is "fundamentally fair, adequate, and reasonable."  *Hanlon v.*

15   *Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).  The Court conducts a balancing of

16   several factors in making this assessment, such as: (1) the strength of plaintiffs' case; (2) the

17   risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining

18   class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of

19   discovery completed and the stage of the proceedings; (6) the experience and views of counsel;

20   (7) the presence of a governmental participant; and (8) the reaction of the class members to the

21   proposed settlement.  *See Officers for Justice*, 688 F.2d at 625; *In re Omnivision Techs., Inc.*,

22   559 F. Supp. 2d 1036, 1041 (N.D. Cal. 2008).  The Court can give varying weight to these or

23   other factors, depending on the circumstances of the particular case.  *Id.*

24       In deciding whether to grant final approval, the Court must "be mindful of the Ninth

25   Circuit's policy favoring settlement, particularly in class action law suits."  *Omnivision*, 559 F.

26   Supp. 2d at 1041; *Knight v. Red Door Salons, Inc.*, No. 08-01520 SC, 2009 WL 248367, at *3

27

28

(N.D. Cal. Feb. 2, 2009); *see also Officers for Justice*, 688 F.2d at 625 ("it must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution.  This is especially true in complex class action litigation . . . ."); 4 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.41 (4th ed. 2002) ("By their very nature, because of the uncertainties of outcome, difficulties of proof, length of litigation, class action suits lend themselves readily to compromise").

Ultimately, "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned."  *Officers for Justice*, 688 F.2d at 625.  Thus, "the settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits." *Id.*  According to the Ninth Circuit:

> Neither the trial court nor this court is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.  The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by negotiators.

*Id.*

### B.   An Analysis of the Requisite Factors Show the Settlement is Fair, Adequate and Reasonable

#### 1.   The Strength of Plaintiffs' Case

Plaintiffs believe that they present strong claims.  Plaintiffs successfully withstood Abbott's motion to dismiss and thwarted most of Abbott's summary judgment challenges. Nevertheless, defeating these motions does not mean that Plaintiffs would obtain a favorable, unanimous trial verdict.  *See In re Airline Ticket Com'n Antitrust Litig.*, 953 F. Supp. 280, 283 (D. Minn. 1997) (approving settlement and noting that objectors failed to appreciate that on

1    summary judgment, the court only decided that defendants did not prevail as a matter of law,

2    not that plaintiffs had a winning case).   Further, even a favorable trial verdict does not ensure

3    ultimate success.   *See Bellows v. NCO Fin. Sys., Inc.*, No. 3:07-cv-01413-W-AJB, 2008 WL

4    5458986, at *7 (S.D. Cal. Dec. 10, 2008) ("Indeed, even if Plaintiff were to prevail at trial, risks

5    to the class remain.").

6         There is, for instance, no guarantee that Plaintiffs would prevail on their antitrust claims.

7    As this Court has recognized, Abbott has vehemently contested Plaintiffs' ability to establish

8    *any* element of a Sherman Act claim.   Among other things, Abbott has argued that: "(1)

9    Kaletra's falling market share establishes a lack of monopoly power, (2) Plaintiffs cannot

10   establish anti-competitive conduct, (3) Plaintiffs cannot establish an anti-trust injury and (4)

11   Defendant's patents, which it contends cover the boosted market, provide immunity from

12   Plaintiffs' anti-trust claims."   July 6, 2006 Order at 6; *see also* May 16, 2008 Order at 6.

13   Abbott also has asserted that a substantially identical class action lawsuit was dismissed by

14   another U.S. District Court and affirmed on appeal by the Seventh Circuit Court of Appeals in

15   Illinois.   *Schor v. Abbott Laboratories.*, 457 F.3d 608 (7th Cir. 2006).   Moreover, Abbott

16   contends that the recent decisions in *Cascade Health Solutions v. Peacehealth*, 515 F.3d 883

17   (9th Cir. 2008) and *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 129 S. Ct.

18   1109 (2009) foreclose Plaintiffs' monopoly leveraging theory altogether because, among other

19   things, Plaintiffs in this case do not allege that Abbott utilized below cost pricing in order to

20   monopolize the market for protease inhibitors boosted by Norvir.   *See* Reply Brief of Appellant

21   Abbott Laboratories, dated March 23, 2009.

22        While Plaintiffs believe they have strong evidence and legal authority to the contrary, it

23   is not inconceivable that the Court, a jury or an appellate court could decide in favor of Abbott

24   on any of these points.   Indeed, antitrust cases in particular are notoriously difficult and

25   unpredictable.   *See e.g. In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 577 (E.D. Pa.

26   2003) (stating that antitrust class actions are "arguably the most complex action to prosecute. . .

27

28

1    . [T]he legal and factual issues involved are always numerous and uncertain in outcome")

2    (citations omitted).  Given that Plaintiffs face substantial risks at trial and on appeal, this factor

3    weighs in favor of final approval.

4            **2.        The Risk, Expense, Complexity and Duration of Continued Litigation**

5            These factors consider "the probable costs, in both time and money, of continued

6    litigation."  *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 254 (D. Del. 2002) (citation

7    omitted).   In most cases, "unless the settlement is clearly inadequate, its acceptance and

8    approval are preferable to lengthy and expensive litigation with uncertain results."  *Nat'l Rural*

9    *Telecomms. Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523, 526 (C.D. Cal. 2004) (quoting 4 Alba

10   Conte & Herbert Newberg, *Newberg on Class Actions* § 11:50 at 155 (4th ed. 2002)).  Indeed, it

11   has been held "proper to take the bird in hand instead of a prospective flock in the bush."  *Id.* at

12   526 (quoting *Oppenlander v. Standard Oil Co.,* 64 F.R.D. 597, 624 (D. Colo. 1974)).

13           There is no question that if this Action does not settle, the potential for this litigation to

14   result in enormous expense and complexity and to continue for a long time is great.  Antitrust

15   class actions "are notoriously complex, protracted, and bitterly fought" and "arguably the most

16   complex actions to prosecute."  *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d

17   503, 510 (E.D.N.Y. 2003) (quoting *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 719

18   (E.D.N.Y. 1989)); *In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1337 (N.D.

19   Ga. 2000).  This Action is no different; it would surely involve significant additional expense if

20   the Action proceeded to trial.   Proceeding to trial would require additional potential

21   supplemental discovery, involve the briefing and resolution of a number of pre-trial and post-

22   trial motions, and additional extensive witness and attorney preparation for a multi-week trial.

23   These costs would substantially increase the considerable costs and fees already incurred,

24   thereby reducing any recovery for the Class.

25           Additionally, the Action would likely take several years to resolve, considering the

26   length of trial and appeals.  Accordingly, avoiding a trial and inevitable appeals in this complex,

27

28

1    antitrust case strongly weighs in support of approval of the Settlement rather than prolonged

2    and uncertain litigation.  *See DIRECTV*, 221 F.R.D. at 527.

3        **3.      The Risks of Maintaining Class Certification Through Trial**

4        There is no guarantee that the Class would remain certified through trial.  *See In re*

5    *Nasdaq Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998).  For instance, if

6    "insurmountable management problems were to develop at any point, class certification can be

7    revisited at any time under Fed.R.Civ.P. 23(c)(1)." (citation omitted)  *Id.*  Even if the Class

8    remained certified through trial and Plaintiffs prevailed, Abbott would surely challenge class

9    certification on appeal.  If at any point the Class was decertified or certification was reversed on

10   appeal, the Class would recover nothing.  Thus, this factor also weighs in favor of the

11   Settlement.  *See id.* at 476 (finding that the risk of decertification or reversal of certification on

12   appeal weighed in favor of settlement).

13       **4.      The Relief Offered in Settlement**

14       The Settlement provides significant relief for the Class.  The all-cash Settlement of

15   between $10 million and $27.5 million provides for, depending on the Ninth Circuit's ruling on

16   the interlocutory appeal, cash payments for California Class members as well as *cy pres*

17   payments to HIV/AIDS charities.  Specifically, the *cy pres* distribution will be used to fund

18   charitable, educational and public interest projects that provide important benefits for the

19   HIV/AIDS patient community.  In selecting *cy pres* recipients, the Parties sought out not-for-

20   profit organizations that provide direct services to people with HIV/AIDS and entities that

21   provide educational and public policy work regarding HIV/AIDS in California and throughout

22   the nation.  Heffelfinger Decl. at ¶ 36 and Exhibit 1.  The entities selected serve diverse

23   populations, including gay men, women, African Americans and Latinos, and are also diverse

24   geographically, covering the entire country, including urban areas hit hardest by the HIV/AIDS

25   epidemic and rural areas with the highest rates of new infections.  Heffelfinger Decl. at ¶ 36 and

26   Exhibit 1.  Depending on the funds ultimately available, the *cy pres* recipients are large and

27

28

1    diverse enough to provide a broad range of projects, yet small enough that the funds allocated

2    to each recipient will have a significant impact.  Heffelfinger Decl. at ¶ 36 and Exhibit 1.

3          The Ninth Circuit and other courts have recognized that *cy pres* distributions are proper

4    and frequently part of class action settlements. *See, e.g., Six (6) Mexican Workers v. Arizona*

5    *Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990) (permitting use of *cy pres* distribution,

6    generally, but disapproving of *cy pres* ordered as part of a judgment, not a negotiated

7    settlement, absent a defined purpose, distribution procedure, and assurances that the class itself

8    would benefit); *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998) (approving *cy pres*

9    contribution to legal aid foundation); *In re Three Mile Island Litig.*, 557 F. Supp. 96, 97 (M.D.

10   Pa. 1982) (approving settlement provided for $20 million to claimants and $5 million to finance

11   public health studies and evacuation planning).

12         In cases like this, where it will be difficult to identify consumers – HIV patients who

13   may wish to keep their diagnosis confidential – a *cy pres* distribution is particularly useful.  *See,*

14   *e.g., Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 345 (7th Cir. 1997) (finding *cy pres* recovery

15   ideal where "it is difficult or impossible to identify the persons to whom damages should be

16   assigned or distributed"); *Simer v. Rios*, 661 F.2d 655, 675 (7th Cir. 1981) (finding *cy pres*

17   recovery useful where class members "are not likely to come forward and prove their claims or

18   cannot be given notice of the case"); *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002,

19   1031-32 (N.D. Ill. 2000) (approving *cy pres* contribution where class includes undocumented

20   persons who may be reluctant to seek settlement benefits regardless of how simple the claims

21   procedures).  The *cy pres* distribution is, thus, particularly appropriate in this case given the

22   challenges associated with identifying consumer Class members.

23         The *cy pres* contribution will also benefit TPP Class members. It is well-settled that

24   greater education and awareness about the spread of HIV/AIDS is critical to reducing the

25   infection rate. *See* Jan Vandemoortele and Enrique Delmonica, *The Education Vaccine Against*

26   *HIV*, Current Issues in Comparative Education, Vol. 3(1) (December 2000).  By funding non-

27

28

1    profit institutions that provide support and guidance to individuals with HIV/AIDS conditions,

2    including those that provide HIV/AIDS educational programs, the Settlement will serve to

3    decrease the rate of HIV/AIDS infection, thereby lowering TPPs' expenses due to the reduced

4    number of covered individuals for whom they would have to pay or reimburse for HIV

5    medications. In addition, the substantial *cy pres* payments provided by this Settlement are a

6    reasonable substitute for the injunctive relief sought by Plaintiffs.   Crafting appropriate

7    injunctive relief for the Class would be challenging here because the conduct at issue concerns

8    Abbott's pricing, and Abbott contends that courts generally have been reluctant to enter

9    injunctions that regulate pricing.  *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d

10   1195, 1225 (9th Cir. 1997).  The *cy pres* payments to HIV-related entities resolve this issue in a

11   manner that meaningfully benefits the entire Class.

12           The Settlement also provides that, should Plaintiffs prevail on appeal, 30% of the

13   combined Initial and Final Payments (net of attorneys' fees, costs and incentive awards) shall

14   be allocated for those Class members (both consumers and TPPs) who seek relief under

15   California Business & Professions Code § 17200. Accordingly, the valuable relief obtained here

16   heavily supports final approval of the Settlement.

17           **5.      The Extent of Discovery Completed and the Stage of Proceedings
                        When the Parties Reached the Settlement**

18

19           "A court is more likely to approve a settlement if most of the discovery is completed

20   because it suggests that the parties arrived at a compromise based on a full understanding of the

21   legal and factual issues surrounding the case."   *DIRECTV*, 221 F.R.D. at 527 (citations

22   omitted). Settlement "following sufficient discovery and genuine arms-length negotiation is

23   presumed fair." *Id.* at 528 (citing *City P'ship Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041,

24   1043 (1st Cir. 1996)).  This Settlement was reached less than a week before trial and was the

25   product of months of arduous negotiations and the assistance of a well-respected mediator.

26

27

28

1    The Parties engaged in nearly four years of discovery prior to the Settlement.  The

2    Parties propounded numerous discovery requests and produced and reviewed over half a

3    million pages of documents.  Heffelfinger Decl. at ¶ 10.  Further, well over a dozen depositions

4    were taken of individuals including former Abbott employees, third parties, and medical and

5    economics experts concerning the major issues in this case including market share, whether

6    Abbott had engaged in anticompetitive conduct, the scope and breadth of Abbott's patents, and

7    how the market was affected by Abbott's conduct.  Heffelfinger Decl. at ¶¶ 11-12.    Abbott,

8    likewise, engaged in its own extensive affirmative discovery, took depositions, and responded

9    to and defended Plaintiffs' numerous discovery requests and depositions.

10    In addition to extensive discovery, this Action has also involved significant motion

11    practice.   The Parties fully briefed and argued, and the Court ruled on, Abbott's two Fed. R.

12    Civ. P. 12(b)(6) motions to dismiss, Abbott's three summary judgment motions, Plaintiffs' Rule

13    56(f) motion, Plaintiffs' Cross-Motion for Summary Judgment, and Plaintiff's Class

14    Certification motion, as well as Defendant's motion to reconsider and for leave to file an

15    interlocutory appeal.  Further, when the Settlement was negotiated, the Parties had the benefit

16    of key rulings on class certification and Abbott's motions for summary adjudication.  Indeed, as

17    the Settlement was reached on the eve of trial it is clear that the parties had more than sufficient

18    information to adequately assess the strengths and weaknesses of the case.   *See In re Portal*

19    *Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2007 WL 4171201, at *4 (N.D. Cal. Nov. 26,

20    2007) (finding extent of discovery and stage of proceedings supported settlement as parties

21    "ha[d] a clear view of the strengths and weaknesses of their cases.") (citing *In re Warner*

22    *Commc'ns Sec. Litig.,* 618 F. Supp. 735, 745 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir.

23    1986)); *DIRECTV*, 221 F.R.D. at 528 ("the proposed settlement was reached only after the

24    parties had exhaustively examined the factual and legal bases of the disputed claims. This fact

25    strongly militates in favor of the Court's approval of the settlement.").

26

27

28

1   Moreover, the parties have extensively litigated the validity and scope of certain patents

2   that Abbott claims on the method of using Norvir for its pharmacokinetic boosting properties.

3   Heffelfinger Decl. at ¶ 14.  Finally, there can be little doubt that the Settlement was the product

4   of anything but a good-faith, arms-length negotiation.   The hard-fought negotiations here

5   spanned the course of several months and required the assistance of Judge Infante.  *See*

6   *Brailsford v. Jackson Hewitt Inc.*, No. C 06-00700 CW, 2007 WL 1302978 (N.D. Cal. May 3,

7   2007) (considering Judge Infante's experience and recommendation in approving settlement).

8   The legitimacy of the negotiations is also underscored by the Parties' continued litigation

9   before the Ninth Circuit.

10   Accordingly, the extent of discovery, stage of the proceedings and manner of the

11   negotiations indicate that the Settlement was the product of an informed decision and was

12   reached in good-faith.  Thus, this factor should weigh heavily in favor of the Settlement.

13   **6.      The Experience and Views of Counsel Favor Final Approval**

14   In assessing the adequacy of the Settlement, the trial court is entitled to and should rely

15   upon the judgment of experienced counsel for the Class.  *See DIRECTV*, 221 F.R.D. at 528

16   ("Great weight is accorded to the recommendation of counsel, who are most closely acquainted

17   with the facts of the underlying litigation") (internal quotations and citations omitted); *Bellows*,

18   2008 WL 5458986, at *8 (noting "[t]he recommendations of plaintiffs' counsel should be given

19   a presumption of reasonableness" and affording "great weight" to the "considered judgment of

20   experienced counsel that this settlement is a fair, reasonable, and adequate settlement") (internal

21   quotations and citations omitted).  The basis for such reliance is that "[p]arties represented by

22   competent counsel are better positioned than courts to produce a settlement that fairly reflects

23   each party's expected outcome in the litigation."  *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373,

24   378 (9th Cir. 1995).  Indeed, the when evaluating the proposed settlement, "the trial judge,

25   absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of

26   counsel."  *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (citing *Flinn v. FMC Corp.*,

27

28

528 F.2d 1169, 1173 (4th Cir. 1975)); *see also Hanrahan v. Britt*, 174 F.R.D. 356, 366 (E.D. Pa. 1997) (presumption of correctness applies to "a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery.") (citing *Manual for Complex Litigation* § 30.41 (2nd ed. 1985)).

After thorough consideration, Class counsel concluded that the Settlement is fair, adequate, and reasonable and in the best interests of the Class as a whole, and recommend that it be granted final approval. *See* Heffelfinger Decl. at ¶ 40. The Settlement provides valuable *cy pres* relief and the possibility of a significant cash reimbursement for California Class members. Further, the Settlement avoids the risks of a trial relating to, among other things, the scope of liability and the amount of provable damages. In negotiating the terms of the Settlement, Class counsel considered a multitude of factors, including: the nature and complexity of the alleged offenses; the availability and admissibility of evidence to support each of the required elements of the alleged causes of action; the nature and idiosyncrasies of the market for drugs used to combat HIV; the extent to which Class members were damaged by Abbott's alleged conduct; the defenses asserted; the anticipated motions to be filed by Abbott; and the benefit of obtaining a settlement on the proposed terms now, as opposed to holding out for a potentially greater settlement or judgment some unknown time in the future. Heffelfinger Decl. at ¶ 40.

Class counsel have considerable experience in litigating antitrust matters, class actions, and other complex litigation, as their firm résumés show. *See* Sub-Exhibit C to the declarations of the law firms litigating this action on behalf of plaintiff, attached as Exhibits 6-9 to the Heffelfinger Declaration. Moreover, Class counsel have demonstrated a high degree of competence in the litigation of this case. With the benefit of extensive factual and expert discovery and arduous motion practice, including class certification and summary judgment, Class counsel strongly believe that the Settlement is a fair, adequate, and reasonable resolution of this Action, and is preferable to continued litigation and the costs and uncertainties

associated therewith.  Class counsel's view should weigh greatly in favor of approval of the Settlement.

### 7.      The Settlement Enjoys Overwhelming Class Support

The last criterion for final approval is the reaction of the Class.  *See Officers for Justice*, 688 F.2d at 625.  "It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members."  *Omnivision*, 559 F. Supp. 2d at 1043 (quoting *DIRECTV*, 221 F.R.D. at 528-29); *see also Churchill Village LLC v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming settlement with 45 objections out of 90,000 notices sent).  The Settlement enjoys the overwhelming support of the Class.  As of June 22, 2009, the Long Form of Notice of Class Action Settlement (the "Mailed Notice") had been mailed to over 42,000 TPPs  and was made available on the Internet.  Declaration of Eric P. LaChance in Support of Joint Motion for Final Approval ("LaChance Decl.") at ¶¶ 7-12.  Additionally, by June 11, 2009, the Summary Form of Notice of Class Action Settlement (the "Summary Notice") had been published in periodicals with reaching more than 33,000,000 consumers.  Declaration of Katherine Kinsella ("Kinsella Decl.") at ¶¶ 20-30.   Yet, as of June 29, 2009, there have been only 3 consumer objectors and no TPP objectors.  Heffelfinger Decl. at ¶ 35.  In fact, two of the three objections have since been withdrawn.  *See* Heffelfinger Decl. at Ex. 17.  Accordingly, the reaction from the Class warrants final approval of the Settlement.  *See, e.g.*, *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979) (objections from only 16% of the class was persuasive that the settlement was adequate).

## IV.      THE NOTICE PROGRAM SATISFIES DUE PROCESS

Due process requires that class members be given notice of a proposed settlement and their right to be heard at the fairness hearing.  As one court explained:

> The standard for the adequacy of a settlement notice in a class action under the Due Process Clause or the Federal Rules is measured by reasonableness.  *See Soberal-Perez v. Heckler*, 717 F.2d 36, 43 (2d Cir. 1983); Fed.R.Civ.P. 23(e).  There are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements; the settlement notice must "fairly apprise the prospective members of the class of the terms of the proposed

settlement and of the options that are open to them in connection with the proceedings." *Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982) (internal quotation marks and brackets omitted).   Notice is "adequate if it may be understood by the average class member." 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions*, §11:53, at 167.

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 113-14 (2d Cir. 2005).

A settlement notice is a summary, not a complete source of information.  *See, e.g., Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1153 (8th Cir. 1999); *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 170 (2d Cir. 1987), *cert. denied sub nom. Pinkey v. Dow Chem. Co.*, 484 U.S. 1004 (1988); *Mangone v. First USA Bank*, 206 F.R.D. 222, 233 (S.D. Ill. 2001).  This circuit requires a very general description of the proposed settlement in such a notice.  *See Churchill Village*, 361 F.3d at 575; *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1374 (9th Cir. 1993); *Mendoza v. Tucson School Dist. No. 1*, 623 F.2d 1338, 1351 (9th Cir. 1980), *cert. denied sub nom. Sanchez v. Tuscon Unified Sch. Dist. No. 1*, 450 U.S. 912 (1981).  "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'"  *Churchill Village*, 361 F.3d at 575 (quoting *Mendoza*, 623 F.2d at 1352).

Here, the court-approved forms of notice (the "Notices") and the notice distribution plan (the "Settlement Notice Plan") fulfill the requirements of Rule 23 and due process.  The Notices clearly describe the nature of the Action and the terms of the Settlement.  They also adequately identify the members of the Class and explain, among other things, how to exclude oneself from the Class, how to object to the Settlement, how to obtain copies of papers filed in the Action and how to contact Class counsel.[8]  Additionally, Class members are informed that the

---

[8] The mailed notice provides detailed information regarding the nature of the underlying Action, Plaintiffs' claims, Abbott's defenses, a summary of the Settlement, a summary of the Class members' rights and choices, and sources for additional information about the case and the proposed settlement.  Heffelfinger Decl. at ¶ 32**.**  The Summary Notice provides basic information about the Action and the Settlement, a description of the Class members' rights and choices, and sources for additional information.  *Id.*

1  Notices are only summaries of the Settlement and that the Settlement Agreement is on file with

2  the District Court and available online at www.NorvirClassAction.com.

3       The Notices were also adequately disseminated to the Class.  Approximately 42,000

4  TPPs received the Mailed Notice.  Lachance Decl. at ¶ 11.  With respect to individual

5  consumers, for whom privacy concerns, including federal and state disclosure laws, precluded

6  the execution of a direct mail plan, an extensive nation-wide publication process was

7  implemented.  The Summary Notice was published in local and national periodicals targeted at

8  those in high-risk HIV/AIDS communities as well as major metropolitan areas where a

9  significant number of individuals with HIV/AIDS reside.  Kinsella Decl. at ¶¶ 11-18.  The

10  Summary Notice was published in, among other places, 13 daily newspapers in the top ten

11  metropolitan statistical areas in the United States.  Kinsella Decl. at ¶ 17.

12       The Settlement Notice Plan here -- by first-class mail, publication in print media,

13  including newspapers and periodicals, and publication on the Internet – was published by

14  methods of notice that have been approved by numerous courts.  *See, e.g.,* 5 James Wm. Moore,

15  Moore's Federal Practice ¶¶ 2b.63[8][a], 23.b3 8][b] (3d ed. 2003) at 26.63[8][a], 23.63[8][b];

16  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (holding

17  "[b]ecause defendants do not have a list of potential class members, . . . the court agrees with

18  plaintiffs that notice by publication is the only reasonable method of informing class members

19  of the pending class action and the . . . settlement."); *San Francisco NAACP v. San Francisco*

20  *Unified Sch. Dist.*, No. C-78-1445 WHO, 2001 WL 1922333, at *4-5 (N.D. Cal. Oct. 24, 2001)

21  (notice was translated and published in regional periodicals); *In re Warfarin Sodium Antitrust*

22  *Litig.*, 212 F.R.D. at 252-53 (approving class action notice of settlement where TPPs were

23  contacted by first class mail and consumers were provided with notice by publication of the

24  summary notice in newspapers and magazines); *Henry v. Sears Roebuck & Co.*, No. 98-CV-

25  4110, 1999 WL 33496080, at *4 (N.D. Ill. July 23, 1999) (court directed class action settlement

26

27

28

notice be mailed by first class mail to all class members that could be identified and that the summary notice be published twice in the national edition of *USA Today*).

Given the informative content of the Notices and their comprehensive dissemination under the Settlement Notice Plan, the requirements of Rule 23 and due process have been satisfied.  Accordingly, final approval of the Settlement is appropriate.

## V.    CONCLUSION

The Settlement meets all the requirements for final approval.  The Settlement has the overwhelming support of the Class and is the result of hard-fought and adversarial litigation and negotiations.   Further, the Settlement was negotiated and is supported by counsel who are thoroughly informed on all issues of liability and damages here, and who have extensive experience in litigating and resolving complex antitrust class action suits such as this.  In light of the strengths of the claims, the risk, expense, complexity and duration of continued litigation, the risks associated with class certification, the discovery completed and the stage of the proceedings, the experience and views of counsel, and the positive response of the Class, the Parties request that the Court grant final approval of the Settlement.

Dated:  June 29, 2009                               Respectfully submitted,

**WINSTON & STRAWN LLP**                  **LABATON SUCHAROW LLP**

By:  ____/s/ James F. Hurst_____
     JAMES F. HURST                          By:  ___/s/ Hollis L. Salzman_____
                               HOLLIS L. SALZMAN

James F. Hurst                                  Michael W. Stocker (179083)
Charles P. Klein                                Kellie Lerner (KL-0927)
Samuel S. Park                                  140 Broadway
35 W. Wacker Dr.                                New York, NY 10005
Chicago, IL  60601                              Telephone: (212) 907-0700
Telephone: 312-558-5700                         Facsimile:  (212) 818-0477
Facsimile: 312-558-5600

**Counsel for Abbott Laboratories**             **Co-Lead Class Counsel and Counsel for**
**Plaintiffs Service Employees International**
**Union Health and Welfare Fund and**
**Institutional Class Members**

**BERMAN DEVALERIO PEASE**
**TABACCO BURT & PUCILLO**

By:    /s/ Christopher T. Heffelfinger
        CHRISTOPHER T. HEFFELFINGER

Joseph J. Tabacco, Jr. (75484)
James C. Magid  (233043)
425 California Street, Suite 2100
San Francisco, CA  94104-2205
Telephone: (415) 433-3200
Facsimile:  (415) 433-6382

**Co-Lead Class Counsel and Counsel for**
**Plaintiff John Doe 1 and Individual Class**
**Members**

David S. Nalven
Debra A. Gaw
**HAGENS BERMAN SOBOL**
**SHAPIRO LLP**
One Main Street, 4th Floor
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3033

**Counsel for Plaintiff Service Employees**
**International Union Health and Welfare**
**Fund**

Joseph Lipofsky
Robert S. Schachter
Paul Kleidman
**ZWERLING, SCHACHTER &**
**ZWERLING, LLP**
41 Madison Avenue
New York, NY 10010
Telephone: (212) 223-3900
Facsimile:  (212) 371-5969

**Counsel for Plaintiff Service Employees**
**International Union Health and Welfare**
**Fund**

Richard R. Wiebe
**LAW OFFICE OF RICHARD R. WIEBE**
425 California Street, Suite 2025
San Francisco, CA  94104
Telephone:  (415) 433-3200
Facsimile:  (415) 433-6382

**Counsel for Plaintiff John Doe 1 and**
**Individual Class Members**

### E-FILING SIGNATURE ATTESTATION

I, Christopher T. Heffelfinger, am the ECF User whose ID and password was used to file this JOINT NOTICE OF MOTION, MOTION AND MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT.   In compliance with General Order 45 ¶ X.B., I hereby attest that James F. Hurst and Hollis L. Salzman concurred in this filing.